Michael S. Dowler
Park, Vaughan, Fleming & Dowler LLP
5847 San Felipe, Suite 1700
Houston, TX  77057
Telephone:  713.821.1540
Facsimile:  713.821.1401
Email:  mike@parklegal.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| HOYT A. FLEMING, | ) Case No. 1:12-cv-0066-BLW |
| | ) |
| Plaintiff, | ) |
| | ) PLAINTIFF'S SECOND MOTION FOR |
| v. | ) TERMINATING SANCTIONS DUE TO |
| | ) DEFENDANTS' ADVANCEMENT OF |
| ESCORT INC., ET. AL, | ) MORE FALSE EVIDENCE |
| | ) |
| Defendants. | ) |
| | ) |

## SUMMARY

The Court recently entered an order finding that defense counsel fraudulently disclosed, characterized, and relied on certain source code as the basis for certain of Escort's defenses in this case.  (Dkt. No. 178, Order at pp. 2-12.)  Specifically, the Court found as follows:

> In this case, Escort's counsel represented that ESC17363 operated Escort's accused devices knowing that ESC17363 did not operate any accused device. This false representation was beyond reckless and was made in bad faith because Escort's counsel knew it was not true.  The Court will therefore award attorney fees as sanctions under both § 1927 and the Court's inherent power.  Thus, the court will grant Fleming's motion for sanctions.

(*Id*. at p. 10.)  As the Court found, Escort knowingly advanced false source code in an effort to mislead Mr. Fleming regarding the operation of its accused infringing products and to, thereby, procure a fraudulently-induced verdict.  (*Id*. at p. 9.)

Mr. Fleming recently discovered that Escort's advancement of false evidence was not

limited to ESC17363, but extends to other, subsequently disclosed and produced source code, namely ESC18692.  Specifically, well *after* being caught falsely advancing ESC17363, Escort served (1) a supplemental source code disclosure under Rule 3.4 of the Court's Local Patent Rules and (2) a sworn interrogatory response, both averring that ESC18692 is the source code that controls one of the accused GX65 products.  Not only has Mr. Fleming discovered that ESC18692 does not — and never did — control the operation of that product, Mr. Fleming also has discovered that Escort specifically altered ESC18692 (before producing it to Mr. Fleming) to remove the *exact* functionality Mr. Fleming had told Escort was the source of his infringement contentions for the GX65.  In other words, Escort once again produced false source code, this time faking the GX65 source code in yet another attempt to fraudulently cleanse its infringement and procure a falsely premised jury verdict.

Escort's repeated advancement of false evidence shocks the conscience and has made a mockery of both the judicial system and everything that has transpired in this case since it was filed more than two years ago.  The consequential and monumental waste of time, effort, and money by both Mr. Fleming and this Court, as well as Escort's complete disregard for the integrity of the judicial system, necessitates not only a remedy that rights Escort's wrongs, but causes both Escort and future litigants to take heed that this Court will not tolerate similar behavior.  Indeed, this now is the *second* time that Escort has knowingly advanced false evidence in a fraudulent attempt to procure a falsely premised verdict.  It is difficult even to imagine conduct more reprehensible or deserving of the most severe sanction.

Accordingly, Mr. Fleming requests that this case be terminated in his favor, that he be awarded all damages and remedies sought, that Escort and its counsel be jointly and severally required to pay Mr. Fleming a trebled amount of all of his fees and costs, that defense counsels'

*pro hac vice* appearances be revoked, and that all culpable individuals — against whom additional sanctions and proceedings may be levied — identify themselves.

## BACKGROUND FACTS

The Court is familiar with the important role source code plays in patent cases and its Local Patent Rules requiring the early production thereof.  (Dkt. No. 178, Order at p. 4 ("The Court's Local Rules required Escort to produce the source code that operated the accused devices.").)  As the Court recently made clear, substituting some other source code for the source code that *actually operates* the accused products is sanctionable.  (*Id*. at pp. 9–10 ("All of this could have been avoided if Escort had provided the source code that actually operated the Pro 500 as required by Local Rule 3.4, instead of producing ESC17363 that Escort knew was not being used to operate any accused device.")

As the Court recently found, for well more than one year of this case, every one of Escort's contentions concerning infringement and willful infringement was premised on its sworn citations, references, representations, and assurances that all of its accused products used the source code at ESC17363.  (*Id*. at p. 4 ("The entire manner in which Escort produced ESC17363, and the allegations it made concerning ESC17363, constituted a representation that ESC17363 was the source code operating the [accused products].").)

As the Court also found, all of Escort's citations, references, representations, and assurances were fraudulently made to mislead Mr. Fleming regarding the identity of the actual source code used by the accused products.  (*Id*. at p. 10 ("Escort's counsel represented that ESC17363 operated Escort's accused devices knowing that ESC17363 did not operate any accused device.  This false representation was beyond reckless and was made in bad faith because Escort's counsel knew it was not true.").)

## THE GX65/PRO 500 SOURCE CODE DEBACLE

Months after Escort made its repeatedly false representations about ESC17363, Escort filed a motion seeking to dismiss Mr. Fleming's infringement allegations against the Pro 500 product.  The briefing cycle pertinent to that motion is where many of Escort's falsehoods concerning its source code came to light and began to fall apart.  Thus, understanding the details of the ESC17363/Pro 500 debacle is necessary to understanding the present motion regarding Escort's subsequent and more recent falsehoods regarding ESC18692 and the GX65.

Fortunately, the Court is familiar with the ESC17363/Pro 500 history, which it recently described as follows:

> Escort moved to dismiss Counts One and Two…on the ground that the jury verdict in Fleming I had essentially given Escort a paid-up license covering both past and future use of the patented technology.  The Court agreed with Escort as to the four devices actually litigated in that case, specifically the GX65, Passport 9500i, Passport 9500ix, and Passport iQ devices.  But the Court refused to extend its ruling to devices not litigated in Fleming I.

> Escort responded to that ruling by filing another motion to dismiss, alleging that one of its allegedly infringing devices – the Pro 500, named in both Count One and Count Two -- was identical to the GX65 and is entitled to be dismissed from these two Counts just as the GX65 was dismissed.  Fleming countered by pointing to differences between the two devices.  The Court found issues of fact that precluded dismissal.

> The litigation over that motion is the source of much of the dispute that now occupies the Court.  To demonstrate that the Pro 500 was not the same as the GX65, Fleming compared the source code of the GX65 with the source code that ran the Pro 500 and found thousands of differences.

> Fleming had identified the source code that ran the Pro 500 from, among other material, (1) Escort's First Amended Answer and Counterclaim and (2) Escort's Non-Infringement Contentions.  Escort's First Amended Answer and Counterclaim, filed on March 27, 2013, cites specific lines of source code that incorporate a technique known as "grid matching" that allegedly differentiated Escort's products from Fleming's patented inventions.  *See First Amended Answer and Counterclaim (Dkt. No. 35)* at pp. 15-18.  About a month later – on May 6, 2013 – Escort filed its Non-Infringement Contentions, citing the source code contained in its discovery production at ESC17363 as providing a defense

for all its accused devices.   On that same day, Escort physically produced ESC17363 to Fleming.   The source code lines cited by Escort in its Non-Infringement Contentions were identical to the source code lines cited by Escort as a defense to infringement in its First Amended Answer and Counterclaim.

The Court's Local Rules required Escort to produce the source code that operated the accused devices.   Escort produced ESC17363 as part of its obligation under this Local Rule.   The source code contained in ESC17363 was the only new source code produced by Escort, and the Pro 500 was the only product not previously litigated.   Escort's counsel told Fleming's counsel that all the source code had been produced.   The entire manner in which Escort produced ESC17363, and the allegations it made concerning ESC17363, constituted a representation that ESC17363 was the source code operating the Pro 500.

Yet the source code in ESC17363 was much different from the source code that ran the GX65.   Indeed, the differences were so profound and obvious that Escort's argument to the contrary appeared frivolous at best and fraudulent at worst. Accordingly, Fleming filed a motion for an order to show cause compelling Escort and its declarant – John Kuhn – to appear and explain why they should not be sanctioned for, in Fleming's words, a fraud upon the Court.   That motion was filed on September 5, 2013.

Just over two weeks later – on September 23, 2013 – Escort filed its reply brief to its motion to dismiss and attached another declaration from Kuhn.   He represented – for the first time – that the source code at ESC17363 was not used to run the Pro 500.   *See Kuhn Declaration (Dkt. No. 80-1)* at ¶¶ 11-12.   Escort argued that Fleming's rush to charge Escort with fraud, and his failure to do discovery, led him to mistakenly assume that ESC17363 operated the Pro 500.   Escort argued further that because the Pro 500 was not operated by ESC17363, the differences in source codes were irrelevant.

Escort's argument raised more questions than it answered.   If ESC17363 did not operate the Pro 500, why did Escort disclose it under the Court's Local Rules requiring the production of all source code used to operate the accused devices? Why had Escort represented in its non-infringement contentions that the source code contained in ESC17363 provided a defense for all its accused devices? What source code did operate the Pro 500?   Why had that source code not been disclosed?   If some undisclosed source code operated the Pro 500, why had Escort's counsel earlier represented that he had produced all the source code to Fleming?

Fleming sought answers to these questions from Escort.   Escort responded on September 30, 2013, by providing the source code that actually ran the Pro 500. *See Letter (Dkt. No. 143-28)*.   A few months later, Escort produced Product Compatibility Logs showing the source code used by each of the accused devices. That Log demonstrated that ESC17363 was never used in any commercial version

of Escort's products.

This absence of ESC17363 in the Log directly contradict Escort's earlier representation – discussed above – that the source code in ESC17363 provided a complete defense to Fleming's infringement allegations as to all of Escort's accused devices.

\* \* \* \* \* \* \* \* \* \* \*

Taking Escort at its word, the following is undisputed: (1) In March of 2013, Escort cited specific lines of source code from ESC17363 in its First Amended Answer and Counterclaim as a defense to infringement; (2)  In May of 2013, Escort filed Non-Infringement Contentions – pursuant to Local Rule 3.4 that requires production of the source code operating the accused devices – citing ESC17363 as a defense to infringement and produced a physical copy of the source code to Fleming; (3) Escort's counsel represented to Fleming's counsel that all the source code had been produced; (4) Escort failed to explain in its production of ESC17363 that the source code was not being currently used in any Escort accused device being sold commercially, and that Escort only hoped to use it commercially – or some portion of it – in the future; (5) ESC17363 in its entirety has never been used in any commercially produced Escort product and was only used during tests of the 9500ix product; (6) Some lines of source code contained in ESC17363 eventually were used in commercial products by January of 2014 (and perhaps as early as November of 2013).

\* \* \* \* \* \* \* \* \* \* \*

Escort's production was misleading because it represented that ESC17363 was the current operating source code for the Pro 500 even though Escort was not using ESC17363 in the Pro 500.  At the same time, Escort's counsel represented to Fleming's counsel that all the source code had been produced, when in fact that was not true.  This constitutes misleading conduct by Escort's counsel.

\* \* \* \* \* \* \* \* \* \* \*

In this case, Escort's counsel represented that ESC17363 operated Escort's accused devices knowing that ESC17363 did not operate any accused device. This false representation was beyond reckless and was made in bad faith because Escort's counsel knew it was not true.  The Court will therefore award attorney fees as sanctions under both § 1927 and the Court's inherent power.  Thus, the Court will grant Fleming's motion for sanctions.

(Dkt. No. 178, Order at pp. 2-10.)

As the Court's analysis shows, Escort started this case by falsely swearing that *all* of its

accused products used the source code at ESC17363.  However, when its fraud began to unravel

in connection with its motion to dismiss the Pro 500, Escort was forced to (1) concede that it lied when telling Mr. Fleming (months earlier) that it had produced "all" of its source code and (2) finally produce what it now contends is the real source code for the Pro 500. (*Id*. at p. 5 ("Escort responded on September 30, 2013, by providing the source code that actually ran the Pro 500. *See Letter (Dkt. No. 143-28.)*".)

While Escort's belated production addressed the Pro 500, Mr. Fleming continued to question the veracity of the source code for all the *other* accused products, including the GX65. In that regard, as described in more detail below, Mr. Fleming now has discovered that Escort's falsehoods were not limited to ESC17363 because even *after* Escort was caught falsely disclosing that code, Escort lied again — this time by producing ESC18692 as the source code for the accused GX65.

Undisputed evidence shows that — like ESC17363 — no commercial GX65 ever used the source code Escort produced as ESC18692.  Worse, Mr. Fleming also has discovered that Escort doctored ESC18692 (before producing it to Mr. Fleming) to remove the exact feature in the GX65 that Mr. Fleming had told Escort he was accusing of infringement.  Thus, Escort's fraud with respect to ESC18692 parallels its adjudicated fraud concerning ESC17363 since in both instances Escort knowingly advanced false source code in an effort to launder its infringement and to procure a fraudulently induced jury verdict.

## THE RECENTLY FALSIFIED GX65 SOURCE CODE (ESC18692)

Escort wrongly assumed the circumstances surrounding ESC18692 were so unique and complex that Mr. Fleming would never be able to discover Escort's second instance of source code fraud.

Specifically, on July 19, 2013, Mr. Fleming served his second supplemental infringement contentions, wherein he described how the GX65 infringed his patent claims.  For example, claim 23 in the asserted '905 patent calls for "generating a visual indication based at least in part upon the one of the pointing direction of the radar detector…"  Part of Mr. Fleming's contentions included the photograph below showing the GX65 producing a red arrow (on the left side) that corresponds to the claim's requirement of "generating a visual indication…"  (Exh. 1 at pp. 17-



18.)[1]  To put the timing of these infringement contentions in perspective relative to Escort's first false disclosure of source code (*i.e.,* ESC17363), Mr. Fleming served his infringement contentions on July 19, 2013, and Escort moved to dismiss the Pro 500 nearly one month later on August 15, 2013.  As described above, the motion to dismiss the Pro 500 gave rise to the unraveling of Escort's falsehoods concerning the source code at ESC17363. Indeed, several weeks later, on September 5, 2013, Mr. Fleming filed his motion to show cause (for falsely advancing ESC17363), and on September 30, 2013, Escort for the first time produced the source code that it contends is the real source code for the Pro 500.  (Dkt. No. 178, Order at p. 5.)

Escort's production of the Pro 500 source code was a watershed moment because it confirmed (1) that Escort had repeatedly falsely sworn that all its accused products used ESC17363 and (2) that Escort had further falsely told Mr. Fleming that it had previously produced "all" of its source code.  Thus, now under pressure from Mr. Fleming to produce the real source code for all the *other* accused products, one week later on October 7, 2013 Escort

---

[1] The attached declaration of Hoyt Fleming avers that all Exhibits referenced herein are true and correct copies of those documents.

produced ESC18692.  (Exh. 2.)  Next, on January 17, 2014, Escort supplemented its source code
disclosure pursuant to Local Patent Rule 3.4 to specifically include ESC18692, thereby again
averring that ESC18692 was the source code that ran the accused products.  (Exh. 3.)  Finally, on
May 28, 2014 — more than one month *after* Mr. Fleming had filed his first motion for
terminating sanctions due to Escort's advancement of false evidence relating to ESC17363 —
Escort served an interrogatory response (signed by Mr. Schatz and sworn to by Escort's officer,
Mr. Kuhn) averring that ESC18692 was the source code that demonstrates how the GX65
operates.  (Exh. 4.)[2]  Indeed, the whole point of Mr. Fleming's interrogatory was to confirm
which accused products used which source code, to which Escort and its counsel expressly
identified ESC18692 as the code that demonstrates how the GX65 operates.  (*Id*.)

Just like ESC17363, however, Escort's averments regarding ESC18692 were knowingly
false, and it was only through a lot of work, persistence, and a little luck that Mr. Fleming was
able to uncover the falsehood.  Specifically, when Escort first produced ESC18692, Mr. Fleming
scoured the code for confirming evidence of infringement.  (Exh. 5, Fleming Decl. at ¶ 6.)  This
was no small task because ESC1892 contains 21,331 lines of code and would consume 853
pages if printed to paper.  (*Id*. at ¶ 7.)

What Mr. Fleming discovered from his review was that ESC18692 did not implement the
red arrow (photographed above), which formed the basis of some of his infringement contentions
for the GX65.  (*Id*. at ¶¶ 2-13.)  While it was possible that Escort had designed that feature out of
its products, Mr. Fleming was suspicious in light of Escort's established history of falsifying
ESC17363 and its corresponding averments that it had "redesigned" that code so that none of its

---

[2] Escort's reference to ESC20873 (in its response to Interrogatory No. 13 at p. 3) correlates to the
Product Compatibility Log for the GX65.  Escort's reference to "ESC20873 (revision A)" is to
Revision A of the GX65 listed in the Product Compatibility Log for that product.  (*See infra* at p.
10.)

products infringed.  Indeed, the Court recently commented on that exact scenario:

> What motive would Escort have to produce false source code?  Fleming points out that the source code in ESC17363 uses a "grid matching technique" that Fleming had expressly disclaimed during the reexamination process before the Patent Office.  This is why Escort claimed earlier that ESC17363 provided a complete defense – the source code contained in ESC17363 used a "grid matching technique" that Fleming had represented was not used in his patented inventions.

(Dkt. No. 178, Order at p. 6.)  Knowing that faking the removal of infringing features was Escort's *modus operandi* for this case, Mr. Fleming did two things.

First, Mr. Fleming reviewed the Product Compatibility Log for the GX65, which Escort had finally produced in response to the debacle concerning the Pro 500 and the falsified source code at ESC17363.  (Exh. 5, Fleming Decl. at ¶¶ 2-3.)  As the Court is aware, a Product Compatibility Log is Escort's way of tracking which of its source code corresponds to which of its accused products.  (Dkt. No. 178, Order at p. 5 ("Escort produced Product Compatibility Logs showing the source code used by each of the accused devices.").)  Below is the pertinent portion of the Product Compatibility Log for one of the accused GX65 products.

**Product Compatability Log: GX65 No Ku**
**Document #: 909069-00**

| Revision | Effective Date | ECN/ETN | Serial # Start | Assembly | | Marking | Hardware Board Assembly | Software Main Processors | Audio | Test File MB | Test File RF |
|---|---|---|---|---|---|---|---|---|---|---|---|
| A | 7/17/2013 | ECN2130721 | CP000001 | Receiver | Main | GX65NK-A | 05MGN-5E | 9500i_receiver_v5h.s19 | gx65_voice_v1_5.bin | MB_P500_V5H_A .INI | RF_P500_V5H_A .INI |
| | | | | | Front End | | 05F95E-5D | 31K57v10.s19 | bel_audio_v1_35.hex | MB_P500_V5H_A .MEM | RF_P500_V5H_A .MEM |
| | | | | | | | | gx65_main_v2_46_b6.hex | | | |
| | | | | | | | | gx65_usb_v4_0.hex | | | |
| | | | | GPS | | | 05CG65-5B | gx65_gps_v10_198_b6.hex | | | |
| | | | | Switch | | | | | | | |

(Exh. 6 (emphasis original).)  As shown, Revision A of the GX65 was first released commercially on July 17, 2013, and its main processor executed code with a file name "gx65_main_v2_46_b6.hex".  The parties do not dispute that this nomenclature corresponds to main processor source code Version 2.46.

The first telltale sign of Escort's falsehood is that ESC18692 (*i.e.,* the bates number for

the source code Escort averred ran the GX65) consists of Version 3.46 of the main processor source code, not Version 2.46 as the Log dictates.  (Exh. 5, Fleming Decl. at ¶¶ 2–6.)  Second, six of the twenty electronic files that Escort produced at ESC18692 indicate that they were "last modified" in August 2013.  This is significant because August 2013 is the month *after* Revision A of the GX65 was released in July 2013 and two months *before* ESC18692 was first produced to Mr. Fleming.  (*Id*. at ¶¶ 4–5.)  Thus, according to Escort's own documents: (1) ESC18692 (*i.e.,* Version 3.46) was *never* used in any commercial version of any Escort product, much less the GX65 since that product used Version 2.46; and (2) six of the twenty source code files produced at ESC18692 were modified *after* they were first used with the GX65 and only *then* (*i.e.,* after they were modified) were they produced to Mr. Fleming.  These undisputed facts at least show ESC18692 is *not* the source code that corresponds to Revision A of the GX65, despite all of Escort's numerous averments to the contrary.  Things get worse.

While ESC18692 does not generate the red arrow on the GX65's display during operation, which is one of the features Mr. Fleming accused of infringement, it just so happens that Mr. Fleming owns a Revision A, GX65 radar detector.[3]  (Exh. 5, Fleming Decl. at ¶¶ 8–11.)  Mr. Fleming took that radar detector and operated it in his car.  (*Id*.  at ¶ 11.)  Below is a



photograph of that device hanging from his windshield in Boise, Idaho and displaying the red arrow Escort would have everyone believe is not generated by the source code (ESC18692) that Escort swears runs that product.  (*Id*. at ¶ 11.)

---

[3] Escort likely believed that Mr. Fleming would never be able to acquire a GX65, Revision A since that product has been discontinued and Escort has refused to produce any physical devices to Mr. Fleming.

So there is no doubt that this device is the GX65 precisely as described in Escort's Product Compatibility Log and that Escort repeatedly swore used ESC18692, shown below is a photograph of the circuit board of the GX65 Mr. Fleming tested. (*Id*. at ¶ 9.)



As shown, the circuit board bears a label designating it as a "GX65NK-A", which the parties do not dispute correlates exactly to Revision A of the GX65 identified in Escort's Product Compatibility Log. (*Id*. at ¶ 10; *see also* Exh. 6 in the "Marking" column.)

Accordingly, all of the evidence expressly refutes Escort's (and counsels') repeated averments that ESC18692 is the source code that operates the GX65. It does so by establishing that: (1) ESC18692 was *never* used in any commercial version of any Escort product, much less Revision A of the GX65; (2) ESC18692 was modified *after* the real source code for the GX65 was used (commercially) for that product; (3) at least one of the modifications made to ESC18692 removed the exact functionality Mr. Fleming is accusing of infringement; (4) only after those modifications were made was ESC18692 produced to Mr. Fleming; and (5) the GX65 does not operate in accordance with ESC18692 and, in fact, operates exactly as Mr. Fleming originally accused it of infringement.

Escort's efforts to procure a falsely premised verdict by passing off ESC18692 as non-

infringing code for the infringing code actually used by the GX65 is a fraud whose evils are matched only by Escort's effort to perpetuate the fraud through knowingly false Local Patent Rule disclosures and knowingly false interrogatory responses.  Indeed, the above facts beg the identical questions the Court asked in its previous order sanctioning Escort's counsel the first time they advanced false evidence:

> [W]hy did Escort disclose [ESC18692] under the Court's Local Rules requiring the production of all source code used to operate the accused products?...What source code did operate the [GX65]?  Why had that source code not been disclosed?

(Dkt. No. 178, Order at p. 5.)  As the Court also previously stated: "[a]ll of this could have been avoided if Escort had provided the source code that actually operated the [GX65] as required by Local Rule 3.4, instead of producing [ESC18692] that Escort knew was not being used to operate any accused device."  (*Id.* at pp. 9–10.)

## THE LAW

There are three separate bases for imposing sanctions in these circumstances: (1) 28 U.S.C. § 1927; (2) Idaho Rule of Professional Conduct 3.3; and (3) the Court's inherent powers.  This District has considered and applied each of these in similar, albeit less sever, circumstances.  *See Gibson v. Credit Suisse AG,* Case No.: CV 10-1-EJL-REB (Dist. Idaho March 29, 2013) (awarding sanctions) (attached as Exh. 7).

Under 28 U.S.C. § 1927, "[a]ny attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."  28 U.S.C. § 1927.  *See Gadda v. Ashcroft,* 377 F.3d 934, 943 n. 4 (9th Cir. 2004).  Under this statute, "a finding that the attorney recklessly or intentionally misled the court is sufficient to impose sanctions under [28 U.S.C.] § 1927…"  *In re Girardi,* 611 F.3d 1027, 1061 (9th Cir. 2010).

Idaho Rule of Professional Conduct 3.3(a)(1) provides that a lawyer shall not knowingly "make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer."  IRPC 3.3(a)(1); *see also, Girardi*, 611 F.3d at 1035.  Given a "lawyer's obligation as an officer of the court to prevent the trier of fact from being misled by false evidence" (*see* IRCP 3.3, cmt. 5), when previously-offered materials turn out to be false/misleading, a lawyer's "duty of candor to the tribunal" warrants "reasonable remedial measures" (*see* IRCP 3.3, cmt. 10).

Finally, "[d]istrict courts have the inherent power to sanction a lawyer for a 'full range of litigation abuses.'"  *Evon v. Law Offices of Sidney Mickell,* 688 F.3d 1015, 1035 (9th Cir. 2012).  While a district court's authority to impose sanctions under its inherent powers is broad, it is not limitless.  "Before awarding sanctions under its inherent powers…the court must make an explicit finding that counsel's conduct 'constituted or was tantamount to bad faith.'"  *Primus Auto. Fin. Servs., Inc. v. Batarse,* 115 F.3d 644, 648 (9th Cir. 1997); *Braunstein v. Arizona Dept. of Transp.,* 683 F.3d 1177, 1189 (9th Cir. 2012).  A finding of bad faith may be appropriate when, among other things, a party engages in behavior that has the effect of "delaying or disrupting the litigation or hampering enforcement of a court order."  *Id*. at 649.

## THE SANCTION

There can be no dispute that at least Mr. Schatz's, Mr. Ahren's, Mr. Kuhn's, and Escort's repeated, knowing advancement of false evidence constitutes one of the most egregious attacks imaginable on the integrity of this Court, this case, and the adversarial process in general.  Nor can it be disputed that this false evidence has irrevocably infected the entirety of this case since its inception.  Nearly all of Mr. Fleming's work, strategy, and case development over the two years this case has been pending has been irreparably affected and, effectively, rendered for

naught in light of the false evidence advanced.  Indeed, this case is so soiled by the false evidence that the only remedy short of dismissal would be to start the case over with new pleadings, discovery, and disclosures.  No innocent litigant should be subjected to the delay, cost, and harm associated with a "do-over".  Instead, only the responsible party should suffer whatever harms are associated with the consequences of its actions.

Accordingly, both monetary and non-monetary sanctions are appropriate in these circumstances where Escort (and defense counsel) have been caught once *again* advancing false evidence with the intent of procuring a fraudulently induced jury verdict.  In particular, Mr. Fleming requests that this case be terminated in his favor, that he be awarded all damages and remedies sought, that Escort and its counsel be jointly and severally required to pay Mr. Fleming a trebled amount of all his fees and costs, and that defense counsels' *pro hac vice* appearances be revoked.  *See Leon v. IDX,* 464 F.3d at 958 (9th Cir. 2006) (the non-monetary sanction of dismissal "is an available sanction when 'a party has engaged deliberately in deceptive practices that undermine the integrity of judicial proceedings' because 'courts have inherent power to dismiss an action when a party has willfully deceived the court and engaged in conduct utterly inconsistent with the orderly administration of justice.'"); *Tesco Corp. v. Weatherford Int'l.,* Civil Action No. H-08-2531 (S.D. Tex. August 25, 2014) (dismissing case due to counsel's false statements) (attached as Exh. 8).

## THE PEOPLE INVOLVED

These are serious allegations and, as such, Mr. Fleming has been careful about making allegations only against those individuals who were identifiably, culpably involved.  There may be others, however, and they should not be allowed to avoid scrutiny by virtue of operating in the shadows.  Accordingly, as this Court ordered in *Gibson*, Mr. Fleming further requests an order

15

compelling (1) Messrs. Schatz, Ahrens, and Kuhn to serve the Court's order on each involved individual and (2) for each individual to file a motion explaining his/her involvement, or lack thereof, in the creation or advancement of false evidence as set forth herein.  *Gibson,* Case No.: CV 10-1-EJL-REB (Dist. Idaho March 29, 2013) at pp. 12-13 (attached as Exh. 7) ("To the extent any one of Plaintiff's remaining counsel believes that he should not be subject to the Memorandum Decision and Order, he is to file a motion seeking relief from the same on or before April 12, 2013, detailing the good cause for said relief.").

## CONCLUSION

For the foregoing reasons, Mr. Fleming respectfully requests that the Court grant this motion.

October 15, 2014                    Respectfully Submitted

                                    _____/s/_____
                                    Michael S. Dowler
                                    Park, Vaughan, Fleming & Dowler, LLP
                                    5847 San Felipe, Suite 1700
                                    Houston, TX 77057
                                    (713) 821-1540
                                    (713) 821-1401 (facsimile)

                                    Attorneys for Plaintiff Hoyt A. Fleming

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on the 15th day of October 2014, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing. To the extent any of the foregoing was filed under seal, each of the following parties or counsel was served by email.

| | |
|---|---|
| Gregory F. Ahrens<br>Wood, Herron & Evans, L.L.P.<br>441 Vine Street, 2700 Carew Tower<br>Cincinnati, Ohio 45202-2917 | Bryce J. Yoder<br>Keating Muething & Klekamp PLL<br>One East 4th Street, Suite 1400<br>Cincinnati, OH 45202 |
| Brett A. Schatz<br>Wood, Herron & Evans, L.L.P.<br>441 Vine Street, 2700 Carew Tower<br>Cincinnati, Ohio 45202-2917 | Rachael A Rowe<br>Keating Muething & Klekamp PLL<br>One East 4th Street, Suite 1400<br>Cincinnati, OH 45202 |
| Bradlee R. Frazer<br>Hawley Troxell Ennis & Hawley LLP<br>877 Main Street, Suite 1000<br>Boise, ID 83702 | Keely E. Duke<br>Duke Scanlan Hall PLLC<br>1087 W. River Street, Suite 300<br>Boise, ID 83702 |
| Steven F. Schossberger<br>Hawley Troxell Ennis & Hawley LLP<br>877 Main Street, Suite 1000<br>Boise, ID 83702 | Robert B. White<br>Givens Pursley LLP<br>601 West Bannock Street<br>Boise, ID 83702 |
| Brian P. Muething<br>Keating Muething & Klekamp PLL<br>One East 4th Street, Suite 1400<br>Cincinnati, OH 45202 | Terry C. Copple<br>Davidson, Copple, Copple & Copple<br>199 N Capitol Blvd., Ste. 600<br>Boise, ID 83702 |

/s/
Michael S. Dowler