Michael S. Dowler
PARK VAUGHAN FLEMING & DOWLER LLP
5847 San Felipe, Suite 1700
Houston, TX  77057
Telephone:  713.821.1540
Facsimile:  713.821.1401
Email:  mike@parklegal.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| HOYT A. FLEMING, <br><br> Plaintiff, <br> v. <br><br> ESCORT, INC., ET. AL, <br><br> Defendants. | Case No. 1:12-cv-0066-BLW <br><br> PLAINTIFF'S MOTION TO COMPEL AND FOR SANCTIONS |

Plaintiff, Hoyt A. Fleming ("Mr. Fleming"), respectfully requests an order compelling defendants Escort, Inc. and Beltronics USA, Inc. (collectively "Escort") to produce the code <u>actually used</u> by each of its accused infringing products, as required by Dist. Idaho Loc. Patent R. 3.4(a).  Escort's violation of the Court's Rules is so blatant and its dealings with Mr. Fleming on the issue have been so vexatious that Mr. Fleming also requests that the Court sanction Escort for its actions.

**FACTUAL BACKGROUND**

Mr. Fleming filed this case on February 13, 2012 (Dkt. No. 2), and he served his infringement contentions pursuant to Dist. Idaho Loc. Patent R. 3.1 on August 6, 2012 (Exh. 1). Mr. Fleming's infringement contentions identified the following five accused infringing products: the Passport 9500i, the Passport 9500ix, the Passport iQ, the GX65, and the Pro 500. (*Id*. at p. 2.)  Because the Court's Rules require a motion permitting amendments to a party's

infringement contentions, Mr. Fleming filed a motion to add the (then) newly released Passport Max to the case on August 22, 2013 (Dkt. No. 66) and the (then) newly released Passport Max2 on October 10, 2014 (Dkt. No. 181). The Court granted Mr. Fleming's motions on March 12, 2014 (Dkt. No. 138, Order at pp. 4-5 (adding the Max)) and December 8, 2014 (Dkt. No. 194 (adding the Max2)). Thus, the seven products currently at issue in the case are: the Passport 9500i, the Passport 9500ix, the Passport iQ, the GX65, the Pro 500, the Passport Max, and the Passport Max2.

Each accused product contains one or more microprocessors whose internal code controls the operation of the microprocessor and, therefore, the operation of the product itself. As a consequence, a product's code often is the best evidence of infringement in a patent case. Indeed, as the Court may recall, trial of the parties' first case involved extensive testimony regarding the accused products' code.

The Court's Local Patent Rules confirm the importance of an accused product's code by requiring—in all patent cases—that the defendant produce the code for each accused product, and that the defendant further identify the produced code by production number. (Dist. Idaho Loc. Patent R. 3.4(a).) Specifically, Rule 3.4 states:

> With the "Invalidity Contentions," the party opposing a claim of patent infringement shall produce or make available for inspection and copying:
>
> (a)   Source code, specifications, schematics, flow charts, artwork, formulas, or other documentation sufficient to show the operation of any aspects or elements of an Accused Instrumentality identified by the patent claimant in its [infringement contentions].
>
> \* \* \* \* \* \* \* \* \* \*
>
> The producing party shall separately identify by production number which documents correspond to each category.

This production and identification of code is to be made independent of the parties' discovery

requests. (Dist. Idaho Loc. Patent R. 2.5.) Indeed, the Northern District of California (from which this Court's Local Patent Rules were adopted) has characterized the Patent Rules as a vehicle for hastening resolution of cases on their merits. *See e.g., Shared Memory Graphics LLC v. Apple, Inc.,* 812 F.Supp.2d 1022 (N.D. Cal. 2010). This Court—in this case no less—similarly acknowledged the requirement of Rule 3.4 when commenting: "[t]he Court's Local Rules required Escort to produce the source code that operated the accused devices". (Dkt. No. 178, Order at p. 4; *see also id.* at pp. 9-10 ("All of this could have been avoided if Escort had provided the source code that actually operated the Pro 500 as required by Local Rule 3.4(a), instead of producing ESC17363 that Escort knew was not being used to operate any accused device.").)

Despite Escort's obligation under the Court's Rules to have identified and produced its actual code years ago, Escort still refuses to do so. Mr. Fleming has written dozens of letters to Escort about the matter, all of which Escort has avoided, evaded, and refused to deal with in good faith. Moreover, the Court already found that Escort knowingly produced false source code in this case at ESC17363.

> In this case, Escort's counsel represented that ESC17363 operated Escort's accused devices knowing that ESC17363 did not operate any accused device. This false representation was beyond reckless and was made in bad faith because Escort's counsel knew it was not true. The Court will therefore award attorney fees as sanctions under both § 1927 and the Court's inherent power.

(*Id*. at p. 10.) Despite the Court's sanction, Escort *still* refuses to produce all the code <u>actually used</u> by each accused product or to identify that code by separate bates number as required by the Court's Local Rules. Escort vexatious approach has become so severe that Mr. Fleming was forced to file this motion.

### ESCORT'S EXCUSES

Escort's excuses for refusing to produce and identify (by bates number) all the code

3

actually used by its accused products have varied from making knowingly false disclosures of code (as the Court found) to completely illogical and vexatious efforts to avoid the issue in hopes that Mr. Fleming would eventually give up under the financial strain purposefully inflicted by Escort's vexatious approach. The reasons behind Escort's litigation misconduct are simple.

As the Court previously found, Escort produced code early in the case and swore that code operated all of Escort's accused products and formed the basis for all of its non-infringement defenses. (Dkt. No. 178, Order at p. 3 ("About a month later – on May 6, 2013 – Escort filed its Non-Infringement Contentions, citing the source code contained in its discovery production at ESC17363 as providing a defense for all its accused devices.").) Mr. Fleming subsequently discovered, as the Court ultimately found, that the code Escort produced (ESC17363) was not the code that operated Escort's accused products, and that Escort's representation to the contrary "was beyond reckless and was made in bad faith because Escort's counsel knew it was not true". (*Id*. at p. 10.)

The Court's fraud finding and corresponding sanction did not deter Escort one bit because Mr. Fleming subsequently discovered that Escort produced other code (*i.e.,* code other than ESC17363) that it had similarly, knowingly falsely advanced. Mr. Fleming recently filed a second motion for terminating sanctions in connection what that false code. (*See* Dkt. No. 182, Plaintiff's Second Motion for Terminating Sanctions Due to Defendants' Advancement of More False Evidence.) The Court has not yet ruled on that motion.

In light of Escort's repeated, knowing advancement of false evidence, the parties have come to a point where (1) Mr. Fleming has realized he cannot trust any of the code defendants have produced and (2) Escort has realized that any "real" code it subsequently produces will serve only as proof that its prior productions were equally fake and advanced only as additional,

yet-to-be-adjudicated attempts to procure a falsely-premised verdict. Thus, Escort has resorted to stonewalling the Court's Local Rule requirements and Mr. Fleming's associated efforts at getting Escort to produce and identify (by bates number) the *actual* code used by each accused product.

## THE ACTUAL CODE USED BY THE ACCUSED PRODUCTS

Mr. Fleming seeks production of nothing less than (1) the binary code file *actually* loaded into each revision of each accused product, (2) the source code and project files that were *actually* compiled to generate that binary code file, and (3) an identification of those source code files, project files, and binary code files using separate bates numbers to identify each separate file. So there is no confusion about what files should be produced, the following description illustrates the nomenclature used in a code design process.

As shown by the diagram below, a product designer writes "source code" in a human-readable programming language.



Because microprocessors only operate on machine-readable code, the human-readable source code must be translated into machine-readable "binary code". The process of translating (human-readable) source code files into (machine-readable) binary code files is performed by a

"compiler/linker".[1] Specifically, the compiler/linker receives one or more source code files and certain other "project files" (also created by the designer), compiles the files, and outputs a corresponding (machine-readable) binary code file. This binary code file is then loaded into a product's memory, from which the product's microprocessor fetches it for execution and, thus, causes the product to operate as the designer intended.

As shown, there is a tight interrelatedness between source code files, project files, and binary code files that makes each file critical to this case. For example, while binary code files are not human-readable, it has value in terms of proving the authenticity of its corresponding human-readable source code files. For example, if there are questions about the authenticity of a source code file (as there are in this case), that source code file (and its associated project files) can be compiled to produce a binary file. That resulting binary file then can be electronically compared to the binary file *actually* used by the accused product. If there are differences between the two binary files, the source code file irrefutably was *not* the source code file that was compiled to form the binary file that was actually used in the accused product. In other words, the source code file is not authentic.

None of this is controversial and, in fact, Escort provided a similar explanation of source code, binary code, and project files in its opposition to Mr. Fleming's second motion for terminating sanctions. (*See* Dkt. No. 182, Opp. Br. at pp. 2-5.) Thus, the files that Escort must produce in this case for each revision of each accused product are: (1) the binary code file *actually* loaded into each revision of each accused product and (2) the source code and project files that were *actually* compiled to generate that binary code file. It is that simple and easy.

---

[1] The "compiler/linker" is an off-the-shelf program specifically designed to compile source code (and its associated project files) into machine-readable binary code.

## THE BINARY CODE ESCORT REFUSES TO PRODUCE/IDENTIFY

Though a tortured effort, Escort finally produced a "Product Compatibility Log" for each of the accused infringing products. (Exh. 2.) A "Product Compatibility Log" is a document that identifies which version of binary code was installed in which product and over what period of time. Such logs are necessary because manufactures often change a product's code over time in order to fix "bugs" and/or otherwise improve the operation of subsequent generations of their products, and it is important to document which code correlates to which product over which period of time.

For example, listed below is a portion of the Product Compatibility Log for the accused GX65 radar detector.

**Product Compatability Log: GX65**
**Document #: 909013-00**

| | | | | Hardware | | | Software | | Test File | |
|---|---|---|---|---|---|---|---|---|---|---|
| Revision | Effective Date | ECN/ETN | Serial # Start | Assembly | | Marking | Board Assembly | Main Processors | Audio | MB | RF |
| A | 8/28/2008 | ETN 0908120 | BG000001 | Receiver | Main | GX65-A | 05MG65-5C | 9500i_receiver_v5b.s19 | gx65_voice_v1_4.bin | MB_9500_C.INI | RF_9500_C.INI |
| | | | | | Front End | | 05F950-5D | 31K75v10.s19 | bel_audio_v1_34.hex | MB_9500_C.MEM | RF_9500_C.MEM |
| | | | | | | | | gx65_main_v1_24_b6.hex | | | |
| | | | | | | | | gx65_usb_v1_7.hex | | | |
| | | | | GPS Switch | | | 05CG65-5B | gx65_gps_v6_110_b6.hex | | | |
| B | 4/3/2009 | ETN 0409105 | BG004451 | Receiver | Main | GX65-B | 05MG65-5C | 9500i_receiver_v5g.s19 | gx65_voice_v1_4.bin | MB_GX65_D.INI | RF_GX65_D.INI |
| | | ECN 081202 | | | Front End | | 05F950-5D | 31K75v10.s19 | bel_audio_v1_34.hex | MB_GX65_D.MEM | RF_GX65_D.MEM |
| | | | | | | | | gx65_main_v1_25_b6.hex | | | |
| | | | | | | | | gx65_usb_v1_7.hex | | | |
| | | | | GPS Switch | | | 05CG65-5B | gx65_gps_v6_116_b6.hex | | | |

(Exh. 3, GX65 Product Compatibility Log (emphasis original).) This portion of the log shows, among other things, that Revision A of the GX65 started on August 28, 2008, and that the binary code running on the GPS processor in that product has a file name "gx65_gps_v6_110_b6.hex". (*Id.*) The Log also shows that Revision B of the GX65 was released on April 3, 2009, and that its GPS processor code had been changed (from that in Revision A) and now has a file name "gx65_gps_v6_116_b6.hex". Thus, if one wanted to prove that the GX65 product manufactured

7

by defendants over the period August 28, 2008 to April 2, 2009 infringed, the source code files (and corresponding project files) that were compiled to produce gx65_gps_v6_110_b6.hex (for Revision A) would need to be analyzed.

Despite the simplicity of this analysis, Escort first steadfastly refused to produce and identify (using separate bates numbers) all the binary files identified in the accused products' Product Compatibility Log.  After numerous letters from Mr. Fleming explaining the problem, Escort finally agreed to produce the binary files, but it would *only* agree to produce them for limited inspection in Cincinnati, Ohio.  (Exh. 4.)  In other words, contrary to all the other code in the case that Escort has physically produced to Mr. Fleming and publicly introduced into evidence during trial of the parties' first case, Escort would only permit Mr. Fleming to fly from Boise (and his counsel from Houston) to Cincinnati to inspect the binary code files at a location and timing of Escort's choosing.  (*Id*.)  Escort's vexatious approach obviously was designed to obstruct Mr. Fleming's access to the binary code files and the development of his case, but Escort gambled that Mr. Fleming would not have the time, ability, or financial wherewithal to raise the issue with the Court.

After numerous additional letters from Mr. Fleming, and after the Court caught and sanctioned Escort for producing false source code, Mr. Fleming asked Escort to reconsider its position and to finally physically produce the binary code files to him and his counsel as it had done with all the other code in the case.  This time Escort relented and agreed to produce the binary code files to Mr. Fleming.  (Exh. 5.)

However, when Escort finally produced the binary code, it made sure to produce it so that it was impossible for Mr. Fleming to identify whether all the code had been produced and which code corresponded to which product.  Specifically, Escort buried the files in more than one

gigabyte of hundreds of other disparate files. Likewise, Escort produced the more than one gigabyte of hundreds of files using a *single* bates number—ESC022562. Despite still more letters from Mr. Fleming, Escort refused to sort out the mess in a manner that would enable Mr. Fleming to identify which binary code had been produced and which binary code file corresponded to which accused product. (Exh. 6.)

## THE SOURCE CODE AND PROJECT FILES ESCORT REFUSES TO PRODUCE/IDENTIFY

Escort's Product Compatibility Logs identify (by file name) the binary code associated with each accused product. As described above, while we know the file names of that binary code, Escort made sure—through the vexatious way in which it produced its files—that Mr. Fleming would be unable to identify whether all the files have been produced, whether the files are authentic, and which file corresponds to which product. Instead, Escort jumbled hundreds of disparate files in more than one gigabyte of data and marked all of it using a single bates number. (Exh. 6.)

Unfortunately, but not surprisingly, Escort's production of its corresponding source code and project files is even worse. Specifically, Escort has refused to produce all of its actual source code and all of its actual corresponding project files, and it has refused to identify (using separate bates numbers) which files correspond to which accused product. In sum, Escort has done everything in its power to either resist and/or obscure its production of all the critical files expressly called for by the Court's Local Patent Rules.

## THE PROPOSED CURE

The remedy to this mess is not difficult and can be cured by a simple Court order. As the Court's Local Patent Rules require, Mr. Fleming requests an order compelling Escort to fill in the chart below by doing two things.

9

First, Mr. Fleming requests an order compelling Escort to use *separate* bates numbers to identify the *actual* binary code file loaded into the main processor and the *actual* binary code file loaded into the GPS processor of each revision of each accused product.  If Escort does not possess the *actual* file (*e.g.,* because it has been spoliated), it must say so.  Second, Mr. Fleming requests an order compelling Escort to use *separate* bates numbers to identify the source code files and project files that were *actually* used to compile—and thereby create—each previously identified binary code file.  If Escort does not possess the *actual* source code files and project files (*e.g.,* because one has been spoliated), it must say so.

| Accused Product | Processor | Binary Code Bates Number | Source Code Bates Number | Project Files Bates Number |
|---|---|---|---|---|
| 9500ix Revision S | Main | | | |
| | GPS | | | |
| 9500ix Revision T | Main | | | |
| | GPS | | | |
| 9500ix Revision U | Main | | | |
| | GPS | | | |
| 9500ix Revision V | Main | | | |
| | GPS | | | |
| 9500ix Revision W | Main | | | |
| | GPS | | | |
| 9500ix Revision Y | Main | | | |
| | GPS | | | |
| 9500ix Revision Z | Main | | | |
| | GPS | | | |
| Pro500 Revision A | Main | | | |
| | GPS | | | |
| Pro500 Revision B | Main | | | |
| | GPS | | | |
| Pro500 Revision C | Main | | | |
| | GPS | | | |
| GX65 Revision J | Main | | | |
| | GPS | | | |
| GX65 Revision K | Main | | | |
| | GPS | | | |
| GX65 Revision L | Main | | | |
| | GPS | | | |
| GX65 | Main | | | |

| Accused Product | Processor | Binary Code Bates Number | Source Code Bates Number | Project Files Bates Number |
|---|---|---|---|---|
| Revision M | GPS | | | |
| GX65 (No Ku) Revision A | Main | | | |
| | GPS | | | |
| GX65 (No Ku) Revision B | Main | | | |
| | GPS | | | |
| Passport IQ Revision E | Main | | | |
| | GPS | | | |
| Passport IQ Revision F | Main | | | |
| | GPS | | | |
| Passport Max Revision B | Main | | | |
| Passport Max Revision C | Main | | | |
| Passport Max Revision D | Main | | | |
| Passport Max Revision E | Main | | | |
| Passport Max Revision F | Main | | | |
| Passport Max Revision G | Main | | | |
| Passport Max Revision H | Main | | | |
| Passport Max Revision I | Main | | | |
| Passport Max2 Revision B | Main | | | |
| Passport Max2 Revision C | Main | | | |

Mr. Fleming also requests an order compelling Escort to verify the accuracy of its answers by a sworn affirmation from one of its officers.

The wording of the Court's order should be as specifically set forth above. As the Court previously found, Escort has played bait-and-switch games throughout this case by attempting to produce alleged test code that was never *actually* used for any of the accused products as commercially sold. (Dkt. No. 178, Order at pp. 9-10 ("All of [Escort's misleading conduct] could have been avoided if Escort had provided the source code that actually operated the Pro

11

500 as required by Local Rule 3.4(a), instead of producing ESC17363 that Escort knew was not being used to operate any accused device.").) Escort also has sought to convince Mr. Fleming to use other code files not actually used in or for the accused products so long as (1) certain unidentified lines of the produced code were used in its commercial/accused products or (2) the produced code is supposedly "sufficient" (in Escort's mind) to show the operation of its accused products, despite that code never being commercially used in those products. These nonsensical substitutes for the actual, real code should cease, and Escort should be ordered to fill in the above chart exactly as specified.

## **SANCTIONS SHOULD BE AWARDED**

The Court has sanctioned Escort for 19 separate occasions of vexatious or other litigation misconduct. Specifically, after the parties' first trial, the Court held as follows:

> In the present case, there is clear and convincing evidence that Escort's counsel pursued a strategy in this litigation that vexatiously increased the fees incurred by Fleming. There were numerous discovery disputes caused by Escort's meritless refusals to turn over discoverable information. Escort forced further litigation over its unsuccessful attempt to add 286 new patent invalidity contentions over 18 months after the deadline for those to be exchanged. On another occasion, Escort vehemently objected to turning over sensitive trade secrets in discovery only to later allow those same "secrets" to be publically disclosed at trial.
>
> This is just a small sample of Escort's vexatious conduct.

(*Fleming v. Escort Inc., et al.,* Case No. 1:09-cv-105-BLW, Order at Dkt. No. 376, pp. 3-4; *see also id.* at pp. 15-17 (sanctioning Escort for willfully violating a court order); *id*. at Dkt. No. 416, Order, p. 2.) These sanctions amounted to $129,483.85 payable to Mr. Fleming. (*Id*. at Dkt. No. 417, Amended Judgment.)

More recently, the court found that Escort knowingly advanced false code and engaged in a pattern of abuse in connection with 17 briefs Mr. Fleming was forced to file in response to Escort's litigation misconduct in the present case. Specifically, the court held as follows:

> In this case, Escort's counsel represented that ESC17363 operated Escort's accused devices knowing that ESC17363 did not operate any accused device. This false representation was beyond reckless and was made in bad faith because Escort's counsel knew it was not true. The Court will therefore award attorney fees as sanctions under both § 1927 and the Court's inherent power.
>
> * * * * * * * * *
>
> Despite the Court's ruling granting the motion for sanctions only in part and denying the motion for an order to show cause, Fleming filed both motions in a reasonable attempt to hold Escort to account for the misleading way it produced ESC17363. Thus, Escort's vexatious conduct caused Fleming and this Court to waste time resolving these matters. Accordingly, the Court will direct Fleming's counsel to provide a petition for the fees and costs he incurred in filing the following [17 briefs].

(Dkt. No. 178, Order at pp. 10-11.) Mr. Fleming subsequently filed his fee petition. While Escort disputes the full range of Mr. Fleming's fees, it does not dispute that Mr. Fleming is owed at least $235,768.50. (Dkt. No. 184, Opp. Br.) Thus, between the parties' two cases, the Court has ordered or Escort has acknowledged $365,252.35 in sanctions.

Despite these sanctions, Escort's litigation misconduct has not waned. It is so easy for Escort to simply identify by bates number which actual code file corresponds to which accused product (as required by the Court's Local Patent Rules) that the only explanation for Escort's refusal to do so is that it either (1) does not possess the actual code and does not want to admit it, (2) possesses the code but knows that producing it will reveal more prior instances of fraudulently advanced false code, or (3) would prefer to delay, obstruct, obscure, and bend the Rules so much that it either forces Mr. Fleming to give up or incur the cost and expense of filing this motion.

Mr. Fleming submits that Escort's abuse must stop. Escort's reading of the Court's Rules is indefensible and its litigation behavior is vexatiously designed to delay, obscure, obstruct, and increase the litigation costs of an individual litigant who Escort believes will have to buckle under the weight of a better-financed corporate defendant if Escort continues its abuse.

13

Accordingly, Mr. Fleming requests that the Court sanction Escort in the form of three times Mr. Fleming's reasonable fees incurred in making this motion so as to reimburse Mr. Fleming and to deter similar abuse by Escort in the future.

December 9, 2014                            Respectfully Submitted

                                                        /s/
                                      Michael S. Dowler
                                      Park, Vaughan, Fleming & Dowler, LLP
                                      5847 San Felipe, Suite 1700
                                      Houston, TX 77057
                                      (713) 821-1540
                                      (713) 821-1401 (facsimile)
                                      Attorneys for Plaintiff Hoyt A. Fleming

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on the 9th day of December 2014, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing. To the extent any of the foregoing was filed under seal, each of the following parties or counsel was served by email.

| | |
|---|---|
| Gregory F. Ahrens<br>Wood, Herron & Evans, L.L.P.<br>441 Vine Street, 2700 Carew Tower<br>Cincinnati, Ohio 45202-2917<br><br>Brett A. Schatz<br>Wood, Herron & Evans, L.L.P.<br>441 Vine Street, 2700 Carew Tower<br>Cincinnati, Ohio 45202-2917<br><br>Bradlee R. Frazer<br>Hawley Troxell Ennis & Hawley LLP<br>877 Main Street, Suite 1000<br>Boise, ID 83702<br><br>Steven F. Schossberger<br>Hawley Troxell Ennis & Hawley LLP<br>877 Main Street, Suite 1000<br>Boise, ID 83702<br><br>Brian P. Muething<br>Keating Muething & Klekamp PLL<br>One East 4th Street, Suite 1400<br>Cincinnati, OH 45202 | Bryce J. Yoder<br>Keating Muething & Klekamp PLL<br>One East 4th Street, Suite 1400<br>Cincinnati, OH 45202<br><br>Rachael A Rowe<br>Keating Muething & Klekamp PLL<br>One East 4th Street, Suite 1400<br>Cincinnati, OH 45202<br><br>Keely E. Duke<br>Duke Scanlan Hall PLLC<br>1087 W. River Street, Suite 300<br>Boise, ID 83702<br><br>Robert B. White<br>Givens Pursley LLP<br>601 West Bannock Street<br>Boise, ID 83702<br><br>Terry C. Copple<br>Davidson, Copple, Copple & Copple<br>199 N Capitol Blvd., Ste. 600<br>Boise, ID 83702 |

/s/
Michael S. Dowler