Michael S. Dowler
Park, Vaughan, Fleming & Dowler LLP
5847 San Felipe, Suite 1700
Houston, TX  77057
Telephone:  713.821.1540
Facsimile:  713.821.1401
Email:  mike@parklegal.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| HOYT A. FLEMING,<br><br>            Plaintiff,<br>v.<br><br>ESCORT INC., ET. AL,<br><br>            Defendants. | Case No. 1:12-cv-0066-BLW<br><br>PLAINTIFF'S REPLY IN SUPPORT OF HIS SECOND MOTION FOR TERMINATING SANCTIONS DUE TO DEFENDANTS' ADVANCEMENT OF MORE FALSE EVIDENCE (DKT. NO. 182) |

Escort's opposition acknowledges that Escort—after being caught and sanctioned a first time for advancing false evidence—has *again* advanced *more* false evidence in a *second* attempt to procure a fraudulently-induced jury verdict. Escort's repeated fraud on Mr. Fleming, the Court, and the judicial process is so shocking and repugnant that it leaves only one question: how many times must Escort be caught advancing false evidence before terminating sanctions become appropriate?

Escort's litigation strategy is clear. Escort lost the parties' first case and now—knowing it cannot win on the merits—it is seeking victory by (1) financially burying Mr. Fleming in legal costs associated with every discovery issue imaginable and (2) repeatedly falsifying the evidence when it thinks the situation is complicated enough that it will not get caught. To date, the Court has sanctioned Escort and counsel for 19 separate matters involving their litigation misconduct—including the advancement of false evidence—and Escort as acknowledged liability for $365,251 in attorney fees.[1] Because Escort accepts monetary sanctions as the "cost of doing business" associated with its chosen litigation strategy (*i.e.,* it is a risk worth taking), Mr. Fleming submits the appalling nature of Escort's recidivistic abuse and its complete disregard for the sanctity of the judicial process necessitate that this case be terminated in Mr. Fleming's favor.

## THE UNDISPUTED FACTS

The pertinent facts are undisputed since they are matters of public record, have already been found by the Court, and/or are acknowledged by Escort's opposition.

- On February 13, 2012, Mr. Fleming filed the present case against Escort and a number of its resellers. (Dkt. No. 2, Complaint.)

---

[1] *Fleming v. Escort Inc., et al.,* Case No. 1:09-cv-105-BLW, Order at Dkt. No. 376, pp. 3-4 (sanctioning Escort $125,424 for its repeatedly vexatious litigation behavior); *id.* at pp. 15-17 (sanctioning Escort $4,059 for willfully violating a court order); *id*. at Dkt. No. 416, Order, p. 2. *Fleming v. Escort Inc., et al.,* Case No. 1:12-cv-066-BLW, Opposition Br. at Dkt. No. 184 (acknowledging liability for $235,768 in attorney fees).

1

- The Court's Local Patent Rules require Escort to produce—early in the case—source code that operates its accused infringing products. (Dist. Idaho Loc. Patent R. 3.4(a); Dkt. No. 178, Order at p. 4 ("The Court's Local Rules required Escort to produce the source code that operated the accused devices."); *id*. at pp. 9–10 ("All of this could have been avoided if Escort had provided the source code that actually operated the Pro 500 as required by Local Rule 3.4…").)

- On July 19, 2013, Mr. Fleming served supplemental infringement contentions describing how the GX65 infringed his patent claims. For example, claim 23 in the asserted '905 patent calls for "generating a visual indication based at least in part upon the one of the pointing direction of the radar detector…" Mr. Fleming's contentions included a photograph showing the GX65 visually producing a red arrow that corresponds to the claim's requirement of "generating a visual indication…" (Exh. 1 at pp. 17-18.)

- On August 15, 2013, Escort moved to dismiss the Pro 500 on the theory that it was the same product as the GX65 litigated in the parties' first case. (Dkt. No. 63.) As the Court found, that motion began unraveling Escort's falsehoods concerning the source code Escort produced at ESC17363, which Escort averred controlled all its accused products. (Dkt. No. 178, Order at pp. 3-5 ("The litigation over that motion is the source of much of the dispute that now occupies the Court…Escort's argument raised more questions than it answered. If ESC17363 did not operate the Pro 500, why did Escort disclose it under the Court's Local Rules requiring the production of all source code used to operate the accused devices? Why had Escort represented in its non-infringement contentions that the source code contained in ESC17363 provided a defense for all its accused devices? What source code did operate the Pro 500? Why had that source code not been disclosed? If some undisclosed source code operated the Pro 500, why had Escort's counsel earlier represented that he had produced all the source code to Fleming?").)

- On September 5, 2013, Mr. Fleming filed a motion to show cause for why Escort should not be sanctioned for advancing false code at ESC17363. (Dkt. No. 71.)

- On September 30, 2013, Escort responded by producing, for the first time, the source code it contends is the real code for the Pro 500. (Dkt. No. 178, Order at pp. 4-5.) As the Court found, Escort's production of the Pro 500 code was a watershed moment because it confirmed (1) that Escort had repeatedly falsely sworn that all its accused products used ESC17363 and (2) that Escort's counsel lied when telling Mr. Fleming that Escort had previously produced "all" its source code. (Dkt. No. 178, Order at p. 5.)

- On October 7, 2013, Escort produced ESC18692 in response to pressure from Mr. Fleming to produce the real source code for all the *other* accused products, *i.e.,* not just the code for the Pro 500. (Exh. 2.)

- On January 17, 2014, Escort supplemented its source code disclosure pursuant to Local Patent Rule 3.4 to specifically include ESC18692, thereby averring that ESC18692 was the source code that ran the accused products. (Exh. 3.)

2

- On May 28, 2014, Escort served an interrogatory response (signed by Mr. Schatz and sworn to by Escort's officer, Mr. Kuhn) averring that ESC18692 was the source code that demonstrates how the GX65 operates. (Exh. 4 at Interrogatory No. 13.)[2] Indeed, the whole point of Mr. Fleming's interrogatory was to confirm which accused products used which source code, to which Escort and its counsel expressly identified ESC18692 as the code that demonstrates how the GX65 operates. (*Id*.)

- After Escort identified and produced ESC18692, Mr. Fleming studied the code for confirming evidence of infringement. (Exh. 5, Fleming Decl. at ¶ 6.) This was no small task because ESC1892 contains 21,331 lines of code and would consume 853 pages if printed to paper. (*Id*. at ¶ 7.)

- Mr. Fleming discovered that ESC18692 did not implement the red arrow (photographed in his infringement contentions), which formed the basis for some of his infringement contentions for the GX65. (*Id.* at ¶¶ 2-13.) While it was possible that Escort had designed that feature out of its products, Mr. Fleming was suspicious in light of Escort's established history (as the Court found) of falsifying ESC17363 and its corresponding false averments that it had "redesigned" that code so that none of its products infringed. (Dkt. No. 178, Order at p. 6 ("What motive would Escort have to produce false source code? Fleming points out that the source code in ESC17363 uses a "grid matching technique" that Fleming had expressly disclaimed during the reexamination process before the Patent Office. This is why Escort claimed earlier that ESC17363 provided a complete defense – the source code contained in ESC17363 used a "grid matching technique" that Fleming had represented was not used in his patented inventions.").)

- Knowing that faking the removal of infringing features from its source code was Escort's *modus operandi* for this case (as the Court found), Mr. Fleming did two things.

- First, Mr. Fleming reviewed the Product Compatibility Log for the GX65, which Escort had produced in response to the debacle concerning the Pro 500 and the falsified source code at ESC17363. (Exh. 5, Fleming Decl. at ¶¶ 2-3.) As the Court held, a Product Compatibility Log is Escort's way of tracking which of its source code corresponds to which of its accused products. (Dkt. No. 178, Order at p. 5 ("Escort produced Product Compatibility Logs showing the source code used by each of the accused devices.").)

- Below is the pertinent portion of the Product Compatibility Log for one of the accused GX65 products.

---

[2] Escort's reference to "ESC20873" (in its response to Interrogatory No. 13 at p. 3) correlates to the Product Compatibility Log for the GX65. Escort's reference to "ESC20873 (revision A)" is to Revision A of the GX65 listed in the Product Compatibility Log for that product. (*See* Opening Br. at p. 10.)

3

**Product Compatability Log: GX65 No Ku**
Document #: 909069-00

| Revision | Effective Date | ECN/ETN | Serial # Start | Assembly | | Marking | Hardware Board Assembly | Software Main Processors | Audio | Test File MB | RF |
|---|---|---|---|---|---|---|---|---|---|---|---|
| A | 7/17/2013 | ECN2130721 | **CP000001** | Receiver | Main | GX65NK-A | 05MGN-5E | 9500i_receiver_v5h.s19 | gx65_voice_v1_5.bin | MB_P500_V5H_A .INI | RF_P500_V5H_A .INI |
| | | | | | Front End | | 05F95E-5D | 31K57v10.s19 | bel_audio_v1_35.hex | MB_P500_V5H_A .MEM | RF_P500_V5H_A .MEM |
| | | | | | | | | gx65_main_v2_46_b6.hex | | | |
| | | | | | | | | gx65_usb_v4_0.hex | | | |
| | | | | GPS | | | 05CG65-5B | gx65_gps_v10_198_b6.hex | | | |
| | | | | Switch | | | | | | | |

(Exh. 6 (emphasis original).)  As shown, Revision A of the GX65 was first released commercially on July 17, 2013, and its main processor executed code with a file name "gx65_main_v2_46_b6.hex".  Escort admits this nomenclature corresponds to main processor source code Version 2.46.  (Opp. Br. at p. 8 ("The .hex file that is referenced in the Compatibility Log produced to Mr. Fleming is version 2.46.").)

- A first telltale sign that Escort falsified ESC18692 (*i.e.,* the source code Escort averred ran the GX65) is that it consists of Version 3.46, not Version 2.46 as the Log dictates.  (Exh. 5, Fleming Decl. at ¶¶ 2–6.)  Escort admits this too.  (Opp. Br. at p. 10 ("Thus, if the source code produced at ESC 18692 were compiled, it would generate a file having a major revision of 3, not 2.  *See* Exh. 1 at 3-4.  Mr. Fleming clearly evidences his understanding that if [] is undefined, then version 3.46 is compiled.  He identified the relevant source code and followed its logic to reach that conclusion.").)  Version 3.46 is absent from all of Escort's Product Compatibility Logs, thereby showing that Version 3.46 was *never* used in any commercial product—another devastating fact Escort conspicuously does not challenge.

- A second telltale sign that Escort falsified ESC18692 is that six of the twenty electronic files that Escort produced at ESC18692 indicate they were "last modified" in August 2013, *i.e.,* the month *after* Revision A of the GX65 was commercially released in July 2013 and two months *before* Escort produced ESC18692 to Mr. Fleming.  (Exh. 5, Fleming Decl. at ¶¶ 4–5.)  Escort obviously could not, and does not, challenge this devastating detail showing it doctored the code files (from their commercially-implemented state) before they were given to Mr. Fleming.  Things get even worse.

- While ESC18692 does not visually generate the red arrow on the GX65's display during operation, which is one of the features Mr. Fleming accused of infringement, it just so happens that Mr. Fleming owns a Revision A, GX65 radar detector.[3]  (Exh. 5, Fleming Decl. at ¶¶ 8–11.)  Mr. Fleming took that radar detector and operated it in his car (*id*. at ¶ 11), where he witnessed the device displaying the same red arrow Escort would have everyone believe is not generated by the source code (ESC18692) that Escort swears runs that product (*id*. at ¶ 11).  Once again, Escort does not deny or even try to challenge this devastating discrepancy between the actual operation of the GX65 and the code it (falsely) claims runs that product.

---

[3] Escort likely believed Mr. Fleming would never be able to acquire a GX65, Revision A since that product has been discontinued and Escort has refused to produce any physical devices.

4

- Accordingly, the undisputed evidence and Escort's admissions expressly refute Escort's (and counsels') prior, repeated averments that ESC18692 is the source code that operates the GX65. They do so by establishing that: (1) ESC18692 was *never* used in any commercial version of any Escort product, much less Revision A of the GX65; (2) Escort doctored ESC18692 *after* the real source code for the GX65 was used (commercially) for that product; (3) at least one of the doctored modifications Escort made to ESC18692 removed the exact functionality Mr. Fleming is accusing of infringement; (4) only after those modifications were made did Escort produce ESC18692 to Mr. Fleming; and (5) the GX65 does not operate in accordance with ESC18692 and, in fact, operates exactly as Mr. Fleming originally accused it of infringement.

These facts beg the identical questions the Court asked in its previous order sanctioning Escort's counsel the first time they advanced false evidence:

> [W]hy did Escort disclose [ESC18692] under the Court's Local Rules requiring the production of all source code used to operate the accused products?...What source code did operate the [GX65]? Why had that source code not been disclosed?

(Dkt. No. 178, Order at 5.) The answer is easy—Escort falsified its code to avoid another infringement verdict. As the Court also previously stated, and as is now pertinent to Escort's latest instance of fraud: "[a]ll of this could have been avoided if Escort had provided the source code that actually operated the [GX65] as required by Local Rule 3.4, instead of producing [ESC18692] that Escort knew was not being used to operate any accused device." (*Id.* at 9–10.)

## ESCORT'S EXCUSE PROVES ITS GUILT

Escort's opposition brief proves Escort's guilt. As explained above, the pertinent facts are not in dispute. Escort repeatedly averred (in its Local Patent Rule disclosures and interrogatory responses) that ESC18692 is the source code that operates the GX65. But, ESC18692 constitutes code Version 3.46, whereas Escort's Product Compatibility Logs show (1) the GX65 *actually* used Version 2.46 and (2) Version 3.46 (ESC18692) was *never* used in any commercial version of any Escort product. The Product Compatibility Logs also show that Version 2.46 was first commercially implemented in the GX65 on July 17, 2013, and yet the metadata for ESC18692 shows that Escort *modified* six of its files in August 2013 *before*

5

producing them (as ESC18692) to Mr. Fleming several months later. At least one of Escort's modifications removed the *exact* functionality Mr. Fleming is accusing of infringement, as demonstrated by Mr. Fleming's physical/operational testing of the actual GX65 product.

Escort now argues that despite producing falsified Version 3.46 and repeatedly swearing (falsely) that code operated the GX65, Mr. Fleming should have clairvoyantly recognized Escort's fraudulent scheme and re-designed the code himself to form (from Version 3.46) the never-before-seen Version 2.46, which actually operated the GX65. Indeed, Escort argues that because its opposition brief shows Escort was able to re-design Version 3.46 back into Version 2.46, Mr. Fleming should have too. Escort's argument not only acknowledges that it advanced false code, but the argument is so illogically preposterous that it only exacerbates the criminality of Escort's decision to advance more false evidence.

The substance of Escort's opposition obfuscates what is an otherwise simple issue. Escort's argument is as follows. ESC18692 contains a number of different types of files, including .c files and .h files. Shown below are the actual file contents of ESC18692. As Escort admits, the two files germane to this issue are the "main.h" file (highlighted) and the "display.c" file (highlighted). As Escort also admits, the display.c file is a human-readable file that contains a number of individual modules for controlling a radar detector, where each module controls a different aspect of the detector. (Opp. Br. at pp. 2-4; 8-9.) For example, one module could be designed for products sold in Russia (*i.e.,*

| Name | Date Modified | Size |
|---|---|---|
| main.h | Aug 19, 2013, 9:51 AM | 26 KB |
| audio.h | Aug 8, 2013, 9:19 AM | 32 KB |
| display.c | Aug 2, 2013, 11:19 AM | 93 KB |
| main.c | Aug 2, 2013, 11:18 AM | 167 KB |
| bluetooth.c | Aug 2, 2013, 11:16 AM | 80 KB |
| bluetooth.h | Aug 2, 2013, 11:14 AM | 10 KB |
| gps.h | May 23, 2013, 10:52 AM | 14 KB |
| twi.c | May 22, 2013, 9:16 AM | 8 KB |
| receiver.c | May 22, 2013, 9:16 AM | 56 KB |
| display.h | May 21, 2013, 8:26 AM | 19 KB |
| twi.h | May 21, 2013, 8:26 AM | 5 KB |
| uart1.c | May 21, 2013, 8:26 AM | 5 KB |
| uart1.h | May 21, 2013, 8:26 AM | 3 KB |
| receiver.h | May 20, 2013, 3:37 PM | 18 KB |
| gps.c | Jan 18, 2013, 7:25 AM | 30 KB |
| audio.c | Aug 4, 2011, 12:17 PM | 16 KB |
| adc.c | Aug 10, 2009, 9:05 AM | 6 KB |
| adc.h | Apr 15, 2009, 12:49 PM | 4 KB |
| uart3.c | Mar 11, 2008, 10:25 AM | 9 KB |
| uart3.h | Nov 9, 2006, 7:37 AM | 4 KB |

implementing the Russian language and functionality unique to Russian uses), whereas another module could be designed for use in the U.S. As Escort also admits, selection of the individual code modules for actual use in a particular product is the job of the main.h file (also written by the programmer). (*Id*. p. 4-6; 8-9.) In other words, there is a main.h file that selects from the display.c file certain modules for products destined for the Russian market, and a different main.h file that selects certain modules from the display.c file for products destined for the U.S. market.[4] (*Id*.)

The process of using a main.h file to select files from a display.c file is akin to making a motion picture. As shown in the diagram below, the process of making a movie begins with the director filming hundreds (if not thousands) of separate scenes. The editor then selects only



All Scenes

Actual Movie

those scenes the producer wants in the final movie. He may select (or cut out) scenes in order to provide a happy (or sad) ending, cut out scenes to ensure the movie is not too long, and cut out scenes test audiences do not like. The point is, he selects only those scenes from the larger body of work that he wants in the final movie. As indicated, this is akin to how the display.c and main.h files work. The programmer can create a display.c file containing hundreds of modules for possible inclusion in the final code, but it is the job of the main.h file to act as the "editor" by picking which of those modules will be selected for inclusion in the final file to be compiled and loaded into the product. (*Id*.)

In the present case, Escort produced ESC18692, inclusive of the above-identified

---

[4] As Escort also admits, once the display.c and main.h files interact to produce the source code the designer wants to install in a product, that code (*i.e.,* the group of modules selected by main.h) is compiled into a computer-readable file (called a .hex file) and loaded into the product's memory. (Opp. Br. at p. 4.)

display.c and main.h files.  (*Id*. at pp. 5-6.)  The display.c file contains modules that implement the infringing arrow and modules that do not implement the infringing arrow.  (*Id*.)  The main.h file Escort produced in ESC18692, however, directs that *only* the non-infringing modules are selected for inclusion in the code actually loaded into the GX65.  Thus, when Mr. Fleming read ESC18692, he read display.c in combination with main.h and realized (as Escort admits) that combination resulted in Revision 3.46 (*id*. at p. 7), which does not implement the infringing functionality.  However, when Mr. Fleming looked at the Product Compatibility Log, which indicates the GX65 used Revision 2.46 (*id*. at p. 8), he began to believe Escort had once again produced false code.

Mr. Fleming's suspicions were confirmed when he noticed (from the metadata in the figure above) that Escort had *modified* both the display.c and main.h files (in ESC18692) in August 2013*, i.e.,* one month *after* the code was installed in the GX65 and two months *before* Escort produced the files.  The *coup de gras* in terms of confirming that Escort has produced false code was when Mr. Fleming tested the actual GX65 and discovered that it operated *differently* from that dictated by ESC18692.  Not only did it operate differently, but the *exact* functionality Mr. Fleming had accused of infringement was present in the actual GX65 but was conspicuously missing from ESC18692.

Escort argues the display.c file it produced authentically replicates the display.c file used by the GX65.  That may or may not be true since (as shown above) the metadata for that file indicates Escort modified it *after* the GX65 started selling and *before* Escort produced it to Mr. Fleming.  We need not get bogged down (for now) with the authenticity of display.c, however, because Escort's opposition admits (1) Escort modified main.h before producing it to Mr. Fleming, and (2) that the modification caused the removal (or de-selection) of the infringing

module from display.c.  In other words, Escort produced a doctored version of the main.h file (in ESC18692) in order to fake the real/actual functionality of the GX65 for purposes of this case. Escort's opposition and supporting declarations admit this is exactly what Escort did.

For example, Escort explains that its paid consultant, Dr. Grindon, attempted to verify that ESC18692 would produce code Version 2.46 identified in the Product Compatibility Log as being used in the GX65.  Here is what Escort says about Dr. Gindon's analysis:

> He collected the .C File and .H Header Files provided to Mr. Fleming on ESC18692. Grindon Decl. at ¶14.  ***Then, he made sure that the .H Header File had ENABLE_MARKED_LOCATION_ARROW as defined.***  Grindon Decl. at ¶¶16-18.

(Opp. Br. at p. 13 (emphasis added).)  If it is not clear from the emphasized language that Dr. Grindon *changed* the main.h file given to Mr. Fleming as part of ESC18692, Dr. Grindon's declaration confirms it.  Here is what Dr. Grindon says:

> During my meeting at Escort on November 3, 2014, ***I asked Escort engineers to go through the process, while I observed, to first set the model selection directives in a copy of the main.h Header File to cause compilation of a version 2.46 Hex File***, ***and then compile the source code which was produced to Fleming so as to generate a version 2.46 Hex File.***  This was done as I watched…  ***First, an Escort engineer changed the preprocessor directive in Line 457 of the main.h Header File from [].  This change is shown in the right-hand tile of the comparison screenshot in Exhibit E…This is the only change that was made to the main.h Header File.  In the lower right hand corner of the screenshot in Exhibit E, note the text reporting the comparison as "1 change".***

(Opp. Br. at Exh. 4 (Grindon Decl.) at ¶¶16-17 (emphasis added).)  In other words, Dr. Grindon directed Escort's engineers to *change* the main.h file given to Mr. Fleming (which creates Version 3.46) to the supposedly real main.h file that was *never* given to Mr. Fleming (which creates Version 2.46).  Thus, Dr. Grindon concluded that Escort produced the right code only by *changing* the code Escort produced as ESC18692 back to the code he claims was actually used in the GX65.  This twisted logic obviously proves nothing, other than Escort should have produced the code as modified by Dr. Grindon, not the faked code at ESC18692, which was never used in

9

any commercial product and was only created and produced as part of Escort's overall pursuit of a false verdict.

The remainder of Escort's opposition criticizes Mr. Fleming for failing to make a "trivial" change to the 21,331 lines of code in ESC18692 necessary to convert it to the code Escort now argues was actually used by the GX65. (Opp. Br. at pp. 17-18.) Aside from once again acknowledging that Escort produced faked code, this argument makes no sense. Local Patent Rule 3.4(a) requires that the actual/real accused code be produced, not code the recipient must clairvoyantly know needs to be redesigned and how to redesign it. Moreover, Mr. Fleming cannot possibly be expected to modify ESC18692 (Version 3.46) to produce Version 2.46 when he had never seen (and still has never seen) what Version 2.46 looked like. In sum, Escort's argument is so contrived that it shows there is no limit to its effort to "win no matter what".

## CONCLUSION

The Court previously found that Escort advanced false evidence, to which Escort has acknowledged liability for at least $235,768 in attorney fees. As shown above, the Court's finding did nothing to deter Escort from *again* advancing more false evidence. Because monetary sanctions obviously have no deterrent effect on Escort, and Escort's actions show it has no intentions of behaving within the most basic bounds of ethics, Mr. Fleming submits this case must be terminated in his favor. Mr. Fleming further requests an award of all damages and remedies sought, that Escort and its counsel be jointly and severally required to pay Mr. Fleming a trebled amount of all his fees and costs, that defense counsels' *pro hac vice* appearances be revoked, and that all individuals involved in the advancement of false evidence be ordered to identify themselves.

December 18, 2014  Respectfully Submitted

                    /s/
Michael S. Dowler
Park, Vaughan, Fleming & Dowler, LLP
5847 San Felipe, Suite 1700
Houston, TX 77057
(713) 821-1540
(713) 821-1401 (facsimile)

Attorneys for Plaintiff Hoyt A. Fleming

11

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 18th day of December 2014, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing. To the extent any of the foregoing was filed under seal, each of the following parties or counsel was served by email.

| Gregory F. Ahrens<br>Wood, Herron & Evans, L.L.P.<br>441 Vine Street, 2700 Carew Tower<br>Cincinnati, Ohio 45202-2917<br><br>Brett A. Schatz<br>Wood, Herron & Evans, L.L.P.<br>441 Vine Street, 2700 Carew Tower<br>Cincinnati, Ohio 45202-2917<br><br>Bradlee R. Frazer<br>Hawley Troxell Ennis & Hawley LLP<br>877 Main Street, Suite 1000<br>Boise, ID 83702<br><br>Steven F. Schossberger<br>Hawley Troxell Ennis & Hawley LLP<br>877 Main Street, Suite 1000<br>Boise, ID 83702<br><br>Brian P. Muething<br>Keating Muething & Klekamp PLL<br>One East 4th Street, Suite 1400<br>Cincinnati, OH 45202 | Bryce J. Yoder<br>Keating Muething & Klekamp PLL<br>One East 4th Street, Suite 1400<br>Cincinnati, OH 45202<br><br>Rachael A Rowe<br>Keating Muething & Klekamp PLL<br>One East 4th Street, Suite 1400<br>Cincinnati, OH 45202<br><br>Keely E. Duke<br>Duke Scanlan Hall PLLC<br>1087 W. River Street, Suite 300<br>Boise, ID 83702<br><br>Robert B. White<br>Givens Pursley LLP<br>601 West Bannock Street<br>Boise, ID 83702<br><br>Terry C. Copple<br>Davidson, Copple, Copple & Copple<br>199 N Capitol Blvd., Ste. 600<br>Boise, ID 83702 |
|---|---|

                                                                           /s/
                                                              Michael S. Dowler