Michael S. Dowler
Park, Vaughan, Fleming & Dowler LLP
5847 San Felipe, Suite 1700
Houston, TX  77057
Telephone:  713.821.1540
Facsimile:  713.821.1401
Email:  mike@parklegal.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| HOYT A. FLEMING, <br><br> Plaintiff, <br> v. <br><br> ESCORT, INC., ET. AL, <br><br> Defendants. | Case No. 1:12-cv-0066-BLW <br><br> PLAINTIFF'S MOTION FOR SANCTIONS DUE TO SPOLIATION OF EVIDENCE AND FRAUD |

## SUMMARY

The Court recently found that defendants and certain defense counsel committed fraud in connection with the products accused of infringement in this case.  (Dkt. Nos. 178 and 208.)  Specifically, the Court found that defendants and counsel conspired to procure a false verdict by advancing non-infringement defenses based on source code they knew the accused products never used.  (*Id*.)

Mr. Fleming now has discovered that defendants' efforts to hide their infringement did not stop with their fraudulent advancement of source code.  Specifically, Mr. Fleming has discovered that, despite defense counsel falsely assuring him that defendants had preserved all "tangible things…in any way relevant to this litigation", defendants inexplicably failed to preserve a physical specimen of each accused product.  In other words, defendants have failed to preserve some of the exact evidence—the devices accused of infringement—Mr. Fleming needs

to prove his case.

Defendants not only failed to preserve critical evidence, they also engaged in a fraudulent cover-up.  Defendants' actions are so inexplicable, improper, and devastating to Mr. Fleming's infringement proofs that Mr. Fleming hereby requests spoliation sanctions in the form of a directed verdict of infringement on each despoiled product, as well as an award of his attorney fees and costs associated with this motion and his efforts to uncover defendants' latest fraud.

## THE ACCUSED PRODUCTS

Six products are accused of infringement in this case: the GX65; the Pro 500; the Passport iQ; the Passport 9500ix; the Passport Max; and the Passport Max 2.  It is undisputed that defendants sold "revisions" of these products over time.  For example, the GX65 was sold as "GX65, Revision A" from July 17, 2013 through February 5, 2014, where-after defendants sold "GX65, Revision B".  (Exh. 1, Product Compatibility Log: GX65 No Ku.)  As another example, there have been three separate revisions (Revisions A-C) of the Pro 500 sold thus far during the period of infringement.  (Exh. 2, Product Compatibility Log: Pro 500.)  Product revision numbers change as defendants change the products.  For example, the source code controlling the GPS processor in the GX65 was redesigned/changed from code Version 198 for Revision A to code Version 255 for Revision B.  (Exh. 1.)

Mr. Fleming bears the burden of proving that each revision of each accused product infringes his asserted patent claims.  This makes the physical configuration and operation of each product revision critical to Mr. Fleming's infringement proofs.  As the Court may recall, and as shown by the exemplary photo below, Mr. Fleming introduced (into evidence) physical specimens of the products accused of infringement during the parties' first case.  (*Fleming v.*



*Escort, et al.,* Case No. 1:09-cv-105-BLW, Trial Exhs. 1051 (Passport 9500i), 1059 (Passport 9500ix), 1064 (GX65), and 1073 (Passport iQ.) Mr. Fleming's infringement contentions in this case likewise specifically and expressly rely on Mr. Fleming's physical testing (and the actual operation) of physical samples of the accused products. (*See e.g.,* Exh. 3, Fleming's Infringement Contentions at Exhibit 1.)

As further evidence that physical specimens of the accused products are critical to this case, the Court also may recall that it has repeatedly relied on physical samples of the accused products when making rulings in this case. Specifically, when denying defendants' motion to dismiss the Pro 500 as an accused product in this case, the Court relied on Mr. Fleming's physical and operational comparisons between the Pro 500 and the GX65, which would not have been possible without Mr. Fleming actually possessing a physical sample of those products.

> Escort now alleges that its new device, the Pro 500 – named as an infringing device in both Count One and Count Two -- is identical to the GX 65 and is entitled to be dismissed from these two Counts just as the GX 65 was dismissed. <u>In response, Fleming has filed material that he alleges shows significant differences in the circuitry and source code of the two devices.</u> *See Fleming Declaration (Dkt. No. 70-1).* <u>In addition, Fleming alleges that a test of the operation of the two devices demonstrates that the Pro 500 is more sensitive than the GX 65.</u> *Id*.
>
> The Court expresses no opinion on whether the devices are similar; it is enough that the record contains a factual dispute that precludes resolution of this issue on a motion to dismiss.
>
> * * * * * * * * * * *
>
> Thus, Escort must show that the Pro 500 is the same product as the GX65 to be entitled to a dismissal based on the earlier jury verdict. <u>Because there are questions of fact over whether the Pro 500 is the same product as the GX65, the Court will deny the motion to dismiss.</u>

(Dkt. No. 138, Order at pp. 3-4 (emphasis added); *see also id.* at pp. 4-5 (relying on Mr. Fleming's physical examination of the Passport Max); Dkt. No. 138, Order at pp. 23-24 (relying on Mr. Fleming's physical examination of the 9500ix).)

In addition to using physical specimens of the accused devices at trial, in his present infringement contentions, and as evidence of the products being properly included/accused in this case, Mr. Fleming used a physical specimen of the GX65, Revision A as evidence that defendants falsified the source code they produced as allegedly corresponding to that product. (Dkt. No. 182, Fleming's Second Motion for Terminating Sanctions.) Specifically, as Mr. Fleming's motion papers show, that product generates a directional arrow shown in the



photograph to the left. That arrow is a telltale sign that the GX65, Revision A infringes the portion of Mr. Fleming's asserted patent claims calling for "generating a visual indication…" (*Id.* at p. 7-13.) Nevertheless, the code files defendants produced as allegedly corresponding to that product do not generate that directional arrow. (*Id.*) Thus, without the physical device, Mr. Fleming never would have discovered that defendants falsified the code files for the GX65, Revision A. (*Id.*)[1]

Finally, there are major disputes between the parties regarding the veracity of the code files defendants produced as allegedly corresponding to other revisions of each accused product. Mr. Fleming has chronicled each issue in spreadsheets he has shared with defense counsel in an unsuccessful effort to resolve those issues. (Exh. 4, party correspondence.) Whenever and however those disputes ultimately are resolved, the irrefutable fact remains that—as

---

[1] The Court has not yet ruled on Mr. Fleming's motion.

demonstrated by the parties' first trial and so far in the present case—Mr. Fleming needs a physical specimen of each revision of each accused product in order to prepare for and successfully carry his burden of proof at trial and to counter defendants' non-infringement and license (*i.e.,* product similarity) defenses.

## DEFENDANTS DESPOILED THE ACCUSED PRODUCTS AND ENGAGED IN A FRAUDULENT COVER-UP

Unable to avoid it any longer and as described below in more detail, defendants now admit they failed to preserve a physical sample of each revision of each accused product. (Exh. 5.) That admission, however, did not come about without a fraudulent cover-up.

Although this case was filed in February 2012 (Dkt. No. 2, Complaint), it did not begin in earnest until after the Court denied defendants' stay motion in March 2013 (Dkt. No. 31). Several months later, Mr. Fleming filed his first request for the production of documents and things. (Exh. 6.) Mr. Fleming's Request No. 38 and defendants' response thereto are set forth below:

> **REQUEST FOR PRODUCTION 38:**
>
> A physical sample of each Accused Infringing Product.
>
> **RESPONSE**
>
> Escort objects to this Document Request as being overly broad and burdensome to the extent it seeks Escort to provide a physical sample of each Accused Infringing Product."
>
> Fleming may purchase such products on the open market.

(Exh. 7.)

Defendants' response was false and vexatious for a number of reasons. First, defendants concealed the fact that they sold their accused products by "revisions" until they finally produced their Product Compatibility Logs the following year. (Exh. 8.) Second, as defendants knew (but at the time Mr. Fleming did not), it is not possible to purchase a specific revision of a particular product—if you want a product, you purchase it and you get whatever revision is presently being

sold.  Indeed, as shown in the photo below, the product must be deconstructed in order even to



find the revision label indicating the product's revision number.  (*See* Dkt No. 70, p. 4-6.)  Third, depending on where on the "open market" the product is purchased*, i.e.,* from EBay or other resellers, defendants also now admit the

re-purchased product likely will not be in its original form since prior owners usually download code from defendants' website in order to "update" their product, thereby despoiling the product's originality.  (Exh. 5 ("While it may be possible to obtain versions from the market (or via product returns), the detectors usually have been updated by the consumer.").)  Thus, while defendants told Mr. Fleming to obtain products from the open market in response to his discovery request, they now acknowledge that their instructions were false since such market purchases admittedly lack authenticity.

Nor was this the only falsehood defendants made in connection with Mr. Fleming's ongoing efforts to acquire a physical specimen of each accused product.  Shortly after defendants' rebuffed Mr. Fleming's discovery request and told him to purchase the accused products on the open market, they assured him in response to his concerns that they were preserving all evidence of even marginal relevance.

> Without waiving any applicable privilege or immunity, we also confirm that a litigation hold was issued in April 2009.  <u>That litigation hold still remains in effect and was directed to numerous Escort employees, including but not limited to all Escort employees potentially having any reasonable relation to the litigation, the products at issue, and engineering personnel, and instructed the preservation of all documents, data, and tangible things, regardless of their source or format, which could be in any way relevant to this litigation.</u>  As noted above, this included any information pertaining to Mr. Fleming.  This also included preservation of letters, memos, email messages, meeting notes, and any other type of documentation, whether in paper or in electronic format.

(Exh. 10 at p. 2 (emphasis added).) As we now know based on defense counsel's recent admission, this assurance was 100% false, at least as it relates to the accused products.

Specifically, with replacement counsel for defendants recently making an appearance in the case, Mr. Fleming again sought production of the accused products. Mr. Fleming asked three separate times if defendants would produce the product revisions, and each time replacement counsel refused to respond to that inquiry. (Exh. 5.) Mr. Fleming's fourth request (now demanding a simple "yes" or "no" answer to whether defendants would produce the products) finally received the following response:

> You asked if Escort retains a physical specimen of each revision of each accused product. It does not appear that Escort possesses an individual radar detector for each of the prior software versions that have been released.

(*Id*.) Thus, nearly three years after this case was filed, and after having been falsely led to believe (1) that he could obtain each of the accused products on the open market and (2) that defendants were otherwise preserving those products, Mr. Fleming now has learned that he has once again been the pawn in defendants' fraud, this time the cover-up of their violation of Rule # 1 in patent litigation—don't despoil the accused products.

## LEGAL BACKGROUND

Spoliation of evidence is "the destruction or material alteration of evidence or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Apple, Inc. v. Samsung Electronics Co., Ltd.,* 888 F.Supp.2d 976, 989 (N.D. Cal. 2012) (*citing Silvestri v. Gen. Motors Corp.,* 271 F.3d 583, 590 (4th Cir. 2001)). "The obligation to preserve evidence arises when the party reasonably should know the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *Id.* at 990. Evidence of spoliation may be grounds for sanctions. *Id*. at 989 (*citing Akiona v. U.S.,* 938 F.2d 158, 161 (9th Cir. 1991)).

Spoliation of evidence raises the presumption that the destroyed evidence goes to the merits of the case, and further, that such evidence was adverse to the party that destroyed it. *Id*. at 998 (*citing Hynix Semiconductor v. Rambus,* 591 F.Supp.2d 1038, 1060 (N.D. Cal. 2006), *vacated on other grounds* in *Hynix Semiconductor v. Rambus,* 645 F.3d 1336 (D.C. Cir. 2011)). In the Ninth Circuit, "a party's destruction of evidence need not be in 'bad faith' to warrant a court's imposition of sanctions." *In re Napster, Inc. Copyright Litigation,* 462 F.Supp.2d 1060, 1066 (N.D. Cal. 2006) (*citing Glover v. BIC Corp.,* 6 F.3d 1318, 1329 (9th Cir.1993)). The Ninth Circuit has instructed that district courts may impose sanctions even against a spoliating party that merely had "simple notice of 'potential relevance to the litigation.'" *Glover*, 6 F.3d at 1329 (*quoting Akiona v. United States,* 938 F.2d 158, 161 (9th Cir. 1991)).

While the Court has the discretion to impose sanctions, "the sanction should be designed to: (1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party." *West v. Goodyear Tire & Rubber Co.,* 167 F.3d 776, 779 (2d Cir. 1999). To decide which specific spoliation sanction to impose, courts generally consider three factors: "(1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party." *Apple*, 888 F.Supp.2d at 992. Prejudice is determined by evaluating whether the spoliating party's actions impaired the non-spoliating party's ability to go to trial, threatened to interfere with the rightful decision of the case, or forced the non-spoliating party to rely on incomplete and spotty evidence. *In re Hitachi,* 2011 WL 3563781 at *6 (*citing Leon v. IDX Systems Corp.,* 464 F.3d 951, 959 (9th Cir. 2006)).

This Court is well aware of a litigant's obligation to preserve evidence.  In *United States v. Fed. Res. Corp.,* the Court held:

> [I]f a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents.

2012 U.S. Dist. LEXIS 65430, *8 (D. Idaho 2012) (Winmill, J.).   Likewise, in *Scentsy, Inc. v. B.R. Chase, L.L.C.,* the Court held:

> The Court has serious concerns with Scentsy's retention policy and litigation hold process.  Generally not deleting documents, and orally requesting certain employees to preserve relevant documents concurrently with filing a lawsuit, is completely inadequate.  It is very risky – to such an extent that it borders on recklessness.

2012 U.S. Dist. LEXIS 143633, *20 (D. Idaho 2012) (Winmill, J.).

## **ARGUMENT—EVIDENTIARY SANCTIONS**

This is a patent infringement case where the structure, function, and operation of the accused infringing products will determine the outcome of the case.  As such, it is beyond dispute that defendants should have preserved those products.  Indeed, the fact that defendants despoiled the exact products at issue in this case is so inexplicable that its impropriety rivals defendants' earlier, fraudulent disclosure of knowingly false source code associated with those products.  (Dkt. Nos. 178 and 208, Orders finding fraud.)  Because defendants' destruction of evidence is so improper and devastating to Mr. Fleming's case, Mr. Fleming requests spoliation sanctions in the form of a directed verdict of infringement on each despoiled product.

Defendants' duty to preserve the accused products arose at least as early as March 2009, when the parties' first case was filed accusing defendants' radar detectors of infringement. (*Fleming v. Escort, et al.,* Case No. 1:09-cv-105-BLW at Complaint.)   Since the Product Compatibility Logs for each accused product show each product was manufactured after 2009 (Exh. 9; *infra* at p. 15), defendants were under a duty to preserve all such products.  *United*

9

*States v. Fed. Res. Corp.,* 2012 U.S. Dist. LEXIS 65430, *8 (D. Idaho 2012) (Winmill, J.) ("[I]f a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents.").

Defendants claim they instituted a litigation hold, but they refuse to produce any evidence of one. (Exh. 10 at p. 2.) Nevertheless, despite defendants' false assurances that Mr. Fleming could purchase the accused products on the open market and that they were otherwise preserving them, defendants recently were forced to admit that they violated their duty to preserve the accused products. Specifically, in response to numerous, repeated requests for confirmation that defendants had preserved the accused products, defense counsel finally provided the following admission that the products, in fact, had been despoiled:

> You asked if Escort retains a physical specimen of each revision of each accused product. It does not appear that Escort possesses an individual radar detector for each of the prior software versions that have been released.

(Exh. 5.) As indicated, this admission came nearly two years after defendants falsely told Mr. Fleming that he could purchase the products on the open market and that defendants were otherwise preserving those products. (*Supra* at pp. 5-7.) Irrespective of defendants' false discovery response and assurances, defendants' attempt to place on Mr. Fleming the burden of gathering and preserving the products himself ignores defendants' unquestionable obligation to itself preserve the accused products for litigation purposes. *United States v. Fed. Res. Corp.,* 2012 U.S. Dist. LEXIS 65430, *8 (D. Idaho 2012) (Winmill, J.)

Defendants now seek to distance themselves from their prior falsehoods. Specifically, when finally admitting they failed to preserve the accused products, defendants raised a new, inconsistent argument for the first time in the case*, i.e.,* that defendants intentionally decided not to preserve the products because they have the ability to recreate them. Here is defendants'

10

newest argument:

> You asked if Escort retains a physical specimen of each revision of each accused product. It does not appear that Escort possesses an individual radar detector for each of the prior software versions that have been released. So the answer to that questions is no; however, we do retain the ability to recreate any such specimen, which is why Escort has not seen the need to retain a [sic] physical specimens.

(Exh. 5.) This argument appears conjured and is, in any event, misplaced and unavailing.[2]

As an initial matter, aside from the rank inconsistency between defendants' prior and present arguments, Mr. Fleming is entitled to samples of the accused products as the were actually made and sold during the period of infringement, not after-the-fact "recreated" products that lack authenticity. Indeed, it cannot be disputed that defendants violated their obligation to simply set aside, at least for litigation purposes, one of each of the accused products at the time they were originally manufactured. *United States v. Fed. Res. Corp.,* 2012 U.S. Dist. LEXIS 65430, *8 (D. Idaho 2012) (Winmill, J.) The simplicity with which defendants could have complied with their preservation obligation belies any excuse they now have for violating that obligation.

Second, as described above, there are massive disputes between the parties regarding whether the code files defendants have retained and produced in this case are the actual code files that were used with/for the accused products. (*Supra* at pp. 4-5.) Indeed, the Court already has found that defendants fraudulently advanced source code in this case as corresponding to its accused products. (Dkt. Nos. 178 and 208, Orders finding fraud.) Likewise, a second motion for

---

[2] After receiving defendants' latest excuse for not preserving the accused products, Mr. Fleming served a document request seeking: "All documents and things relating to, supporting, or contradicting defense counsels' claim that defendants have not preserved a physical specimen of each revision of each accused product on the basis that defendants allegedly 'retain the ability to recreate any such specimen'". (Exh. 12.) Defendants' response to this request is due before Mr. Fleming's Reply brief. Thus, Mr. Fleming will be able to present to the Court all the evidence corroborating or contradicting the veracity defendants' claim for why they did not preserve the accused products.

terminating sanctions is pending, which shows defendants committed yet another fraud by advancing still more falsified code in connection with the GX65. (*Supra* at p. 4.) Still further, there is yet another motion pending that again describes the complete abomination defendants have made of the code that allegedly corresponds to their accused products. (Dkt. No. 196.) In these circumstances, it is hardly availing that defendants now contend they can remedy their spoliation by cooking up a sample of each accused product in their lab using despoiled, falsified, and otherwise highly questionable code files.

  Third, it is not merely disputes concerning the authenticity of the code for each accused product that preclude defendants from "recreating" those accused products in a manner that would remedy their spoliation. Rather, each product includes intricately designed boards (one of which is shown in the photo below) that are populated with a very specific set of electronic components. (*See e.g.,* Exh. 12 (Bill of Materials for GX65, Revision A).)



Many of the different revisions of the accused products use different boards and/or different sets of electronic components. As defendants admitted earlier in the case, in some cases those boards/components have been discontinued such that it now is impossible to recreate the accused products.

> 18. An updated GPS circuit board was incorporated into the GX65 radar detector so that the GX65 would acquire GPS signals faster upon powering the unit on after being in the "off" position for an extended time, and an updated GPS receiver was incorporated into the GX65 radar detector because the company "Navman" was purchased by, or combined or consolidated with, "Telit," and Telit announced to Escort that the Navman receiver was obsolete and being replaced with the Telit receiver.
>
> 19. A new display board was incorporated into the GX65 radar detector because the old version (from Malaysia) was deemed at its "end of life" by Escort's supplier and therefore needed to be replaced. The replacement display board was provided by a supplier (from the Philippines).

(Dkt. No. 80-1 (Kuhn Declaration), ¶¶ 18-19.) Defendants further admit that "manufacturing differences" vary the performance of defendants' products. (*Id*. at ¶ 22.) Thus, as the circumstances show, defendants have admitted that a "recreated" product will not identically replace the accused products, either structurally or functionally, as they were built and sold during the period of infringement.

The harm associated with defendants' spoliation also cannot be denied. Mr. Fleming used the physical devices to successfully prove infringement during the parties' first case, he has used them in this case to support his infringement contentions, he has used them to rebut certain of defendants' defenses (*i.e.,* that the products in this case are impermissibly similar to the products in the parties' first case), he has used them to prove the falsity of the code files defendants have alleged are used by the accused products, and the Court has relied on Mr. Fleming's use of the products when ruling on certain motions in this case. (*Supra* at pp. 2-5.)

The irrefutable fact is that each of the accused products is critical at least to Mr. Fleming proving that defendants infringe his patents. Mr. Fleming's case should not suffer because defendants failed to simply set aside one of each accused product for purposes of this case. While the evidence shows defendants engaged in a fraudulent cover-up, it does not matter

13

whether defendants' failure was intentional, negligent, or the result of faulty advice from counsel. *In re Napster, Inc. Copyright Litigation,* 462 F.Supp.2d 1060, 1066 (N.D. Cal. 2006) (*citing Glover v. BIC Corp.,* 6 F.3d 1318, 1329 (9th Cir.1993)). The fact that the evidence is missing in circumstances where defendants had a clear, undeniable obligation to preserve it is all that matters when it comes to this issue of whether evidence was despoiled.

Moreover, where, as here, spoliation is shown, the burden of proof shifts to defendants to show that no prejudice resulted from their spoliation. *Apple*, 888 F.Supp.2d at 998; *In re Hitachi,* 2011 WL 3563781 at *6. As explained above, all of the evidence shows Mr. Fleming's dire need for the accused products. No evidence shows otherwise. As such, defendants' spoliation has usurped Mr. Fleming's ability to prove infringement and counter certain of defendants' defenses. The only reasonable remedy in these circumstances is for the Court to direct a verdict of infringement as to the products defendants have despoiled. Since Mr. Fleming does possess a few of the accused products, the despoiled products consist of:

| Product | Revisions |
|---|---|
| 9500ix Red | A, B, C, D, E, F, G, H, I, K, and L |
| 9500ix | N, O, P, Q, R, S, T, U, V, W, X, Y, Z, and AA |
| 9500ix Spanish | A, B, C, and D |
| 9500ix Russia | A, B, and C |
| 9500ix International | A, B, C, D, E, F, and G |
| 9500ix Asia | A and B |
| GX65 | G, I, J, K, and L, and M |
| GX65 No Ku | B |
| Pro500 | A and C |
| Passport iQ | B, C, E, and F |
| MAX | B, C, D, F, G, H, and I |
| MAX 2 | A, B, and C |

## ARGUMENT—MONETARY SANCTIONS

Monetary sanctions may be imposed where one party has wrongfully destroyed evidence. *See, e.g., Scentsy, Inc. v. B.R. Chase, L.L.C.,* 2012 U.S. Dist. LEXIS 143633, *25 (D. Idaho

2012) (Winmill, J.); *National Ass'n of Radiation Survivors,* 115 F.R.D. 543, 558-59 (C.D. Cal. 1987); *Personalweb Technologies, LLC v. Google, Inc.,* 2014 U.S. Dist. LEXIS 116132 (N.D. Cal. 2014).

Here, defendants not only admit they despoiled the accused products, the evidence shows defendants engaged in a fraudulent cover-up.  Because defendants have intentionally violated the most basic tenants of litigation (to preserve evidence and litigate honestly), and because those violations has caused Mr. Fleming to incur the cost and expense of investigating and proving them, Mr. Fleming also requests that he be made whole through an order compelling defendants to reimburse all of Mr. Fleming's associated costs and legal fees, as is customary in such situation. (*See e.g.,* Dkt. No. 208, Order awarding fees for defendants' fraud.)  Indeed, as this Court has previously ruled:

> The spoliation issue is a bit different.  While it is unlikely that relevant documents were destroyed, we can never be certain.  That uncertainty, which can only be attributed to Scentsy's inadequate retention policies and litigation hold, is very troubling to the Court.  Moreover, the Court views spoliation as a very serious matter with potentially serious consequences for the parties.  Accordingly, the Court has, in essence, sanctioned Scentsy by requiring it to pay the deposition costs as outlined above, and by giving Scentsy a shot across the bow that if there is evidence that spoliation occurred, future consequences will be harsh.

*Scentsy,* 2012 U.S. Dist. LEXIS 143633, *25 (D. Idaho 2012) (Winmill, J.).

January 30, 2015                     Respectfully Submitted

                                                /s/
                                       Michael S. Dowler
                                       Park, Vaughan, Fleming & Dowler, LLP
                                       5847 San Felipe, Suite 1700
                                       Houston, TX 77057
                                       (713) 821-1540
                                       (713) 821-1401 (facsimile)

                                       Attorneys for Plaintiff Hoyt A. Fleming

CERTIFICATE OF SERVICE

      I HEREBY CERTIFY that on the 30th day of January 2015, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing.  To the extent any of the foregoing was filed under seal, each of the following parties or counsel was served by email.

| | |
|---|---|
| Brian P. Muething<br>Keating Muething & Klekamp PLL<br>One East 4th Street, Suite 1400<br>Cincinnati, OH 45202<br><br>J. Walter Sinclair<br>Holland & Hart LLP<br>800 West Main Street, Suite 1750<br>Boise, ID 83702<br><br>Timothy P. Getzoff<br>Holland & Hart LLP<br>800 West Main Street, Suite 1750<br>Boise, ID 83702 | Bryce J. Yoder<br>Keating Muething & Klekamp PLL<br>One East 4th Street, Suite 1400<br>Cincinnati, OH 45202<br><br>Rachael A Rowe<br>Keating Muething & Klekamp PLL<br>One East 4th Street, Suite 1400<br>Cincinnati, OH 45202<br><br>Keely E. Duke<br>Duke Scanlan Hall PLLC<br>1087 W. River Street, Suite 300<br>Boise, ID 83702<br><br>Robert B. White<br>Givens Pursley LLP<br>601 West Bannock Street<br>Boise, ID 83702 |

                /s/
              Michael S. Dowler