Michael S. Dowler
Park, Vaughan, Fleming & Dowler, LLP
5847 San Felipe, Suite 1700
Houston, TX 77057
(713) 821-1540
(713) 821-1401 (facsimile)
mike@parklegal.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| HOYT A. FLEMING, | ) Case No. 1:12-cv-0066-BLW |
| Plaintiff, | ) PLAINTIFF'S REPLY IN SUPPORT OF HIS |
| v. | ) REQUEST FOR AN ORDER TO SHOW |
| | ) CAUSE (DKT. NO. 71) |
| ESCORT, INC., ET AL. | ) |
| | ) **ORIGINALLY FILED UNDER SEAL** |
| Defendants. | ) **(DKT. NO. 94)** |

Escort got caught misrepresenting the facts in its motion to dismiss its Pro 500 product from this case. Instead of honorably making amends, Escort has "doubled-down" through an opposition brief and subsequent party communications that reveal a further pattern of deceit and falsehoods. Because Escort "agrees with the law presented by Fleming" (Opp. Br. p. 5) and that a show cause hearing is warranted (Opp. Br. pp. 1, 3), Mr. Fleming respectfully requests that the Court schedule a hearing at its earliest convenience. Neither the Court nor Mr. Fleming should be subjected to the cost and expense of dealing with Escort's actions.

I.     **FACTUAL BACKGROUND**

This case was filed accusing five Escort products of infringement, namely the 9500i, 9500ix, GX65, Passport iQ, and Pro 500. (Exh. 1, Fleming's Infringement Contentions at p. 2.[1])

---

[1] The other accused products are manufactured by Cobra and Whistler, which are different defendants that have settled with Mr. Fleming.

Four of those products were accused in the parties' first case, namely the 9500i, 9500ix, GX65, and Passport iQ. (Exh. 2, Jury Verdict.) Thus, there is *one* new product accused of infringement in this case—the Pro 500. In response to Mr. Fleming's infringement contentions, the Court's Local Patent Rules required Escort to produce the "source code" for each accused product. (Dist. Idaho Loc. Patent R. 3.4(a).) Escort responded by producing all of the source code it had produced in the parties' first case and *one* new set of source code. Escort identified the new code using bates numbers ESC 17363-364.[2] (*Compare* Exhs. 3-4, Escort Rule 3.4(a) disclosures.) Escort's newly produced source code makes specific reference to the Pro 500 on **forty-four** separate occasions.[3] (Exh. 5, Fleming Decl., ¶20.)

As explained in Mr. Fleming's opening brief, Escort recently filed a motion in this case seeking to dismiss certain infringement allegations against the Pro 500. (Dkt. No. 63.) The premise of Escort's motion is that the Pro 500 is the "same" product as the GX65 radar detector previously litigated in the parties' first case. (*Id*.) Escort supported its argument with Mr. Kuhn's declaration, which averred that "[t]he Pro 500 radar detector is a GX65 radar detector, but for two very minor changes: (1) the name of the product has been changed from 'GX65' to 'Pro 500,' and when the Pro 500 radar detector is turned on the 'splash screen' displays in text that the product name is 'Pro 500,' and (2) the Pro 500 product cannot detect a radar signal from the Ku frequency band." (*Id*. at Exh. B, Kuhn Declaration at ¶ 3.) Mr. Kuhn further averred that there is no significance to the one minor change in functionality between the two products since "[e]liminating the capability of detecting a radar signal from the Ku frequency band was accomplished by simply disabling a previously enabled feature." (*Id*. at ¶ 6.) Mr. Kuhn did not

---

[2] ESC 17363 is source code that runs in a radar detector's GPS processor, whereas ESC 17364 is source code that runs in a radar detector's main processor.

[3] As explained in more detail below, Escort now wants the Court to believe that its newly produced code has nothing to do with any "commercially sold" Pro 500.

stop there. He further averred that "[o]ther than disabling the feature of detecting a radar signal from the Ku frequency band, the source code [for the GX65 and the Pro 500] is the same." (*Id*.) Mr. Kuhn ended his declaration by averring:

> The sole differences between the Pro 500 radar detector and the GX65 radar detector are (1) the name of the product, and (2) that the Pro 500 cannot detect a radar signal from a particular frequency band. No other changes have been made to the GX65 radar detector to rebrand that product as the Pro 500 radar detector.

(*Id*. at ¶ 7.)

Mr. Fleming opposed Escort's motion to dismiss the Pro 500 and filed the present motion for an order to show cause on the basis that Escort and Mr. Kuhn had egregiously misrepresented the facts when swearing (under oath) that the Pro 500 and the GX65 are the same product and use the same source code. Since the Pro 500 and the GX65 are advertised as having (and have) vastly different functionalities, it does not take a computer science major to know the two products are not the same and obviously cannot use the same source code. Indeed, as pointed out in Mr. Fleming's opening brief—and totally ignored (much less rebutted) by Escort—the Pro 500 was first announced in an August 13, 2012 press release, where Escort repeatedly touted the Pro 500 as "all new" and "completely new". Here is the announcement's headline:

**BELTRONICS Releases All New Professional Series Radar Detector Line Compatible with Industry-leading ESCORT Live™ Ticket Protection App**

*BELTRONICS, maker of the world's best performing radar and laser detectors, has announced a completely new BELTRONICS Professional Series Radar Detector line.*

(Opening Br. at p. 4.) The press release goes on to further distinguish the Pro 500 from the pre-existing GX65, stating:

3

> BELTRONICS has continued to innovate and develop emerging technologies for its new products. Each generation builds on the successes of the previous and the new PRO Line is an extension of that award winning philosophy. The new PRO Line features enhanced levels of performance and convenience as well as housing upgrades to the former models across the earlier Professional Series line-up.
>
> The new PRO line includes four models with new price points: the PRO500 ($399); PRO300 ($299); PRO200 ($229); and the PRO100 (entry level price of $179). All models have a new soft-touch black finish for ease of comfort when handling.
>
> As expected, level of new features, enhanced performance and design improvements increase through the line-up. For example, the PRO500 and PRO300 units include a 40% performance improvement over the previous Professional Series top models. The PRO500 also includes built-in GPS location awareness which allows the driver to identify, mark and then lock out unwanted false alerts. The GPS model also includes the Defender Database of red light and speed camera locations for early warning.
>
> The new PRO line's flagship models, the PRO500 and PRO300, are compatible with ESCORT Live™, the ultimate real-time ticket protection network. ESCORT Live™ delivers revolutionary radar and laser ticket protection by using real-time, cloud-based threat and information sharing among drivers throughout North America.

(*Id*. at 5.) As indicated above, Mr. Fleming pointed this out in his opening brief, and yet Escort conspicuously never even attempts to explain why its representations to the public radically differ from its present representations to Mr. Fleming and the Court.

Nevertheless, Mr. Fleming did not rely only on the veracity of Escort's advertising; he also compared the circuitry, source code, and functionality of the GX65 and Pro 500. He also took both products and performed comparative tests on them, as evidenced by videos provided to the Court in connection with his opening brief. (Opening Br. at Exhs. E-F.) In doing so, Mr. Fleming noted (in his supporting declaration) literally "thousands" of physical and operational differences between the two products and their source codes, not the mere "two" Mr. Kuhn represented to the Court under the penalty of perjury. (*Id*. at pp. 5-16.)

II. ARGUMENT

Escort's arguments for why it should not be sanctioned reveal a further pattern of deceit so shocking that they simply cannot go unaddressed.

A. Escort's Argument Concerning the "Real" Pro 500 Source Code

Escort argues it should not be sanctioned because the Pro 500 source code Mr. Fleming

4

used to compare the GX65 source code to is not the code for a "commercially sold" Pro 500. (Opp. Br. pp. 2-3.) In other words, Escort argues Mr. Fleming used the wrong source code when demonstrating that it bore no relation to the GX65 code. Note that Escort never identifies the "real" Pro 500 source code or whether that code is the same as the GX65 code. Escort appears suspiciously comfortable hiding that from everyone, despite it being the dispositive issue at stake in this motion.

Nevertheless, Mr. Fleming noticed Escort's argument when Escort first made it in its reply brief in support of its motion to dismiss the Pro 500.[4] (*See* Dkt. No. 80, Escort Reply Br.) Escort's argument immediately raised issues because Mr. Fleming had used the only new source code Escort had produced in the case (as corresponding to the only new accused product and repeatedly referencing the Pro 500). Nevertheless, the very next day Mr. Fleming wrote to Escort (in an effort to understand what source code Escort contends corresponds to the Pro 500) stating:

> Mr. Fleming specifically identified the Pro 500 radar detector as an accused product under Dist. Idaho Patent Loc. R. 3.1(b) and provided a claim chart for that product under Rule 3.1(c). As a consequence, Rule 3.4 required that Escort produce the source code for that product and identify it by bates number in its Rule 3.4 disclosure. Accordingly, please identify, by bates number(s), where the source code for the Pro 500 can be found in Escort's production and in its Rule 3.4 disclosure.

(Exh. 6, September 24, 2013 party correspondence.) This began a correspondence exchange spanning the next several weeks wherein Escort engaged in a despicable pattern of deceit designed to conceal the falsehoods advanced in its motion to dismiss and in the supporting Kuhn declaration. For example, Escort first sought to continue its falsehoods by responding as follows:

---

[4] Escort's present opposition brief is a cut-and-paste of its reply brief in support of its motion to dismiss the Pro 500. (*See* Dkt. No. 80, Escort Reply Br.)

5

> As you have already been informed, when the GX65 radar detector was rebranded as the Pro 500 radar detector, the source code for the GX65 (main and GPS processors) was used. Thus, the source code used for the Pro 500 can be located at ESC 13457 (main processor) and ESC 10689 (GPS processor). These documents were identified in Escort's Local Patent Rule 3.4(a) disclosure.

(Exh. 7, September 26, 2013 party correspondence.) The source code at ESC 13457 and 10689 is the source code Escort produced years ago in the parties' first case (*i.e.,* years before the Pro 500 existed) for the GX65. Thus, like Mr. Kuhn, Escort once again told Mr. Fleming that the Pro 500 and the GX65 used the same source code, which had been previously produced and litigated in the parties' first case.

Mr. Fleming knew that was not right. Indeed, it could not be right. For starters, the GX65 source code contains a command that causes "GX65" to appear on the GX65 splash screen when it boots up. When the Pro 500 boots up, "Pro 500", not "GX65", appears on its splash screen. Thus, the Pro 500 obviously does not use the GX65 source code.

Still further, as Escort advertised and as confirmed by Mr. Fleming's hands-on operation of both products, the Pro 500 has functionality that the GX65 does not support. For example, as explained in detail in Mr. Fleming's opening brief (and his supporting declaration), the Pro 500 supports "Escort Live!", "Traffic Signal Rejection (TSR)", and USB functionalities that the GX65 does not support. (Opening Br. at pp. 11-16.) Again, in these circumstances, it does not take a computer science major to know that these extra functionalities cannot be performed by source code for a product not capable of performing those functions.

Accordingly, Mr. Fleming believed there must be some deceit involved in Escort's correspondence. He then went back and parsed Escort's words very carefully, noting Escort's repeated use of "used" in its correspondence, namely "the source code ***used for*** the Pro 500 can be located at [the GX65 source code]" and for "the Pro 500 radar detector, the source code for the GX65 (main and GPS processors) ***was used***". (Exh. 7, September 26, 2013 party

6

correspondence.) Mr. Fleming began to wonder whether Escort had attempted to deceive him (and the Court) by merely produced the source code "used for creating" the Pro 500 source code and not the Pro 500 source code itself. So, the very next day, Mr. Fleming again wrote to Escort as follows:

> As our last correspondence indicated, the Court's Patent Local Rules require Escort to produce the source code for all accused products. That does not mean merely the source code used as a starting point for creating other source code for the Pro 500 (or any other accused product). In other words, it means the source code compiled to generate the actual object code executed by the Pro 500 (and the other accused products) throughout its sales period.
>
> * * * * * * * * * * * * * *
>
> As for your averment that the Pro 500 (at the time of rebranding and/or later) uses the compiled version of the source code previously produced for the GX65, we know that to be false. As one example, that GX65 code causes "GX65" to be displayed on the splash screen of the device. If you want everyone to believe that "GX65" appears on the screen of the Pro 500, we're going to litigate that issue at the sanctions hearing. This is merely one example of the obvious discrepancy between your claim that the GX65 code you produced to us was/is used in the commercially-offered Pro 500 (at the time of rebranding and/or later). There are other plain examples of discrepancies between the GX65 code you produced to us and the operation of the accused Pro 500 that we plan to introduce.

(Exh. 8, September 27, 2013 party correspondence.)

Escort responded by continuing its deception, but also implicitly acknowledging that Mr. Fleming's suspicions were right and that Escort had been deceitfully referencing the Pro 500 source code the entire time. Apparently the treat of a sanctions hearing convinced Escort that litigating the issue of whether the Pro 500 used the same source code as the GX65 was a bad idea. Accordingly, Escort responded by stating:

> This responds to your email from Friday afternoon, and which demands production of extensive source code and other information by today. <u>First, we have now repeatedly informed you that when the GX65 radar detector was rebranded as the Pro 500 radar detector, the source code for the GX65 (main and GPS processors) **was used**. You now request the source code executed by the Pro 500. To that end, please find enclosed source code in the CD accompanying this letter.</u>

7

(Exh. 9, September 30, 2013 party correspondence (emphasis added).)  Thus, only two weeks ago in connection with its September 30 letter, Escort produced—for the first time in the case—the actual source code for the Pro 500.  This production came (1) nearly two years after the Court's Patent Local Rules expressly required Escort to produce it, (2) after repeatedly attempting to deceive Mr. Fleming into believing that the new code Escort had produced pursuant to the Court's Local Rules (repeatedly referencing the Pro 500) was the Pro 500 source code, (3) after repeatedly deceiving Mr. Fleming and the Court with the falsehood that the GX65 and Pro 500 source codes were the same, and (4) only after Mr. Fleming confronted Escort with its deceit in connection with this motion for an order to show cause.

Now having been caught red-handed, Escort seeks to excuse its deception by arguing that its attempt to pass off the GX65 source code for the Pro 500 source code was acceptable since the GX65 code "was used" when developing the Pro 500 code.  As an analogy, Escort would have the Court believe that the first draft of this brief is the same as its final version since the first draft "was used" when preparing the final.  The attempted logic is ridiculous, and Escort's attempt to employ it is nothing more than Escort's latest in a string of deceptions and falsehoods that Mr. Fleming respectfully submits this Court should not tolerate.

With Escort's deceptions revealed, the veracity of Mr. Kuhn's declaration can be adjudged—without argument from Escort—now that the Pro 500 source code finally has been identified and produced.  Specifically, Mr. Fleming compared the Pro 500 code to the GX65 code and found nearly two thousand differences.  (Exh. 5, Fleming Decl. at ¶¶ 5-11.)  Those differences correspond to the identical functional and operational differences between the GX65 and the Pro 500 that Mr. Fleming first reported in his declaration supporting his opening brief.  The multitude of differences are the same because there are similarities in the Pro 500 code and

the code Escort first produced in this case as corresponding to the Pro 500 (but now claims was never used in any "commercially sold" pro 500). (Exh. 5.)

Accordingly, for all the reasons articulated in Mr. Fleming's opening brief (as confirmed by his declaration in support of this reply brief) there is simply no truth whatsoever in Mr. Kuhn's declaration averring that the source code for the GX65 and the Pro 500 is the same and that the two products are otherwise identical, except for the products' name, splash screen, and the Pro 500's inability to detect a radar signal in the Ku frequency band.

No amount of zeal to win a motion or exclude a product from a case justifies dishonesty with the Court or the continuing pattern of deception Escort perpetrated in this situation. The evidence now is irrefutable; therefore, Mr. Fleming requests that Escort, Mr. Kuhn, and Escort's counsel be sanctioned to remedy the harm imposed by their misrepresentations and to deter similar future conduct.

**B.     Escort's Argument Concerning the Physical GX65 is Specious**

Escort seeks to dismiss the multitude of physical and operational differences between the GX65 and the Pro 500 by accusing Mr. Fleming of "relying upon an old version of a GX65 radar detector". (Opp. Br. at pp. 3-5.) That argument is, respectfully, specious.

The similarity between the GX65 and the Pro 500 arose in the context of Escort's motion to dismiss the Pro 500 from this case on the basis that it is the "same" as the GX65 litigated in the parties' first case. (Dkt. No. 63, Escort Motion to Dismiss.) Thus, in order to demonstrate the differences between those two products when making this motion and when opposing Escort's motion to dismiss, Mr. Fleming used the exact same evidence for the GX65 as was produced and used during trial of the parties' first case. Specifically, Mr. Fleming used the exact same source code for the GX65 that the parties' used in their first case for the GX65. (Exh. 5,

9

Fleming Decl. at ¶¶ 3 and 8.) Likewise, Mr. Fleming used the exact same physical GX65 device that was marked as an exhibit during trial of the parties' first case. (*Id*. at ¶ 2.) Mr. Fleming's opening brief even depicts a photograph of the GX65 he used, which bears the original trial exhibit sticker (Plaintiff's Exhibit 1064) used during the parties' trial. (Opening Br. at p. 6.) Thus, there is no legitimacy whatsoever to Escort's argument that Mr. Fleming compared the wrong GX65 to the Pro 500 for purposes of this motion.

### III.   CONCLUSION

Escort and Mr. Kuhn egregiously misrepresented the differences between the GX65 radar detector litigated in the parties' first case and the Pro 500 radar detector accused of infringing in this case. Contrary to Mr. Kuhn's false statements, there are thousands of changes in the source code for the two products; the two products have vastly different circuitry and operational features, and they—not surprisingly—operate differently as Escort's press clippings acknowledge and Mr. Fleming's testing proves.

Escort's efforts to preserve and perpetuate Mr. Kuhn's false statements through repeated violations of this Court's Local Patent Rules (concerning the disclosure of source code) and deceitful correspondence between counsel only exacerbates the harm. Accordingly, Mr. Fleming requests that the Court issue an order requiring Escort and Mr. Kuhn to appear and explain why they should not be sanctioned, so as to deter similar conduct in the future and to reimburse Mr. Fleming and the Court for their lost time and expense in dealing with Escort's misrepresentations. Unless the Court cancels the upcoming Markman hearing (as requested), Mr. Fleming requests that the Court order Escort and Mr. Kuhn to appear and explain why they should not be sanctioned immediately following that hearing on November 8, 2013. By scheduling both hearings on the same day, significant travel expenses can be eliminated.

| | |
|---|---|
| October 17, 2013 | Respectfully Submitted |
| | /s/ |
| | Michael S. Dowler |
| | Park, Vaughan, Fleming & Dowler, LLP |
| | 5847 San Felipe, Suite 1700 |
| | Houston, TX 77057 |
| | (713) 821-1540 |
| | (713) 821-1401 (facsimile) |
| | Attorneys for Plaintiff Hoyt A. Fleming |

CERTIFICATE OF SERVICE

    I HEREBY CERTIFY that on the 17th day of October 2015, I electronically filed the foregoing with the Clerk of the Court, using the CM/ECF system, which sent a Notice of Electronic Filing to all counsel who have appeared in the case.  To the extent any materials have been filed under seal, the foregoing was served by email as follows on counsel for the party who has asserted a claim to the confidentiality of the information disclosed herein.

    Mr. Greg Ahrens
    Mr. Brett Schatz
    Wood Herron & Evans LLP
    2700 Carew Tower
    441 Vine Street
    Cincinnati, Ohio 45202-2917
    gahrens@whe-law.com
    bschatz@whe-law.com

    Counsel for Defendants Escort, Inc. and Beltronics USA, Inc.

    /s/
    Michael S. Dowler