Michael S. Dowler
Park, Vaughan, Fleming & Dowler LLP
5847 San Felipe, Suite 1700
Houston, TX  77057
Telephone:  713.821.1540
Facsimile:  713.821.1401
Email:  mike@parklegal.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| HOYT A. FLEMING,<br><br>            Plaintiff,<br>v.<br><br>ESCORT, INC., ET. AL,<br><br>            Defendants. | Case No. 1:12-cv-0066-BLW<br><br>PLAINTIFF'S REPLY IN SUPPORT OF HIS MOTION FOR SANCTIONS DUE TO SPOLIATION OF EVIDENCE AND FRAUD (DKT. NO. 221) |

**SUMMARY**

Escort admits it did the unthinkable—it despoiled the exact products accused of infringement. By doing so, Escort has eviscerated Mr. Fleming's ability to (1) prove those products infringe, (2) counter Escort's claim that those products are impermissibly similar to products litigated in *Fleming I*, and (3) prove Escort has once again fraudulently advanced code used by those products. Worse, Escort concedes it has no defense to the fact that it spent the last two years of this case covering up its spoliation. Escort does not even try to distinguish the fact that it falsely assured Mr. Fleming that (1) it had preserved all "tangible things, regardless of their source or format, which could be in any way relevant to this litigation" and (2) that he could purchase authentic samples of the accused products on the open market. Because Mr. Fleming's infringement proofs should not be vanquished by Escort's spoliation, the only reasonable remedy in these circumstances is a directed verdict of infringement on the despoiled products and an award of Mr. Fleming's costs and fees attributable to Escort's spoliation and persistent fraud.

**ESCORT'S ARGUMENTS LACK MERIT**

***1.   Escort's Admits it Despoiled the Infringing Products Because it Does not Keep them "in the Ordinary Course of Business"***

Escort admits it despoiled its infringing products, but now it argues it was justified in doing so because it typically does not preserve them "in the ordinary course of its business". (Opp. Br. at p. 6.) Aside from rankly inconsistent with its prior (false) assurance that it was preserving all "tangible things, regardless of their source or format, which could be in any way relevant to this litigation", Escort could not make a more incriminating and devastating new argument. As this Court has ruled, the business as usual approach to preserving even "potentially relevant" corporate information ends when litigation is anticipated:

> [I]f a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the

1

preservation of relevant documents.

*United States v. Fed. Res. Corp.,* 2012 U.S. Dist. LEXIS 65430, *8 (D. Idaho 2012) (Winmill, J.). Likewise, in *Scentsy, Inc. v. B.R. Chase, L.L.C.,* the Court held:

> The Court has serious concerns with Scentsy's retention policy and litigation hold process. Generally not deleting documents, and orally requesting certain employees to preserve relevant documents concurrently with filing a lawsuit, is completely inadequate. It is very risky – to such an extent that it borders on recklessness.

2012 U.S. Dist. LEXIS 143633 at *20 (D. Idaho 2012) (Winmill, J.); *see also id.* at *6 ("A party engages in spoliation as a matter of law if they had some notice that the documents were *potentially relevant* to the litigation before they were destroyed.") (emphasis added). As such, Escort's primary excuse for its spoliation is expressly contrary to law.

### 2. Escort's Argument that Mr. Fleming's Motion is Dilatory

Escort next seeks to justify its spoliation on the basis that (a) Mr. Fleming's request seeking a physical sample of the infringing devices was not served until a year after the case was filed; (b) Mr. Fleming did not file a motion to compel; and (c) Mr. Fleming unreasonably delayed filing the present motion. (Opp. Br. at p. 3; 12; 14). These excuses make no sense.

First, as this Court has repeatedly ruled, a party's obligation to preserve evidence begins when litigation is reasonably anticipated, not when an opposing party serves discovery. (*Supra* at pp. 1-2.) Second, filing a motion to compel despoiled evidence is an obvious exercise in futility since, by definition, there is no evidence that could be produced. Third, there was no reason for Mr. Fleming to file this motion any earlier since Escort had assured him (1) that he could purchase the products on the open market and (2) that it otherwise was preserving all "tangible things, regardless of their source or format, which could be in any way relevant to this litigation". (Opening Br. at pp. 5-7.) When Mr. Fleming recently found out those averments were false, he filed this motion 3 days later. (Exh. 5, January 27, 2015 email admitting the

2

infringing products had been despoiled and could not be purchased.)

### 3. *Escort's Argument that its Spoliation is all Mr. Fleming's Fault*

Escort next seeks to justify its spoliation on the basis that (a) Mr. Fleming did not request or use all product revisions during *Fleming I* and (b) his infringement contentions served early in this case did not identify all such revisions. (Opp. Br. at pp. 5; 7; 12-13.) These arguments also make no sense.

As an initial matter, what transpired in *Fleming I* obviously has nothing to do with Escort's obligation to preserve evidence for a second, different case involving different products and a different patent. *United States,* 2012 U.S. Dist. LEXIS 65430, *8 (D. Idaho 2012); *Scentsy,* 2012 U.S. Dist. LEXIS 143633, *20 (D. Idaho 2012). It is unconscionable that Escort did not preserve something as indisputably, obviously relevant as the infringing products.

Next, while it is true that individual product revisions were not litigated and tried during *Fleming I*, that was *only* because Escort concealed from Mr. Fleming the fact that such revisions existed. Only Escort knows whether its concealment was the product of it secretly despoiling the product revisions and corresponding source code, as it has done in this case. Whatever the reason, the existence of different product revisions did not come to light until later in this case when Escort got caught falsely claiming its Pro 500 and GX65 products were the same.

Specifically, as the Court may recall, Escort moved to dismiss the Pro 500 on the basis that it was the same product as the previously litigated GX65. (Dkt. No. 63.) It was through the discovery process related to that motion where Mr. Fleming first became aware that Escort possessed Product Compatibility Logs, which showed that Escort's product families actually comprised of a series of revisions that contained different circuitry and source code. As the Court previously found, Escort did not actually first produce its Logs until December 30, 2013—

nearly 2 years after this case was filed. (Dkt. No. 178, Order at p. 5; *see also* Exh. 13.) This, of course, was nearly 1.5 years *after* Mr. Fleming was obligated by the Court's Local Patent Rules to serve his infringement contentions, which Escort now (1) illogically uses as the basis for contending that Mr. Fleming deceptively did not accuse each product revision, and (2) uses as a nonsensical crutch for not preserving its infringing products.[1]

### 4. *Escort's Argument that Mr. Fleming has not Been Prejudiced*

Escort's argument that Mr. Fleming has not been prejudiced by Escort's spoliation is simply bizarre. (Opp. Br. at pp. 14-16.) It is undisputed that each family of accused products consists of separate revisions, where each revision includes different code and some include different circuitry. As such, Mr. Fleming cannot meet his burden of proving infringement—or survive a Fed. R. Civ. P. 50 motion—for each accused revision without proving each revision infringes. <u>Indeed, when explaining why it allegedly does not infringe, Escort did not merely lump the products into families (like its present opposition brief); it explained its non-infringement contentions on a physical, revision-by-revision basis. (Exh. 15, Response to Interrog. No. 2.)</u>[2] <u>In other words, Escort's argument that Mr. Fleming only needs 7 physical products is not only expressly contrary to the facts and Escort's own contentions, it is an obviously conjured argument designed to avoid the wreckage inflicted by its spoliation.</u>

Moreover, as shown in Mr. Fleming's opening brief, Mr. Fleming repeatedly has relied

---

[1] Note that Escort's new argument (that it did not preserve the accused products because Mr. Fleming's early infringement contentions did not identify each revision) is also rankly inconsistent with (1) its original (false) assurance that it had preserved everything of any possible relevance; (2) its (false) assurance that Mr. Fleming could purchase the products on the open market; and (3) its discovery responses where it presented its non-infringement contentions on a revision-by-revision basis. *Infra* at n. 2.

[2] For example, *see* Exh. 15, pp. 1-2 where Escort's references to V1.19, V1.21, V1.22, V1.27, and V1.34 correspond to the Max radar detector, Revisions A, B, C, F, and I, respectively. (Exh. 16, Product Compatibility Log: Passport Max.)

on the physical devices to prove his case. Indeed, as was the case in the parties' first trial and as shown by Mr. Fleming's infringement contentions in this case, Mr. Fleming has *never* accused a device or sought to prove it infringes without physically testing the device and offering evidence related to that physical testing. (Opening Br. at pp. 2-5.) While Escort does not and cannot challenge these facts, it is not Escort's prerogative to destroy obviously relevant evidence and force Mr. Fleming to rely on anything less than evidence (the authentic physical products) he is absolutely and rightfully entitled to and that is necessary to his success.

While it is enough that Mr. Fleming's infringement proofs have been compromised by Escort's spoliation, related aspects of Mr. Fleming's case likewise have been eviscerated. As Mr. Fleming's Opening Brief explains—again wholly unchallenged by Escort—Escort has raised a defense that the products accused in this case are impermissibly similar to the products found to infringe in *Fleming I*. (Opening Br. at pp. 2-5.) As an example, Revision B of the 9500ix was litigated during the parties' first case and Mr. Fleming now is accusing Revisions T-Z and AA of the 9500ix in this case. (Exh. 14, 9500ix Product Compatibility Log.) While Escort would have the Court believe that all Mr. Fleming needs is "any revision of the 9500ix", that simply is not true. For example, if all Escort possesses (after its spoliation) is Revision T, it is impossible for Mr. Fleming to show that Revisions U-Z and AA differ from Revision B through any inspection, testing, or physical attribute of those products.[3]

This is not speculation. As Mr. Fleming pointed out in his Opening Brief—again unchallenged by Escort—the Court repeatedly has relied on physical samples of the accused

---

[3] Once again, expressly contrary to Escort's opposition arguments, Escort's non-infringement contentions for the 9500ix consist of a revision-by-revision analysis, where Escort lists separate non-infringement arguments for Revisions I-N (code version 148), Revisions O-P (code version 152), Revision Q (code version 188), Revision R (code version 193), Revisions S-U (code version 198), Revisions V-W (code version 220), and Revision Y (code version 240). (Exh. 15 at pdf page 40.) (*See also,* Exh. 14, Product Compatibility Log: 9500ix.)

products when making rulings in this case. Specifically, when denying Escort's motion to dismiss the Pro 500 as an accused product, the Court relied on Mr. Fleming's physical and operational comparisons between the Pro 500 and the GX65, which would not have been possible without Mr. Fleming actually possessing a physical sample of those products.

> Escort now alleges that its new device, the Pro 500 – named as an infringing device in both Count One and Count Two -- is identical to the GX 65 and is entitled to be dismissed from these two Counts just as the GX 65 was dismissed. <u>In response, Fleming has filed material that he alleges shows significant differences in the circuitry and source code of the two devices.</u> *See Fleming* <u>*Declaration (Dkt. No. 70-1).*  In addition, Fleming alleges that a test of the operation of the two devices demonstrates that the Pro 500 is more sensitive than the GX 65.</u> *Id*.
>
> The Court expresses no opinion on whether the devices are similar; it is enough that the record contains a factual dispute that precludes resolution of this issue on a motion to dismiss…
>
> Thus, Escort must show that the Pro 500 is the same product as the GX65 to be entitled to a dismissal based on the earlier jury verdict. <u>Because there are questions of fact over whether the Pro 500 is the same product as the GX65, the Court will deny the motion to dismiss.</u>

(Dkt. No. 138, Order at pp. 3-4 (emphasis added); *see also id.* at pp. 4-5 (relying on Mr. Fleming's physical examination of the Passport Max); Dkt. No. 138, Order at pp. 23-24 (relying on Mr. Fleming's physical examination of the 9500ix, Revision J).)

Finally, as the Court also will recall, there are major disagreements between the parties regarding the authenticity of the code Escort has produced as allegedly run by each revision of each accused products. Indeed, the Court recently granted Mr. Fleming's motion to compel Escort to chronicle on a product-by-product, revision-by-revision basis which source code Escort contends was used to generate the binary code actually loaded into *each revision of each product*. (Dkt. No. 231, Order at pp. 7-8.) One way for the parties to prove whether the binary code is authentic is to extract the binary code from each revision of each accused product. If the extracted binary code matches the binary code Escort produced, that binary code is authentic.

Escort's opposition brief argues this is all a red herring because Escort claims it is impossible to extract the binary code from the main processor in the accused products and it cannot extract binary code from the GPS processor in those products. (Opp. Br. at pp. 2; 5-6; 9.) Escort is dead wrong. In the time since Escort made these false arguments, Mr. Fleming has identified at least three different companies that possess the ability to extract binary code from the main processor, and Mr. Fleming himself has extracted binary code from the GPS processor of one of the accused devices he possesses. (Exh. 18, Fleming Decl.) Thus, Escort's argument that physical samples of the accused products are irrelevant to the highly disputed code authenticity issues is demonstrably and irrefutably wrong.

### 5. *Escort's Request to Recreate the Despoiled Products is Unavailing*

Having admitted to despoiling the infringing products and acknowledging Mr. Fleming's need for them, Escort now seeks permission to create "substitute" products. (Opp. Br. at pp. 8-10.) That request is totally unavailing. Mr. Fleming is entitled to authentic samples of the accused products, *i.e.,* as they were actually made and sold during the period of infringement, not after-the-fact, recreated, made-for-litigation products that lack authenticity and cannot otherwise be cross-examined due to the absence of the despoiled actual products.

As described, there are massive disputes between the parties regarding whether the code files Escort retained and produced in this case are the actual code files that were used with/for the accused products. (Opening Br. at pp. 4-5.) Indeed, the Court already has found that Escort fraudulently advanced source code that did not actually correspond to its accused products. (Dkt. Nos. 178, 208, 231.) In these circumstances, it hardly is availing that Escort now contends it can remedy its spoliation by cooking up a sample of each accused product in its lab using despoiled, falsified, and otherwise highly questionable code files. Stated otherwise, Escort's offer to load

<u>its "recreated" products with its suspect code is circular because one of the reasons Mr. Fleming needs the original products is to assess whether the code in those products comports with the code files Escort has produced as allegedly being used in those products.</u>[4]  Thus, Escort's offer to recreate products totally fails to put Mr. Fleming in the position he would have been in had Escort simply preserved actual, authentic samples of its infringing products.

Further, it is not merely disputes concerning the authenticity of the code for each accused product that preclude Escort from "recreating" those accused products in a manner that would remedy their spoliation.  Each product includes intricately designed boards (one of which is shown in the photo below) that are populated with a very specific set of electronic components.  (*See e.g.,* Exh. 12 (Bill of Materials for GX65, Revision A).)  Many of the different revisions of



the accused products use different boards and/or different sets of electronic components.  As Escort admitted earlier in the case, in some cases those boards/components have been discontinued such that it now is impossible to recreate the accused products.  (Dkt. No. 80-1 (Kuhn Declaration), ¶¶ 18-19.)  Escort further admits that "manufacturing differences" vary the performance of its products.  (*Id*. at ¶ 22.)  Thus, as the circumstances show, Escort has admitted that a "recreated" product will not identically replace the accused products, either structurally or functionally, as they were built and sold during the period of infringement.  Mr. Fleming pointed this out in his opening brief (Opening Br. at pp. 10-13), yet Escort has no

---

[4] Note also that Escort's newly-minted argument that it intentionally despoiled its products on the premise that it could manufacture new ones is completely uncorroborated.  Immediately after Escort first presented this new argument, Mr. Fleming propounded a document request seeking all documents evidencing Escort's supposed corporate policy of despoiling its products on the premise that it could manufacture new ones.  Not surprisingly, Escort was forced to admit that it did not possess one single corroborating document, other than its present, self-serving opposition, which is not evidence.  (Exh. 17.)

rebuttal, thereby showing that its proposal to recreate products to replace those it despoiled will not result in authentic replacements.[5]  Finally, Escort's spoliation of its actual accused products precludes Mr. Fleming even from assessing whether the "recreated" products function and operate the same as the despoiled products.

### 6. *Escort's Legal Argument and Analysis Errs as a Matter of Law*

Escort erroneously recasts Mr. Fleming's motion from one seeking a directed verdict of infringement on the despoiled products to one seeking "terminating sanctions".  Escort did this in order to espouse an incorrect legal standard it contends applies to the spoliation issue.

Specifically, Escort argues that because Mr. Fleming is seeking "terminating sanctions" he must show Escort acted with "willfulness, fault, or bad faith".  (Opp. Br. at p. 11, citing the "terminating sanctions" or "dismissal" portions of *Conn. Gen. Life,* 482 F.3d 1091, 1096 (9th Cir. 2007) and *Leon,* 464 F.3d 951, 958 (9th Cir. 2006).)  Mr. Fleming is not seeking terminating sanctions.  He is seeking a directed verdict of infringement on the despoiled products, which leaves Escort with all its properly pled defenses.  As a result, Escort's error renders its entire legal argument irrelevant.  The correct legal standard is set forth in Mr. Fleming's opening brief, which Escort does not challenge.  (Opening Br. at pp. 7-9.)

Finally, this is a patent infringement case where—like every patent case—the structure, function, and operation of the accused products will determine the outcome.  It is not remotely

---

[5] Escort argues two cases authorize a spoliating party to regenerate the despoiled evidence. (Opp. Br. at pp. 17-18.)  Both are easily distinguishable because, unlike the despoiled products here, both cases established that the despoiled evidence could be accurately reproduced.  For example, in *Centrifugal Force, Inc. v. Softnet Comm'n,* the court held that "the [despoiled] source code can be decompiled". 783 F.Supp.2d 736, 745-46 (S.D.N.Y. 2011).  Here, Escort admits that is not the case.  (Opp. Br. at p. 9 (Escort's "source code cannot be decompiled"); *see also id.* at pp. 5-6.)  In *Oleksy v. General Electric.,* it was not disputed that the data input during the recreation process would produce authentic code, thus there was no concern about the authenticity of the recreated code. 2014 U.S. Dist. LEXIS 106115 *7-9, 14-15 (E.D. Ill. August 1, 2014).

believable that Escort—a party that has been in continuous litigation with Mr. Fleming since 2009 concerning its radar detectors—did not think to preserve a physical sample of those same products when it was sued again in a co-pending case in 2012.  Indeed, we are not talking about evidence whose relevancy exists in a disputed gray area.  We are talking about some of the most basic evidence in any patent case—the accused products, individual revisions of which **both parties and the Court** have relied on during this dispute.  (*Supra* at pp. 4-7.)

If that were not enough, there is more.  The undisputed evidence also shows Escort sought to hide its spoliation for nearly two years by telling Mr. Fleming he could purchase the accused products on the open market and to otherwise not worry because it had preserved all "tangible things, regardless of their source or format, which could be in any way relevant to this litigation".  Escort now admits both representations were false.  Still worse, now we are told to believe other contradictory stories, like Escort intentionally despoiled the accused products (not because it could purchase them on the open market like it told Mr. Fleming) but because it can build replacement replicas.  The problem with Escort's latest story is that it is not only inconsistent with its earlier representations, it is both unavailing (due to disputes over the authenticity of the code it would use to build them) and unwittingly inconsistent with Escort's prior averments telling us that such reconstructed products would *not* be structurally and operationally the same as those it originally sold.  (*Supra* at pp. 7-9.)

Contrary to Escort's uncorroborated exaggerations, there are dozens, not hundreds, of product revisions.  (Opening Br. at p. 14.)  As such, Mr. Fleming requests a directed verdict of infringement on the despoiled products, which are listed on page 14 of his Opening Brief, as was well as his fees and costs attributable to Escort's spoliation and fraud.

March 12, 2015                                                  Respectfully Submitted

        /s/
Michael S. Dowler
Park, Vaughan, Fleming & Dowler, LLP
5847 San Felipe, Suite 1700
Houston, TX 77057
(713) 821-1540
(713) 821-1401 (facsimile)

Attorneys for Plaintiff Hoyt A. Fleming

11

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on the 12th day of March 2015, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing. To the extent any of the foregoing was filed under seal, each of the following parties or counsel was served by email.

| | |
|---|---|
| Brian P. Muething<br>Keating Muething & Klekamp PLL<br>One East 4th Street, Suite 1400<br>Cincinnati, OH 45202<br><br>J. Walter Sinclair<br>Holland & Hart LLP<br>800 West Main Street, Suite 1750<br>Boise, ID 83702<br><br>Timothy P. Getzoff<br>Holland & Hart LLP<br>800 West Main Street, Suite 1750<br>Boise, ID 83702 | Bryce J. Yoder<br>Keating Muething & Klekamp PLL<br>One East 4th Street, Suite 1400<br>Cincinnati, OH 45202<br><br>Rachael A Rowe<br>Keating Muething & Klekamp PLL<br>One East 4th Street, Suite 1400<br>Cincinnati, OH 45202<br><br>Keely E. Duke<br>Duke Scanlan Hall PLLC<br>1087 W. River Street, Suite 300<br>Boise, ID 83702<br><br>Robert B. White<br>Givens Pursley LLP<br>601 West Bannock Street<br>Boise, ID 83702 |

/s/
Michael S. Dowler