Michael S. Dowler
Park, Vaughan, Fleming & Dowler LLP
5847 San Felipe, Suite 1700
Houston, TX 77057
Telephone: 713.821.1540
Facsimile: 713.821.1401
Email: mike@parklegal.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| HOYT A. FLEMING,<br><br>Plaintiff,<br>v.<br><br>ESCORT, INC., ET. AL,<br><br>Defendants. | Case No. 1:12-cv-0066-BLW<br><br>REPLY IN SUPPORT OF PLAINTIFF'S SECOND MOTION FOR SANCTIONS DUE TO SPOLIATION OF EVIDENCE (DKT. NO. 223) |

## SUMMARY

Escort's opposition misapprehends and otherwise fails to address the issues raised by Mr. Fleming's motion. Mr. Fleming seeks sanctions for Escort's spoliation of Version 63 of its source code and efforts to hide its spoliation. Escort's opposition now admits it despoiled Version 63 when one of its engineers inexplicably destroyed that code after Escort was found to infringe in *Fleming I*. Escort also has no explanation for its 18-month effort to pass off Versions 62 and 64 for Version 63, both of which Escort now admits were never used.

Rather than simply acknowledge its spoliation, Escort makes two desperately illogical arguments. First, despite its engineer's admission that he failed to preserve Version 63, Escort argues "version 63 was not despoiled". Second, Escort argues everyone should just trust that it has correctly explained how to change Version 62 into what Version 63 supposedly looked like before it was despoiled. Escort's after-the-fact, made-for-litigation modification of Version 62 not only advances inauthentic, hearsay evidence, Escort's argument expressly contradicts prior averments by its engineers and the Court's prior holding that such "substitute" code *does not* suitably replace the despoiled code actually used by Escort's accused products.

## ESCORT ADMITS IT DESPOILED VERSION 63

Let us begin with two undisputed facts: (1) certain of Escort's accused products use code Version 63; and (2) more than 3 years since this case was filed and approximately 2 years after Escort was required under the Court's Local Patent Rules to produce the code actually used by its accused products, Escort has *never* produced Version 63. Despite that, Escort now incredibly asks the Court to believe that "version 63 was not despoiled". (Opp. Br. at pp. 2; 10; 12; 14.)

Escort's request is an acknowledgement that there is little it will not argue. As Mr. Fleming has been asking for nearly 2 years, if Version 63 has not been despoiled, Escort should

produce it. Yet, Escort *never* has. We now find out why in the context of Escort's present opposition—Version 63 has been despoiled. Here are Escort's admissions:

> When Mr. Stevens was asked to provide source code for version 63 for production, he realized that he had not kept a copy of version 63 as it had been compiled on July 13, 2012, but instead, had made the minor changes described above (regarding supporting the foreign models) and saved it as version 64. Stevens Decl. ¶¶18-19. However, he did have a copy of version 62…

(Opp. Br. at p. 9 (emphasis added).)[1]

> While it is unfortunate that Mr. Stevens did not save version 63 at the time, the changes he made to version 62 to arrive at version 63 were very minor…

(Opp. Br. at p. 15 (emphasis added).) Even if the Court were to accept this hearsay, at best what Escort's argument shows is that Mr. Stevens opened Version 63 on his computer, made changes to it, and then saved it under the same file name. As anyone who uses a word processor knows, saving a modified file over an original file forever destroys the original file since all you are left with is the modified file. Accordingly, the undisputed fact that Version 63 has never been produced, coupled with Escort's admission that Version 63 was not persevered, collectively make a mockery of Escort's argument that Version 63 was not despoiled. *See United States,* 2012 U.S. Dist. LEXIS 65430, *8 (D. Idaho 2012) (Winmill, J.); *Scentsy,* 2012 U.S. Dist. LEXIS 143633, *20 (D. Idaho 2012) (Winmill, J.).

**ESCORT'S PLEA TO USE "SUBSTITUTE" CODE IS MERITLESS**

Knowing it despoiled Version 63, Escort resorts to a "no harm no foul" argument on the premise that Mr. Fleming should be ordered to rely on "substitute" code Escort created a few

[1] As Escort also admits, July 13, 2012 is a critical date because: (1) that is when Version 63 was first loaded into Escort's accused products (Opp. Br. at p. 5); and (2) it is 5 months after this case was filed and a few weeks after Escort was found to infringe in *Fleming I*. Thus, Escort's destruction of Version 63 irrefutably occurred during a timeframe and in circumstances in which it had an obvious obligation to preserve its source code. *United States v. Fed. Res. Corp.,* 2012 U.S. Dist. LEXIS 65430, *8 (D. Idaho 2012) (Winmill, J.); *Scentsy, Inc. v. B.R. Chase, L.L.C.,* 2012 U.S. Dist. LEXIS 143633, *20 (D. Idaho 2012) (Winmill, J.).

months ago for purposes of this case. (Opp. Br. at pp. 3-6; 9-10.) Escort's argument is meritless.

Let us first be clear about what Escort is arguing and what it is not arguing via a simple explanation of the terminology being used here. As shown by the diagram below, a product designer writes source code in a human-readable programming language. Because




microprocessors only operate on machine-readable code, the human-readable source code must be translated into machine-readable "binary", "hex", or "object" code (all synonyms). The process of translating (human-readable) source code files into (machine-readable) binary/hex/object code files is performed by a "compiler/linker".[2] The compiler/linker receives one or more source code files and certain other "project files" (also created by the designer), compiles the files, and outputs a corresponding (machine-readable) binary/hex/object code file. This binary/hex/object code file (which is no longer human readable) is then loaded into a product's memory, from which the product's microprocessor fetches it for execution and, thus, causes the product to operate as the designer intended.

With this foundation, which Escort agrees with (Opp. Br. at p. 2), let us specifically look at Escort's argument. In response to Mr. Fleming's spoliation and fraud allegations, Escort now admits it recently took Version 62 of its source code, changed and re-wrote some of its 20,173 lines of code, compiled that re-written code to create a hex (a.k.a. binary or object) file, and *viola* that hex file allegedly is the same as the hex file that allegedly was produced by compiling despoiled Version 63. (Opp. Br. at pp. 2-6; 9-12; Exh. 14, Fleming Decl. at ¶ 6.) <u>What Escort does *not* argue is that its modified edition of Version 62 is the *same* as the despoiled Version 63.</u>

[2] The "compiler/linker" is an off-the-shelf program specifically designed to compile source code (and its associated project files) into machine-readable binary code.

In other words, as Escort conspicuously fails to tell the Court, just because two source code files allegedly compile to the same hex/binary/object file does not make the two source code files the same. Escort will not and does not dispute this devastating fact. Indeed, as described in more detail below, Escort admitted this fact earlier in this case.

Specifically, when trying to convince the Court that ESC17363 had not been fraudulently advanced, Escort argued that it could make any number of changes to its source code, *none* of which would affect the resulting hex/binary/object file. In other words, completely inconsistent with its present argument, Escort argued that two source code files could be completely different and yet compile to the same hex/binary/object file. Here is the pertinent declaration testimony from Mr. Orr that Escort advanced:

> 4. Software development generally has the following steps. A programmer writes C source code. The C Source code is fed into a C compiler. The C compiler converts C code into an object file. The object file is programmed directly into the processor inside the product. Only lines of source code that are "compiled into object code" actually operate the products into which they are placed; many lines of source code are created to facilitate the writing or management of the code, but are not compiled into object code as part of compilation in order to optimize source code. In particular, human-readable labels for variables and constants are not compiled into the object code as part of compilation to produce object code, and lines of source code used for organizational purposes but which have no functional effect are not compiled into object code. Further references to "source code that is not compiled into object code" may be referred to as "un-compiled source code," or "un-compiled lines of source code."
>
> 5. Although un-compiled lines of source code and human-readable labels do not operate the products, they do help the programmer's thought process when designing source code. One example of un-compiled source code is a "constant", i.e., a value which does not change throughout a program. Technically, the source code "makes reference to the constant." The programmer may elect to give a constant value a descriptive name or label in the source code, so that the constant can be identified in the source code by name rather than by the value, which can help in organizing and understanding the source code, and insuring the constant value is used consistently throughout the code.
>
> 6. The compiler will optimize code written this way, by replacing the descriptive

> names of constants with the values of those constants. As a result, even though the compiler will process any line of code that assigns a value to a constant, these types of lines will not be compiled into executable code, and any lines of code that simply evaluate the value of a constant will not be compiled into executable code. One consequence of this is that the programmer may change the name of a constant in the source code of a program, if a different name is found more useful organizationally, but that change will have no effect on the resulting compiled object code or the operation of the product.

(Dkt. No. 149-3, Declaration of Mr. Steven K. Orr.)[3] Thus, as Escort admitted through Mr. Orr, there could be many thousands of differences between the despoiled Version 63 and Escort's modified edition of Version 62, and yet the two files would compile to the same hex code. Moreover, as Mr. Orr further admits, many of these differences are critical to Mr. Fleming because they "help the programmer's thought process when designing source code" and "help in organizing and understanding the source code". (*Id.*)

There are additional differences Escort conspicuously has not mentioned that could exist between the despoiled Version 63 and Escort's modified edition of Version 62, where the two files would still compile to the same hex code. Specifically, Escort's Version 62 source code contains over 1,500 "comments", many of which span multiple lines, that the source code author wrote into the code to assist others' understanding of the code, but which do not affect the code's compilation. (Exh. 14, Fleming Decl. at ¶ 5.) During *Fleming I*, both Mr. Fleming's expert and Mr. Orr testified that these "comments" do not affect the compiled (*i.e.,* hex) code but, critical to the issue presently being raised, they both specifically relied on those comments when seeking to prove their cases. (Exh. 12, June 19, 2012 Trial Tr., pp. 228-230 (Fleming expert, Dr. Bartone); Exh. 13, June 22, 2012 Trial Tr., pp. 141-142 (Orr).)

Accordingly, the very foundation of Escort's entire argument—that the despoiled Version

[3] Mr. Orr's reference to "executable" code is another synonym for hex, binary, or object code*, i.e.,* the code that results from compiling source code and that is then "executed" by a product.

63 and Escort's modified edition of Version 62 compile to the same hex code—totally falls apart because it admittedly and irrefutably fails to prove that the two versions are the same. In other words, as Escort (Mr. Orr) testified in *Fleming I* and swore by declaration in this case, and as confirmed by Mr. Fleming's expert in *Fleming I,* there could be an infinite number of differences between the despoiled Version 63 and Escort's modified edition of Version 62, all of which could be critical to the interpretation and understanding of Version 63, and yet none of which would cause them to compile into different hex files. The only way of verifying what those differences are would be to compare Version 63 to Escort's modified edition of Version 62, but that is impossible because Escort despoiled Version 63. Escort cannot and does not dispute this.

What the Court and Mr. Fleming are left with is being forced to take Escort's word that the only changes between despoiled Version 63 and the modified edition of Version 62 are "minor". (Opp. Br. at pp. 9; 15.) That is hardly satisfying, especially coming from a party that has been found to have fraudulently advanced other source code. Perhaps more importantly, as explained below, the Court has expressly rejected Escort's "just trust us" argument.

In *Fleming I*, Escort would only produce its source code in redacted format. Escort argued it should be trusted that the only portions it had redacted related to non-infringing devices. (*Fleming v. Escort,* Case No. 1:09-105-BLW at Dkt. No. 78, Order at pp. 3-5.) Mr. Fleming countered that Escort had redacted code and its comments and, as such, the redactions prevented him from fully seeing and understanding Escort's code. (*Id.*) The Court responded by ordering Escort to produce un-redacted code. (*Id.*) The Court reasoned as follows:

> Escort asks Fleming to take its word that the redactions all relate to non-infringing products. For a litigator – not unlike a country engaged in arms control negotiations – it is not unreasonable to take a position of "Trust but Verify." Fortunately, the parties have filed a Protective Order, approved by the Court, which permits such verification. *See Stipulated Protective Order (docket no. 35).* It limits disclosure of certain items to counsel and experts. Thus, it grants

> protection to Escort while at the same time allows Fleming to verify Escort's claims that the redactions are unimportant.

(*Id.*) Now fast-forward to the present case, where Escort once again demands that the Court and Mr. Fleming simply trust that all the differences between despoiled Version 63 and Escort's modified edition of Version 62 are merely "minor". But the fact is, neither the Court, Mr. Fleming, nor the jury will ever be able to "Trust but Verify" because Escort despoiled Version 63—the only evidence capable of definitively telling us what Version 63 really looked like when Escort used it for its accused products and what the differences are between it and Escort's modified edition of Version 62.

Finally, aside from spoliation issues, Escort's spoliation of Version 63 raises an evidentiary dilemma with no solution that does not violate the Federal Rules of Evidence or destroy the adversarial process. Namely, Mr. Fleming bears the burden of proving that Escort's products infringe. To carry that burden, it is undisputed that Mr. Fleming needs the source code actually used by those products. It is Escort's burden to produce authentic and otherwise admissible code. That cannot be accomplished for Version 63 because it admittedly has been despoiled.

That leaves the question of whether the Court—as Escort apparently proposes—is going to order Mr. Fleming to prove his case using Escort's modified edition of Version 62. Mr. Fleming submits such an order would violate the Federal Rules of Evidence, at least because the modified edition (1) is not authentic since it obviously is not Version 63 and (2) is hearsay without an applicable exception because it admittedly was conjured for purposes of this case. Moreover, any order requiring Mr. Fleming to prove his case using the modified edition of Version 62 would destroy the adversarial process because it is impossible for Mr. Fleming to cross-examine its authenticity and veracity without access to despoiled Version 63.

**ESCORT'S LEGAL ARGUMENT ERRS AS A MATTER OF LAW**

Escort erroneously recasts Mr. Fleming's motion from one seeking a directed verdict of infringement on each product subject to Escort's spoliation to one seeking "terminating sanctions". (*Compare* Opening Br. at pp 1-2 to Opp. Br. at pp. 13-20.) Escort did this in order to espouse an incorrect legal standard it contends applies to the spoliation issue.

Specifically, Escort argues that because Mr. Fleming allegedly is seeking "terminating sanctions" he must show Escort acted with "willfulness, fault, or bad faith". (Opp. Br. at pp. 13-14, citing the "terminating sanctions" or "dismissal" portions of *Conn. Gen. Life,* 482 F.3d 1091, 1096 (9th Cir. 2007) and *Leon,* 464 F.3d 951, 958 (9th Cir. 2006).) Mr. Fleming is not seeking terminating sanctions. He is seeking a directed verdict on each product subject to Escort's spoliation, which leaves Escort with all its properly pled defenses. As a result, Escort's error renders its entire legal argument irrelevant. The correct legal standard is set forth in Mr. Fleming's opening brief, which Escort does not challenge. (Opening Br. at pp. 7-9.)

Finally, this is a patent infringement case where—like every patent case—the structure, function, and operation of the accused products will determine the outcome. It is not remotely believable that Escort—a party that has been in continuous litigation with Mr. Fleming since 2009 concerning its radar detectors—did not think to preserve the actual source code used by its accused products when it was sued again in a co-pending case in 2012. Indeed, we are not talking about evidence whose relevancy exists in a disputed gray area. We are talking about the most basic evidence in any patent case like this one—the source code for the accused products. (*See* Dist. Idaho Loc. Patent R. 3.4(a) (requiring the automatic production of source code).)

If that were not enough, there is more. The undisputed evidence also shows Escort sought to hide its spoliation for nearly two years by telling Mr. Fleming that Versions 62 and 64

controlled some of its accused products. Specifically, in response to the Court's Local Patent Rules requiring Escort to identify the source code actually used by its accused products, Escort disclosed Version 62 (ESC18690) and Version 64 (ESC18692) on January 17, 2014. (Exh. 10.) Several months later, Escort sought to perpetuate its fraud by averring in response to Interrogatory No. 13 that Versions 62 and 64 demonstrated how at least its 9500ix product operated. (Exh. 11.) Escort then got caught fraudulently advancing ESC17363, after which Mr. Fleming seriously began to wonder whether he had been duped again in connection with Versions 62 and 64, because by this time Escort had produced its product compatibility logs showing that neither of those Versions had ever been used in any commercial product.

It was only after that (on November 21, 2014) when Escort produced ESC22563, which is Escort's modified edition of Version 62. But, even that production was deceptive. ESC22563 consists of 337 separate file folders, 3,621 separate files, and over 100,000 lines of code. (Exh. 14, Fleming Decl. at ¶ 2.) Buried among those folders and lines of code were cryptic "modification" instructions that bear no resemblance whatsoever to the detailed description Escort only provided for the first time in its present opposition brief. (*Id*. at ¶ 4; Dkt. No. 231, Order at p. 6 (sanctioning Escort for not providing a full explanation until responding to Fleming's sanctions motion).) And now, nearly 4 months later, Escort has not supplemented its source code disclosures pursuant to the Court's Local Patent Rules or its response to Interrogatory No. 13 (seeking a correlation between Escort's source code and its accused products) to represent that ESC22563 is the code that controls any of its accused products. As such, while Escort appears to be demanding that Mr. Fleming rely on ESC22563, not even Escort is willing to go on record stating that any of its products are controlled by ESC22563. All Escort will do is very carefully claim in its opposition brief that its modified edition of Version 62

(ESC22563) allegedly compiles to the same hex file as Version 63. As explained above, that is a sleight of hand rivaled only by Escort's fraud in connection with ESC17363.

## CONCLUSION

The facts are not in dispute. Escort installed Version 63 in some of its accused products 10 days after it was found to infringe in *Fleming I* and, as its engineer now finally admits, he thereafter despoiled that code. Rather than simply tell Mr. Fleming that, Escort prevaricated by disclosing Versions 62 and 64 in response to its disclosure obligations pursuant to the Court's Local Patent Rules. Escort did not stop there. It subsequently provided sworn interrogatory responses again averring that some of its accused products used Versions 62 and 64.

Things then got complicated for Escort. It was forced to produce its product compatibility logs, which showed no commercial product ever used Version 62 or 64. The Court then found Escort committed fraud in connection with its advancement of ESC17363 and, in response to Mr. Fleming's persistent inquiries regarding the whereabouts of Version 63 and how Escort could be claiming its products used Versions 62 and 64, Escort chose a different tact. This time—now nearly 3 years into the case—it provided cryptic "modifications" for Version 62, buried them in ESC22563, and was careful to never disclose that modified code in response to the Court's Local Patent Rules or in its discovery responses. Finally, even now, all Escort will do is very carefully argue that its modified edition of Version 62 compiles to what Version 63 allegedly would have compiled to. As shown above, that argument is completely meritless and proves nothing about what Version 63 really looks like.

Accordingly, Mr. Fleming requests a directed verdict against those products that used despoiled Version 63, along with his fees and costs incurred as a consequence of Escort's spoliation and cover-up.

March 12, 2015

Respectfully Submitted

/s/

Michael S. Dowler
Park, Vaughan, Fleming & Dowler, LLP
5847 San Felipe, Suite 1700
Houston, TX 77057
(713) 821-1540
(713) 821-1401 (facsimile)

Attorneys for Plaintiff Hoyt A. Fleming

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 12th day of March 2015, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing. To the extent any of the foregoing was filed under seal, each of the following parties or counsel was served by email.

| | |
|---|---|
| Brian P. Muething<br>Keating Muething & Klekamp PLL<br>One East 4th Street, Suite 1400<br>Cincinnati, OH 45202<br><br>J. Walter Sinclair<br>Holland & Hart LLP<br>800 West Main Street, Suite 1750<br>Boise, ID 83702<br><br>Timothy P. Getzoff<br>Holland & Hart LLP<br>800 West Main Street, Suite 1750<br>Boise, ID 83702 | Bryce J. Yoder<br>Keating Muething & Klekamp PLL<br>One East 4th Street, Suite 1400<br>Cincinnati, OH 45202<br><br>Rachael A Rowe<br>Keating Muething & Klekamp PLL<br>One East 4th Street, Suite 1400<br>Cincinnati, OH 45202<br><br>Keely E. Duke<br>Duke Scanlan Hall PLLC<br>1087 W. River Street, Suite 300<br>Boise, ID 83702<br><br>Robert B. White<br>Givens Pursley LLP<br>601 West Bannock Street<br>Boise, ID 83702 |

/s/
Michael S. Dowler