Michael S. Dowler
Park, Vaughan, Fleming & Dowler LLP
5847 San Felipe, Suite 1700
Houston, TX  77057
Telephone:  713.821.1540
Facsimile:  713.821.1401
Email:  mike@parklegal.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| HOYT A. FLEMING, | ) |
| | ) Case No. 1:12-cv-0066-BLW |
| Plaintiff, | ) |
| | ) PLAINTIFF'S MOTION FOR |
| v. | ) RECONSIDERATION OF THE |
| | ) COURT'S ORDER AT DKT. NO. 231 |
| ESCORT INC., ET. AL, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## INTRODUCTION

The Court recently issued an order denying Mr. Fleming's second motion for terminating sanctions (due to Escort's latest fraud in connection with its source code) but granting Mr. Fleming's related motion for attorney fees and costs.  (Dkt. No. 231, Order.)  In initially holding that Escort did not commit fraud for the second time in this case, the Court ruled as follows:

> Escort had a duty to produce Version 2.46, not to produce something else, leaving it up to Fleming to figure out how transform it into what Escort should have produced in the first place.  Escort's claim that Version 2.46 could only be produced in a single format – that is, embedded in Version 3.46 – is false. Escort's own expert, Dr. Grindon, testified that Escort provided him with a stand-alone Version 2.46 that was not embedded in Version 3.46.  Regardless, if the transformation was as easy as Escort alleges, Escort should have completed the transformation before producing the source code.

> Once again, Escort has caused Fleming to undergo needless and wasteful discovery expenses.  Consequently, the Court will once again award attorney fees to Fleming to reimburse it for these unnecessary fees and expenses….

> Escort has moved for a hearing on Fleming's second motion for terminating sanctions.  The Court will grant that request.  At the hearing, both parties may ask the Court to reconsider its ruling above.

(*Id.* at pp. 6-7 (citations omitted).)  This is Mr. Fleming's brief supporting his request that the Court reconsider its decision to not find fraud or terminate this case.

## SUMMARY

The Court previously ruled (in connection with Mr. Fleming's first motion for terminating sanctions) that Escort and its former counsel fraudulently disclosed, characterized, and relied on certain source code as the basis for some of Escort's defenses.  (Dkt. No. 178, Order at pp. 2-12.)  The Court ruled as follows:

> In this case, Escort's counsel represented that ESC17363 operated Escort's accused devices knowing that ESC17363 did not operate any accused device. This false representation was beyond reckless and was made in bad faith because Escort's counsel knew it was not true.  The Court will therefore award attorney fees as sanctions under both § 1927 and the Court's inherent power.  Thus, the court will grant Fleming's motion for sanctions.

(*Id*. at p. 10.)  As the Court found, Escort knowingly advanced false source code in an effort to mislead Mr. Fleming regarding the operation of its accused products and to, thereby, procure a fraudulently-induced verdict.  (*Id*. at p. 9.)  Indeed, the Court later characterized Escort's and counsels' actions as fraudulent.  (Dkt. No. 208, Order at p. 4 ("This is just the type of fraud that opens up all communications related to ESC17363 to discovery.").)

Mr. Fleming subsequently discovered that Escort's advancement of false evidence was not limited to ESC17363, but extends to other, later disclosed source code, namely ESC18692.  Specifically, well *after* being caught falsely advancing ESC17363, Escort served (1) a supplemental source code disclosure under Local Patent Rule 3.4 and (2) a sworn interrogatory response, both averring that ESC18692 is the source code that controls some of its accused products, including the accused GX65.  Not only has Mr. Fleming discovered that ESC18692 does not—and never did—control the operation of that product, Mr. Fleming also has discovered that Escort specifically altered ESC18692 (before producing it to Mr. Fleming) to remove the *exact* functionality Mr. Fleming had told Escort was the source of his infringement contentions.  In other words, Escort once again created and produced false source code, this time knowingly and intentionally faking the GX65 code in yet another attempt to fraudulently cleanse its infringement and procure a falsely premised jury verdict.

## THE ERRORS IN THE COURT'S RECENT RULING

The Court denied Mr. Fleming's second motion for terminating sanctions, but it did so only on the basis of its misunderstanding of several facts, none of which Escort can or will dispute.  (Dkt. No. 231, Order at pp. 3-7.)  Reproduced below is the paragraph of the Court's order explaining the entire articulated basis for the Court's refusal to grant terminating sanctions, where the underlined sentences contain the Court's erroneous fact-findings.

> The Court finds first that Escort has not attempted to mislead counsel or the Court about the source code that actually operates the GX65.  <u>Before producing the CD (ESC18692), Escort revealed in its Log that the GX65 was operated by Version 2.46.</u>  Moreover, <u>the CD itself contains Version 2.46 embedded in Version 3.46.</u>  *See Dr. Grindon Declaration (Dkt. No. 192-4)* at ¶¶ 16-17 (explaining how to transform Version 3.46 on the CD into Version 2.46).  Although there are serious problems with Escort's production of the CD – which will be discussed below – <u>Escort has never attempted to conceal the fact that the GX65 was operated by a version of the source code that displayed the allegedly infringing arrow.</u>  *See also Escort Letter to Fleming of June 20, 2014 (Dkt. No. 192-1)* at p. 3 (wherein Escort tells Fleming that the "Log . . . shows that [Version 2.46] is what has been compiled into each production unit GX65 shipped by Escort").  Moreover, <u>Escort cannot be guilty of spoliation because Version 2.46 exists, both on the CD (embedded in Version 3.46), and in a stand-alone version (as revealed by Escort's expert Dr. Grindon, to be discussed further below).</u>  The Court will therefore deny that part of Fleming's motion that seeks a finding that Escort committed fraud, produced false evidence, or committed spoliation.

(*Id.*)   This is the only portion of the Court's order that was unfavorable to Mr. Fleming. Accordingly, Mr. Fleming separately explains (below) how and why the Court erred in the four highlighted instances.

> ***Erroneous Finding 1:***        ***"Before producing the CD (ESC18692), Escort revealed in its Log that the GX65 was operated by Version 2.46."***

This is a patent case controlled by the Court's Local Patent Rules.  Those Rules required Mr. Fleming to identify, early in the case, the products he was accusing of infringement.  (Dist. Idaho Loc. Patent R. 3.1.)  As the Court held in an earlier ruling, the Rules required Escort to respond to Mr. Fleming's disclosure by identifying the source code that actually operates its accused products.  (Dist. Idaho Loc. Patent R. 3.4(a); Dkt. No. 178, Order at pp. 9-10 ("All of this could have been avoided if Escort had provided the source code that actually operated the Pro 500 as required by Local Rule 3.4(a)…").)

It is undisputed that Mr. Fleming disclosed the accused infringing products on August 6, 2012, that he supplemented his disclosure three times, and that each disclosure identified the GX65 as one of the accused infringing products.  (Exhs. 1-4.)  It also is undisputed that Escort

first produced ESC18692 to Mr. Fleming on October 7, 2013, and that Escort repeatedly and consistently averred that ESC18692 was the source code that operated certain of its accused products.  (Exh. 5.)  Indeed, as part of Escort's October 7, 2013 production, Escort expressly told Mr. Fleming that its commercial products used ESC18692:

> With respect to the main and GPS processors, please find enclosed with this letter a CD containing source code Bates numbered ESC018685-ESC018693.  While our investigation is continuing, <u>we believe that the CD contains the versions of source code for the main and GPS processors from the beginning of this lawsuit that were placed into production and are still available to Escort.</u>

(*Id*. at p. 3 (emphasis added).)[1]  It also is undisputed that Escort continued its described investigation, and three months later (on January 7, 2014) supplemented its source code disclosure pursuant to Local Patent Rule 3.4(a) to specifically and expressly identify ESC18692 as code that operated its accused products.  (Exh. 6.)

It also is undisputed that during this timeframe, Mr. Fleming and Escort were embroiled in a dispute concerning the veracity of certain *other* code Escort had produced as ESC17363. (*See e.g.,* Dkt. No. 144, Fleming's First Motion for Terminating Sanctions.)  As part of Mr. Fleming's discovery efforts regarding ESC17363, he found out that Escort maintained Product Compatibility Logs, which Escort uses to track the code used by each of its commercial products.  (*See* Dkt. No. 178, Order at p. 5.)  Mr. Fleming demanded production of those Logs, and Escort first produced authentic copies of them on March 12, 2014.  (Exh. 10.)  Notably, Escort's production of its Logs was more than 5 months *after* Escort produced ESC18692 and told Mr. Fleming ESC18692 was being used in its commercial products (*see* Exh. 5), and it was more than 2 months *after* Escort swore the same thing by disclosing ESC18692 pursuant to

---

[1] The very first sentence of Escort's opposition to Mr. Fleming's second motion for terminating sanctions characterizes the issue as:  "<u>At issue is a CD labeled ESC18692, produced by Escort and which Escort represented as containing source code files disclosing how its GX65 radar detector operates.</u>"  (Dkt. No. 192 at p. 1 (emphasis added).)

Local Patent Rule 3.4(a) (*see* Exh. 6).

We now turn back to the Court's first stated rationale for concluding Escort did not commit fraud in connection with ESC18692, and the Court's first articulated basis for denying Mr. Fleming's second motion for terminating sanctions. Specifically, the Court found that "[b]efore producing the CD (ESC18692), Escort revealed in its Log that the GX65 was operated by Version 2.46." (Dkt. No. 231, Order at p. 5.) As shown by the undisputed facts above, the Court's finding is incorrect. Escort cannot and will not dispute that it did *not* produce its Log until: (1) more than five months *after* Escort produced the CD containing ESC18692; (2) more than five months *after* Escort expressly told Mr. Fleming ESC18692 operated its commercial products; and (3) more than two months *after* Escort had again sworn in its Local Patent Rule disclosure that ESC18692 operated its accused products.

Not only is the first factual premise of the Court's decision incorrect, Mr. Fleming respectfully submits the actual/correct facts contradict the conclusion the Court reached using that first (erroneous) fact*, i.e.,* that "Escort has not attempted to mislead counsel or the Court about the source code that actually operates the GX65". (Dkt. No. 231, Order at p. 5.) Mislead is exactly what Escort did by lying at least three separate times (once under oath) when telling Mr. Fleming that ESC18692 operated its accused products.

As noted above, when Escort first produced ESC18692 (five months *before* producing its product compatibility logs), Escort expressly told Mr. Fleming that its commercial products were using ESC18692. (Exh. 5.) As the Court found, it is undisputed that ESC18692 is Version 3.46 of Escort's source code and that Version 3.46 *never* operated any of Escort's commercial products. (*Id*. at p. 4 ("Version 3.46 was not on that list, meaning that it never operated any of Escort's commercial products").) Thus, Escort's contrary representation when it produced

ESC18692 was 100% false.  Escort doubled down and lied a second time three months later when it supplemented its Local Patent Rule source code disclosure (more than two months *before* producing its product compatibility logs) to include ESC18692.  (Exh. 6.)

While it is true that Escort produced its product compatibility logs a few months later in response to Mr. Fleming's requests (Exh. 10), it is more meaningfully true that those logs do not correlate the code identified therein to the bates numbers Escort used to produce its code to Mr. Fleming.  For example, listed below is the product compatibility log for the GX65, which is one of the products that gives rise to the ESC18692 dispute.

**Product Compatibility Log: GX65 No Ku**
**Document #: 909069-00**

| Revision | Effective Date | ECN/ETN | Serial # Start | Assembly | Marking | Hardware Board Assembly | Software Main Processors | Audio | Test File MB | RF |
|---|---|---|---|---|---|---|---|---|---|---|
| A | 7/17/2013 | ECN2130721 | CP000001 | Receiver | GX65NK-A | 09MON-5E | 9500_receiver_v5h.a19 | gx65_voice_v1_5.bin | MB_P500_VSH_A.INI | RF_P500_VSH_A.INI |
|  |  |  |  | Main |  | 09F950-5D | 3163.7v10.a19 | bat_audio_v1_35.hex | MB_P500_VSH_A.MEM | RF_P500_VSH_A.MEM |
|  |  |  |  | Front End |  |  | gx65_main_v2_46_b6.hex |  |  |  |
|  |  |  |  | GPS |  | 05GG65-9B | gx65_usb_v4_0.hex |  |  |  |
|  |  |  |  | Switch |  |  | gx65_gps_v10_198_b6.hex |  |  |  |
| B | 2/6/2014 | ECN2140203 | CP?????? | Receiver | GX65NK-B | 09MON-5E | 9500_receiver_v5h.a19 | gx65_voice_v1_5.bin | MB_P500_VSH_A.INI | RF_P500_VSH_A.INI |
|  |  |  |  | Main |  | 09F950-5D | 3163.7v10.a19 | bat_audio_v1_35.hex | MB_P500_VSH_A.MEM | RF_P500_VSH_A.MEM |
|  |  |  |  | Front End |  |  | gx65_main_v2_46_b6.hex |  |  |  |
|  |  |  |  | GPS |  | 05GG65-9B | gx65_usb_v2_0.hex |  |  |  |
|  |  |  |  | Switch |  |  | gx65_gps_v05_255_b6.hex |  |  |  |

(Exh. 8, ESC20873.)  What the log tells us is that, for example, for Revision A of the GX65 product, the main processor used a code file named "gx65_main_v2_46_b6.hex" and the GPS processor used a code file named "gx65_gps_v10_198_b6.hex".  (*Id.*)  Because Escort refused to tell Mr. Fleming how (if at all) the code files referenced in the Logs corresponded to the bates numbers Escort used to produce its code, Mr. Fleming served Interrogatory No. 13, which states:

> **INTERROGATORY 13:**
>
> Separately, for each revision of each Accused Infringing Product sold on or after February 2012, identify the bates number(s) used to produce the source code that was compiled to generate the software listed in the Product Compatibility Log for each such revision. Please explain all reasons why any such source code was not produced and/or not listed in Defendants' Patent Local Rule 3.4(a) disclosure.

(Exh. 9.)  In cataclysmic fashion, Escort's sworn response unequivocally, once again (now for the third time) falsely told Mr. Fleming that ESC18692 was the code that demonstrates how the

GX65 operates.  Here is the pertinent portion of Escort's sworn response:

> Escort understands that what is being requested is that Escort correlate Revisions listed in Product Compatibility Logs since February 2012 with Bates Numbers reflecting source code that has been produced and demonstrates how the accused products operate.  Escort responds as follows:
>
> ESC 20933 (All revisions): Escort refers to ESC 20943.
>
> ESC 20873 (revision A): Escort refers to ESC 18692, ESC 18683, and ESC 18695.
>
> ESC 20873 (revision B): Escort refers to ESC 18692 and ESC 20466.

(Exh. 9 at pp. 3-4, emphasis added.)  To be clear, Escort's reference to ESC 20873 is to the GX65 product compatibility log.  (*See* Exh. 8, GX65 Product Compatibility Log designated ESC020873.)  Thus, approximately three months *after* producing its product compatibility logs, Escort *once again* falsely swore that ESC18692 was the source code that operated the GX65. (Exh. 9 at p. 7, sworn verification signed by John Kuhn, an Escort officer.)[2]  As the Court found, it was not until Mr. Fleming caught Escort lying and filed his second motion for terminating sanctions that Escort finally explained that ESC18692 was not the code that operated its accused products because that code would have to be transformed into something else before it allegedly would replicate the source code used by those products.  (Dkt. No. 231, Order at p. 6 ("Escort did produce a full explanation but not until responding to the motion now at issue.").)  Escort's forced explanation came nearly fourteen months after if falsely created and disclosed ESC18692. (Dkt. No. 192, Defendants' Opposition Brief.)

Accordingly, it cannot be disputed that the Court erred in finding that "[b]efore producing

---

[2] In a different filing, Escort described its response to Interrogatory No. 13 as a "roadmap" for Mr. Fleming to understand which of Escort's source code operated which of its accused products.  Here is what Escort falsely told the Court:  "Not only did Escort produce source code (human-readable files) for the accused products, it also provided Plaintiff with a 'roadmap' via Escort's response to Interrogatory No. 13 that correlates source code files to each accused product.  The production complied with the letter an spirit of Local Patent rule 3.4(a)."  (Dkt. No. 210, Defendants' Response to Plaintiff's Motion to Compel at p. 4.)

the CD (ESC18692), Escort revealed in its Log that the GX65 was operated by Version 2.46". That is simply not the sequence in which the pertinent events transpired—the CD was produced nearly six months *before* the Log.  Mr. Fleming respectfully submits it also cannot be disputed that (based in part on that error) the Court incorrectly concluded that "Escort has not attempted to mislead counsel or the Court about the source code that actually operates the GX65".  The parties do not dispute, as the Court also found, that ESC18692 (*i.e.,* Version 3.46) *never* operated any Escort product, much less the GX65.  Nevertheless, that is *exactly* what Escort told Mr. Fleming over and over and over again.  (Exhs. 5, 6, and 9.)  And, while the Court correctly found that Escort's Log shows the GX65 was operated by Version 2.46, when Mr. Fleming thereafter asked (via Interrogatory No. 13) Escort to identify Version 2.46 in its production, Escort falsely pointed to ESC18692, just as it had been doing repeatedly throughout the case.  (Exh. 9.)

While Escort's rampant and repeated falsehoods are bad enough, things get worse. Escort's false production of ESC18692 was no accident or mistake without consequence.  As the Court found and as Escort now admits—before Escort produced ESC18692 and repeatedly swore it operated the GX65—Escort doctored ESC18692 from its original form (as Revision 2.46) to remove the *exact* functionality Mr. Fleming was accusing of infringement.  (Dkt. No. 231, Order at p. 4 ("That difference is crucial: One of Fleming's claims is that the arrow display infringes his '905 patent.").)  In other words, Escort intentionally falsified its code and then produced it in a sickening effort to dupe Mr. Fleming, the Court, and the jury into believing its products did not infringe.  And, contrary to the Court's implied finding, Escort's production of its Product Compatibility Logs did not change any of that since Escort itself used the Logs to falsely swear that ESC18692 operated its accused products.  (Exh. 9.)

In these circumstances, Mr. Fleming respectfully submits that the Court's factual finding

is incorrect and its conclusion (based on that erroneous finding) that Escort did not "mislead" anyone should be reconsidered and reversed.

> ***Erroneous Finding 2:*** **"the CD itself contains Version 2.46 embedded in Version 3.46"**

The Court's second factual finding that "the CD itself contains Version 2.46 embedded in Version 3.46" is incorrect.  (Dkt. No. 231, Order at p. 5.)  Escort cannot and will not deny that.  Indeed, Escort has never even made that claim.

As explained above, Escort produced ESC18692 and repeatedly falsely swore—both before and after Escort produced its product compatibility logs—that it operated at least the GX65.  (*Supra* at pp. 4-9.)  Escort now admits, as the Court found, that it modified then-existing source code Version 2.46 (*i.e.,* the real code used by the GX65) in order to create Version 3.46 (that no commercial product ever used), and that it then produced the modified code as ESC18692.  (Dkt. No. 231, Order at p. 4.)  Escort's admission was necessitated by Mr. Fleming's protestations that the metadata for ESC18692—along with Mr. Fleming's review of the code and his testing of Escort's products—suggested something very wrong was going on with ESC18692.  (Exh. 11 at p. 3; Dkt. No. 182 at pp. 10-12.)  As shown below by ESC18692's directory image, ESC18692 consists of 20 source code files, 6 of which were modified on or after August 2, 2013.

| Name | Date Modified |
|------|---------------|
| main.h | Aug 19, 2013, 9:51 AM |
| audio.h | Aug 8, 2013, 9:19 AM |
| display.c | Aug 2, 2013, 11:19 AM |
| main.c | Aug 2, 2013, 11:18 AM |
| bluetooth.c | Aug 2, 2013, 11:16 AM |
| bluetooth.h | Aug 2, 2013, 11:14 AM |
| gps.h | May 23, 2013, 10:52 AM |
| twi.c | May 22, 2013, 9:16 AM |
| receiver.c | May 22, 2013, 9:16 AM |
| display.h | May 21, 2013, 8:26 AM |
| twi.h | May 21, 2013, 8:26 AM |
| uart1.c | May 21, 2013, 8:26 AM |
| uart1.h | May 21, 2013, 8:26 AM |
| receiver.h | May 20, 2013, 3:37 PM |
| gps.c | Jan 18, 2013, 7:25 AM |
| audio.c | Aug 4, 2011, 12:17 PM |
| adc.c | Aug 10, 2009, 9:05 AM |
| adc.h | Apr 15, 2009, 12:49 PM |
| uart3.c | Mar 11, 2008, 10:25 AM |
| uart3.h | Nov 9, 2006, 7:37 AM |

(Dkt. No. 182, at Exh. 5, ¶ 4 (Fleming Decl.).)  Notably, August 2, 2013 is a few weeks *after* Escort first commercially released the GX65 on July 17, 2013 (*see* Exh. 8) and a few months *before* Escort first produced ESC18692 to Mr. Fleming.  <u>Thus, as the Court found, it is undisputed that instead of simply producing Version 2.46 to Mr. Fleming as the actual/real GX65 code (which Escort indisputably possessed on July 17, 2013—during the pendency of this case), Escort modified that code (to remove the infringing functionality) and produced it to Mr. Fleming less than two months later in connection with Escort's multiple, subsequent false averments that it operates Escort's accused products.</u>  (Dkt. No. 231, Order at p. 6 ("Escort had a duty to produce Version 2.46, not to produce something else, leaving it up to Fleming to figure out how to transform it into what Escort should have produced in the first place.").)

It also is undisputed that when falsifying the source code for Version 2.46 to remove its infringing functionality, Escort "over-wrote" Version 2.46, just like Mr. Fleming over-wrote the original draft of this motion while editing it.  The natural and obvious effect of this was to destroy the source code for Version 2.46.  We know this for two reasons, both of which Escort admits.  First, Escort admits it over-wrote Version 2.46 (when creating Version 3.46) because that supposedly is what it does "in the ordinary course of its business".  (Exh. 12 at pp. 1-2; Dkt. No. 192, Defendants' Opp. Br. at p. 8 ("When Escort programmers modify existing .C Files and .H Header Files to create new versions of Hex Files, <u>such modifications are made directly in the .C Files and .H Header Files of the immediately previous version.</u>") (emphasis added).)[3]  Second,

---

[3] That fact that Escort was obligated to preserve source code Version 2.46 (at least for litigation purposes) cannot be denied.  This case was filed in February 2012 and accused the GX65 of infringement.  (Dkt. No. 2, Complaint at ¶¶ 52, 59, 66.)  Version 2.46 was complete and first loaded into the accused products in July 2013, *i.e.,* during the pendency of this case.  (Exh. 8.)  Thus, instead of simply setting aside and saving Version 2.46, Escort over-wrote it, thereby obviously despoiling evidence it knew was critical to this case.  *See e.g., Apple, Inc. v. Samsung Electronics Co., Ltd.,* 888 F.Supp.2d 976, 989 (N.D. Cal. 2012) (*citing Silvestri v. Gen. Motors*

to this day Escort has not and cannot produce the actual source code for Version 2.46 for the very simple reason that it no longer exists.[4]  Thus, not only did Escort falsify its infringing code to remove its infringing functionality before producing the resulting fake code to Mr. Fleming, Escort did so in a way that ensured the real source code for Version 2.46 was forever destroyed.

For these same reasons, and contrary to the Court's second fact finding, the real source code for Version 2.46 is *not* embedded in the source code for Version 3.46 any more than the first daft of this motion is embedded in its final version.  In other words, as with the differences between the initial and final versions of this motion, things have been irretrievably changed (*i.e.,* over-written) such that it is impossible to simply pluck the first version out of the final version. Escort cannot and will not deny that.  Indeed, the Court will note that Escort has not even argued that the source code for Version 2.46 is fully embedded in the source code for Version 3.46.  All Escort will do is very carefully claim that it allegedly can re-modify Version 3.46 to create a file that allegedly compiles to the same file as Version 2.46.  (*See* Dkt. No. 192, Defendants' Opp. Br. at p. 12.)[5]

In summary, the best anyone can say under the circumstances is that there may be vestiges of Version 2.46 in Version 3.46.  The problem, however, is that no one will ever know

---

*Corp.,* 271 F.3d 583, 590 (4th Cir. 2001)); *United States v. Fed. Res. Corp.,* 2012 U.S. Dist. LEXIS 65430, *8 (D. Idaho 2012) (Winmill, J.); *Scentsy, Inc. v. B.R. Chase, L.L.C.,* 2012 U.S. Dist. LEXIS 143633, *20 (D. Idaho 2012) (Winmill, J.).

[4] The Court recently ordered Escort to produce the "actual" source code used by the accused products.  (Dkt. No. 231, Order at pp. 7-8.)  Escort violated that Order by refusing to produce the "actual" code used, instead unilaterally opting to produce admittedly "modified" versions of its actual code.  This necessitated a motion by Mr. Fleming to enforce the Court's order, which remains pending.  (Dkt. No. 259, Motion to Compel Enforcement of a Court Order.)

[5] While the Court need not decide the issue for purposes of this motion, Escort's argument is engineering double-talk.  It is axiomatic—and again something Escort will not deny—that there could be an infinite number of differences between two code files (*i.e.,* Version 2.46 and Escort's re-modification of Version 3.46) that compile to the same file.  (*See* Dkt. No. 243, Fleming's Reply in Support of His Second Motion for Sanctions Due to Spoliation of Evidence.)

what those vestiges are because Escort intentionally failed to preserve Version 2.46, which now precludes anyone from comparing the two Versions (*i.e.,* Version 2.46 and Escort's re-modification of Version 3.46) to identify their differences, much less confirm—as the Court mistakenly found contrary to either parties' contention—that Version 2.46 is embedded in Version 3.46. Thus, Mr. Fleming remains where he started: (1) without copy of Version 2.46 that was actually used in the accused products; and (2) with only the falsified Version 3.46, which Escort repeatedly falsely swore operated its products.

> ***Erroneous Finding 3:***     ***"Escort has never attempted to conceal the fact that the GX65 was operated by a version of the source code that displayed the allegedly infringing arrow"***

The Court's third finding that "Escort has never attempted to conceal the fact that the GX65 was operated by a version of the source code that displayed the allegedly infringing arrow" is incorrect and not supported by any evidence. (Dkt. No. 231, Order at p. 5.)

Let us begin with three facts, each of which the Court already found and Escort does not dispute. First, Version 2.46 displays the allegedly infringing arrow and is the code that *actually* operates certain Escort products. (Dkt. No. 231, Order at pp. 4-5.) Second, Version 3.46 (*i.e.,* ESC18962) does not display the allegedly infringing arrow and was *never* used in any of Escort's commercial products. (*Id.* at p. 4.) Third, Escort modified Version 2.46 to remove the allegedly infringing arrow shortly after that code was implemented in Escort's products and shortly before producing that now-falsified code to Mr. Fleming as ESC18692. (*Id.*)

Now let us look at what Escort told Mr. Fleming to see whether Escort "attempted to conceal the fact that the GX65 was operated by a version of the source code that displayed the allegedly infringing arrow". Escort first produced ESC18692 (*i.e.,* the code that *does not* display the arrow) along with a letter telling Mr. Fleming that it operated Escort's products. (Exh. 5.) As the Court found, "Escort produced the CD [containing ESC18692] representing that it

contained the source code used to operate the GX65 but failed to tell Fleming that it would have to modify the Version 3.46 on the CD to obtain Version 2.46".  (Dkt. No. 231, Order at p. 5.)

Escort next supplemented is source code disclosure pursuant to Local Patent Rule 3.4(a) to specifically disclose ESC18692 (*i.e.,* the code that *does not* display the arrow) as code used by its accused products, again without whispering a word about any change Mr. Fleming would have to make to the code to cause it to operate like the actual code that operated its products (*i.e.,* code that *does* display the arrow).  (Exh. 6.)  As the Court previously held, Local Patent Rule 3.4(a) required Escort to disclose the code that *actually* operates its product.  (Dkt. No. 178, Order at pp. 9-10 ("All of this could have been avoided if Escort had provided the source code that actually operated the Pro 500 as required by Local Rule 3.4(a)…").)

Escort next served its response to Interrogatory No. 13 on May 28, 2014, where Escort again swore that ESC18692 (*i.e.,* the code that *does not* display the arrow) was code used by its accused products, again without whispering a word about any change Mr. Fleming would have to make to the code to cause it to operate like the actual code that operated its products (*i.e.,* code that *does* display the arrow).  (Exh. 9.)

All of Escort's representations (noted above) beg the question of why Escort did not simply produce Version 2.46 (*i.e.,* code that *does* display the arrow) instead of ESC18692 (*i.e.,* the code that *does not* display the arrow) if it had no intention of concealing the fact that the code operating the GX65 displayed the infringing arrow.   Indeed, it is undisputed that Escort possessed Version 2.46 shortly before Escort falsified it to produce Version 3.46  The Court expressed the same thought:  "Escort had a duty to produce Version 2.46, not to produce something else, leaving it up to Fleming to figure out how transform it into what Escort should have produced in the first place."  (Dkt. No. 231, Order at p. 6.)

The only supporting citation the Court gave for its third finding is to Escort's letter to Mr. Fleming on June 20, 2014 (Dkt. No. 192-1) at p. 3, which the Court describes as "tell[ing] Fleming that the 'Log…shows that [Version 2.46] is what has been compiled into each production unit GX65 shipped by Escort.'" (Dkt. No. 231, Order at p. 5.)  That much is true— that is what Escort said.  But, that letter was sent (1) nearly nine months *after* Escort first told Mr. Fleming in no uncertain terms that ESC18692 was the code that operated certain of its products (Exh. 5), (2) nearly six months *after* Escort again told Mr. Fleming (in its supplemental Rule 3.4 disclosure) the same thing (Exh. 6); and (3) nearly one month *after* Escort yet again told Mr. Fleming (in its sworn response to Interrogatory No. 13) the same thing (Exh. 9).

Worse, Escort's letter did not tell Mr. Fleming anything other than something Escort now was calling "Version 2.46" was compiled to produce the code used for the GX65.  Anyone could have gleaned that non-informative fact from the Log.  What Escort conspicuously concealed from its letter was anything that would have told Mr. Fleming that: (1) Escort had over-written Version 2.46 and that it, thus, had not been preserved or produced; (2) Escort had modified Version 2.46 to create Version 3.46; (3) Escort's modifications to Version 2.46 removed the infringing arrow; (4) Version 2.46 was not ESC18692; (5) ESC18692 was Version 3.46; (6) no product had ever used Version 3.46; or (7) all of Escort's prior averments that its products used ESC18692 were incorrect.  Indeed, the remainder of the Court's order confirms the infirmity of the Court's citation to Escort's June 20, 2014 letter and (correctly) contradicts its third factual finding that "Escort has never attempted to conceal the fact that the GX65 was operated by a version of the source code that displayed the allegedly infringing arrow".  Here is the pertinent portion of the Court's order, with emphasis on the Court's comments distinguishing Escort's June 20, 2014 letter:

> Escort produced the CD representing that it contained the source code used to operate the GX65 but failed to tell Fleming that it would have to modify the Version 3.46 on the CD to obtain Version 2.46. This forced Fleming to examine 20,000 lines of code searching for Version 2.46.
>
> Fleming eventually figured out that modification of some lines of code in Version 3.46 would produce the allegedly infringing arrow. But this was far from being able to reproduce Version 2.46. Fleming complained in a letter to Escort that he did not understand how the CD could contain the source code that operated the GX65: "The source code produced at ESC18692 cannot generate a [Version 2.46] . . . ." *See Fleming Letter to Escort Dated June 4, 2014 (Dkt. No. 192-1)* at p. 3.
>
> <u>Escort claims that it responded to Fleming's complaint by explaining how to transform Version 3.46 into Version 2.46 in a letter dated June 20, 2014. But that letter contains no such explanation. Escort did produce a full explanation but not until responding to the motion now at issue. In that response, Escort filed the Declaration of its expert, Dr. Grindon, who explained how to transform Version 3.46 into Version 2.46. His explanation is not remotely similar to anything in the letter of June 20, 2014.</u>
>
> But this entire discussion is a red herring. Escort had a duty to produce Version 2.46, not to produce something else, leaving it up to Fleming to figure out how to transform it into what Escort should have produced in the first place. Escort's claim that Version 2.46 could only be produced in a single format – that is, embedded in Version 3.46 – is false. *See Escort's June 20, 2014 Letter, supra,* at p. 2 (wherein Escort claims that "it was not possible to produce a source code file to you that would contain only a single version of source code"). Escort's own expert, Dr. Grindon, testified that Escort provided him with a stand-alone Version 2.46 that was not embedded in Version 3.46. *See Grindon Declaration (Dkt. No. 192-4)* at ¶¶ 11-13. Regardless, if the transformation was as easy as Escort alleges, Escort should have completed the transformation before producing the source code.

(Dkt. No. 231, Order at pp. 5-7 (emphasis added).)  Accordingly, the Court's stated rationale for awarding Mr. Fleming his attorney fees and costs acknowledges Escort's fraud and, in doing so, contradicts the Court's (erroneous) finding that "Escort has never attempted to conceal the fact that the GX65 was operated by a version of the source code that displayed the allegedly infringing arrow".

      ***Erroneous Finding 4:***        ***"Escort cannot be guilty of spoliation because Version 2.46 exists, both on the CD (embedded in Version 3.46), and in a stand-alone version (as revealed by Escort's expert Dr. Grindon…)"***

The Court's fourth finding that "Escort cannot be guilty of spoliation because Version 2.46 exists, both on the CD (embedded in Version 3.46), and in a stand-alone version (as revealed by Escort's expert Dr. Grindon…)" is incorrect.  (Dkt. No. 231, Order at p. 5.)

As an initial matter, Mr. Fleming explained (above) why Version 2.46 does not exist "on the CD (embedded in Version 3.46)".  (*Supra* at pp. 9-12.)  Next, the reason Version 2.46 does not exist in a stand-alone version and has been despoiled requires us to be careful about the terminology because the status of the "source code" for Version 2.46 differs from the status of the "hex code" for Version 2.46.

As shown by the diagram below, a product designer writes source code in a human-readable programming language.  Because microprocessors only operate on machine-readable code, the human-readable source code must be translated into machine-readable "binary", "hex",



or "object" code (all synonyms).  (We will defer to using the term "hex" since that is what Escort uses in its briefing.)  The process of translating (human-readable) source code files into (machine-readable) hex code files is performed by a "compiler/linker".[6]  The compiler/linker receives one or more source code files and certain other "project files" (also created by the designer), compiles the files, and outputs a corresponding (machine-readable) hex code file. This hex code file (which is not human-readable) is then loaded into a product's memory, from which the product's microprocessor fetches it for execution and, thus, causes the product to operate as the designer intended.  Mr. Fleming previously presented this technical tutorial and Escort agreed it "is sufficient for present purposes".  (Dkt. No. 239 at p. 2, n. 1.)

---

[6] The "compiler/linker" is an off-the-shelf program specifically designed to compile source code (and its associated project files) into machine-readable binary code.

With this foundation, it is critical to understand that the stand-alone Version 2.46 that Escort claims it possesses (and the Court acknowledged that it possesses) is a machine-readable hex file.  There is no dispute about this, as Escort admits it.

> Mr. Stevens compiled the source code into a version 2.46 Hex File on July 17, 2013.  Mr. Stevens saved a copy of that 2.46 Hex File onto his computer with the name *gx65_main_v2_46.hex*…  In addition, Stevens combined the 2.46 Hex File with a bootloader, [and] named the resulting file *gx65_main_v2_46_b6.hex*…  Even though version 2.46 was superseded by other updates, the file *gx65_main_v2_46.hex* – with a file date of August 7, 2013 – has remained on the Escort web server and it remains there today.  *See* Screenshot in Martin Decl., Exh. A.").)

(Dkt. No. 192, Defendants' Opp. Br. at pp. 12-13.)[7]  In case it is not totally clear, what Mr. Stevens did on July 17, 2013 (*i.e.,* during the pendency of this case) is take the source code for Version 2.46 and compile it into the hex file for Version 2.46.  He then saved the hex file, which he claims is still available to this day.

Mr. Stevens' actions are "smoking-gun" evidence that disposes of the remaining, pending issues.  First, Mr. Stevens' actions acknowledge that Escort possessed the source code for Version 2.46 on July 17, 2013 (*i.e.,* during the pendency of this case) because that is the code Mr. Stevens compiled to produce the hex code for Version 2.46.  Second, Mr. Stevens' actions establish that Escort preserved what it claims is the machine-readable hex code for Version 2.46 but *not* the human-readable source code for Version 2.46.  We know what happened to the human-readable source code for Version 2.46—Escort admits it over-wrote the file when falsifying it (to remove its infringing functionality) shortly before producing it to Mr. Fleming as Version 3.46 (ESC18692).  (Dkt. No. 192, Defendants' Opp. Br. at p. 8 ("When Escort

---

[7] The only way to assess the authenticity of this hex file is to extract it from the actual product and compare it to the hex file Escort claims it preserved.  But, that cannot be done because Escort despoiled all the accused products.  Escort's spoliation of the accused products is the subject of another pending motion.  (Dkt. No. 221, Fleming's Motion for Spoliation Sanctions.)

programmers modify existing .C Files and .H Header Files to create new versions of Hex Files, such modifications are made directly in the .C Files and .H Header Files of the immediately previous version.") (emphasis added).)   Indeed, if that were not the case, none of these issues would need to be addressed because Escort would/could simply produce the source code for Version 2.46.  But, that has not happened because Escort admits it no longer exists due to having been over-written during the pendency of this case, only weeks before producing the faked code to Mr. Fleming.

Let us now return to the Court's pertinent finding that "Escort cannot be guilty of spoliation because Version 2.46 exists…in a stand-alone version".  (Dkt. No. 231, Order at p. 5.)  If the Court was referring to the machine-readable hex code for Version 2.46, then the Court is correct that there is indeed machine-readable hex code for Version 2.46 that Escort claims is authentic.   Mr. Fleming disputes its authenticity (*see supra* at n. 7), but that is an issue for another day.   The more critical point for present purposes is to note that the *only* file Escort claims to have for Version 2.46 is its "hex" file.   As explained above and as Escort admits, a hex file is only machine-readable*, i.e.,* humans cannot read it because it is simply a collection of symbols only a computer understands.  (Dkt. No. 192, Defendants' Opp. Br. at p. 4.)  Thus, the existence of the hex file for Version 2.46 is irrelevant for purposes of Mr. Fleming's motion because it cannot even be read, much less resolve the issue of whether Escort produced the source code for Version 3.46 (ESC18692) in order to mislead Mr. Fleming (and the Court and jury) regarding the real operation of its accused products.

On the other hand, if the Court's order was referring to the source code for Version 2.46 when it ruled that "Escort cannot be guilty of spoliation because Version 2.46 exists…in a stand-alone version", then the Court erred.   No one disputes that Escort did not preserve the source

code for Version 2.46.  And, since the source code for Version 2.46 is the only pertinent human-readable file, it is the code that is critical to Mr. Fleming's infringement proofs.  (Dkt. No. 178, Order at pp. 9-10 ("All of this could have been avoided if Escort had provided the source code that actually operated the Pro 500 as required by Local Rule 3.4(a)…").)  Accordingly, Mr. Fleming requests that the Court reconsider and clarify its finding regarding Escort's spoliation of the source code for Version 2.46, and further note that Escort's spoliation of its most critical code only exacerbates its fraud in connection with its advancement of Version 3.46 (ESC18692).

## ADDITIONAL CASE PRECEDENT

The Court is aware that it has the authority to terminate this case in light of Escort's repeated fraud.  Mr. Fleming will not belabor the issue, other than to point out a Ninth Circuit case he recently came across that the Court might find interesting.  In *Connecticut General Life Ins. Co. v. New Images of Beverly Hills*, the Ninth Circuit affirmed a district court's decision to terminate a case due to a party's persistent willfulness, bad faith, and fault.  482 F.3d 1091 (9th Cir. 2007).  As the Ninth Circuit held:

> 'There is no point to a lawsuit, if it merely applies law to lies.'  The most critical factor to be considered in case-dispositive sanctions is whether 'a party's discovery violations make it impossible for a court to be confident that the parties will ever have access to the true facts.'  [Defendant's] 'pattern of deception and discovery abuse made it impossible for the district court to conduct another trial with any reasonable assurance that the truth would be available….'

> 'Where a party so damages the integrity of the discovery process that there can never be assurance of proceeding on the true facts, a case dispositive sanction may be appropriate.'  This was just such a case.  The district court did its duty, and fairly exercised its discretion in order to secure a just resolution of the dispute.

*Id.* at 1097 (quoting *Valley Eng'rs v. Electric Eng'g Co.,* 158 F.3d 1051 (9th Cir. 1988) and *Anheuser-Busch, Inc. v. Natural Beverage Distribs.,* 69 F.3d 337 (9th Cir. 1995).  In the present case, this is not the first time Escort has committed fraud on issues that will decide the case.

Moreover, there is a litany of other motions pending regarding the continuing effects of Escort's first fraud (Dkt. No. 212, Motion to Dismiss), Escort's spoliation (Dkt. Nos. 221 and 223), Escort's compliance with the Idaho Code of Professional Responsibility (Dkt. No. 253), and Escort's refusal to abide by a Court order (Dkt. No. 259).  Mr. Fleming respectfully submits that Escort has so damaged this case in ways that impugn its integrity and jeopardize its rightful outcome, that it must be dismissed in Mr. Fleming's favor.

## **CONCLUSION**

The facts are undisputed.  Mr. Fleming accused certain functionality in certain Escort products of infringement.  Version 2.46 of Escort's source code controls the operation those products.  Knowing that, and during the pendency of this case, Escort doctored Version 2.46 to remove the infringing functionality and produced the doctored code as Version 3.46, while also making sure that Version 2.46 was forever destroyed.  Escort then told Mr. Fleming over and over and over again in correspondence, its Local Patent Rule disclosures, and in a sworn interrogatory response that Version 3.46 controls the operation of its products.  Those were all lies, thereby necessitating a second finding of fraud and dismissal of this case.


April 17, 2015                          Respectfully Submitted


                                        _____/s/_____
                                        Michael S. Dowler
                                        Park, Vaughan, Fleming & Dowler, LLP
                                        5847 San Felipe, Suite 1700
                                        Houston, TX 77057
                                        (713) 821-1540
                                        (713) 821-1401 (facsimile)

                                        Attorneys for Plaintiff Hoyt A. Fleming

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on the 17th day of April 2015, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

| | |
|---|---|
| Bradlee R. Frazer<br>Hawley Troxell Ennis & Hawley LLP<br>877 Main Street, Suite 1000<br>Boise, ID 83702 | Bryce J. Yoder<br>Keating Muething & Klekamp PLL<br>One East 4th Street, Suite 1400<br>Cincinnati, OH 45202 |
| Steven F. Schossberger<br>Hawley Troxell Ennis & Hawley LLP<br>877 Main Street, Suite 1000<br>Boise, ID 83702 | Rachael A. Rowe<br>Keating Muething & Klekamp PLL<br>One East 4th Street, Suite 1400<br>Cincinnati, OH 45202 |
| Brian P. Muething<br>Keating Muething & Klekamp PLL<br>One East 4th Street, Suite 1400<br>Cincinnati, OH 45202 | Keely E. Duke<br>Duke Scanlan Hall PLLC<br>1087 W. River Street, Suite 300<br>Boise, ID 83702 |
| J. Walter Sinclair<br>Holland & Hart LLP<br>800 West Main Street, Suite 1750<br>Boise, ID 83702 | Robert B. White<br>Givens Pursley LLP<br>601 West Bannock Street<br>Boise, ID 83702 |
| Timothy P. Getzoff<br>Holland & Hart LLP<br>800 West Main Street, Suite 1750<br>Boise, ID 83702 | |

       /s/
Michael S. Dowler