IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| HOYT A. FLEMING,<br><br>        Plaintiff,<br><br>    v.<br><br>ESCORT, INC., et al.,<br><br>        Defendants. | Case No.  1:12-CV-066-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

The Court has before it motions to reconsider filed by both parties, and a petition for attorney fees and costs filed by Fleming.  The Court heard oral argument on the motions to reconsider on July 23, 2015, and directed counsel to submit further briefing. That supplemental briefing has now been received.  For the reasons explained below, the Court will deny Escort's motion to reconsider, grant in part Fleming's motion to reconsider, and award fees and costs to Fleming in the sum of $51,461.

## LITIGATION BACKGROUND

On January 9, 2015, the Court awarded $341,649 in sanctions to Fleming after finding that Escort and its prior attorneys (who have since withdrawn) falsely claimed that certain source code – labeled ESC17363 – containing non-infringing features was the source code used in Escort's allegedly infringing products.  Escort's false claim was an attempt to mislead Fleming, requiring him to waste substantial time and effort.

**Memorandum Decision & Order – page 1**

With the award of $341,649, the Court compensated Fleming for the fees and costs he incurred.

Thereafter, Fleming discovered that Escort appeared to have committed the same misconduct with another line of source code labeled ESC18692.  Once again, Escort produced source code that appeared to be non-infringing and falsely represented that it was used in Escort's commercial products.  In an earlier decision, the Court held that these new allegations did in fact constitute misconduct.  *See Memorandum Decision (Dkt. No. 231).*  The Court will not repeat the detailed discussion contained there, but will simply summarize it here.  Fleming had alleged that Escort committed three types of misconduct:  (1) Escort attempted to deceive Fleming and the Court into believing that ESC18692 was the source code that operated the GX65 product, (2) Escort committed spoliation by failing to maintain source code that Fleming needs to prove infringement, and (3) Escort needlessly forced Fleming through a wasteful discovery process.  The Court agreed that Fleming was forced through a wasteful discovery process but rejected the deception and spoliation charges.

More specifically, the Court held that Escort had not attempted to mislead Fleming about the source code that actually operates the GX65 product, and did not commit spoliation because the source code at issue – version 2.46 – was embedded in a CD provided by Escort during discovery, labeled ESC18692.  At the same time, Escort needlessly forced Fleming through a wasteful discovery process, warranting an award of the attorney fees and costs Fleming incurred in attempting to obtain version

**Memorandum Decision & Order – page 2**

2.46 from ESC18692.  Fleming filed a petition seeking $51,461 in fees and costs.  That petition is pending and has been fully briefed.

The Court's decision was based on a complicated set of facts and reached a result not anticipated in the briefing by either side.  Consequently, the Court invited counsel to file motions to reconsider now that a target had been established for their challenges.  They both filed such motions, which are now before the Court for resolution.  The Court will address first Fleming's motion for reconsideration.

## Fleming's Motion for Reconsideration

### Logs & CD

Fleming argues first that the Court erred in finding that Escort produced its product compatibility logs revealing the actual source code numbers assigned to the GX65 product before it produced ESC18692, the CD that is the source of Fleming's deception argument.  The Court's finding that the logs were produced before the CD was important to its conclusion that Escort did not attempt to deceive Fleming.  But the Court was incorrect – the logs were produced for the first time about two months after Escort produced ESC18692.

### Deception

Fleming argues next that the Court erred in rejecting his argument that Escort's production of the CD labeled ESC18692 was designed to deceive Fleming into believing that source code version 3.46 operated the GX65.  Escort was required to produce the source code running its allegedly infringing products by Local Patent Rule

3.4.  Source code is written by a programmer in a comprehensible language of words and symbols, and is then transformed by a "compiler" into hex (or object) code, a series of machine-readable binary numbers that actually operate the product.  *See Microsoft Corp. v. AT&T Corp.,* 550 U.S. 437, 448 at n. 8 (2007) (explaining difference between source and hex code).  Thus, source code is human-readable, while hex code is machine-readable.  *See Orr Declaration (Dkt. No. 149-3)* at ¶ 4.  Source code often contains programmer's notes or comments that "try to make [the source code] easier to understand."  *See JustMed, Inc. v. Byce,* 600 F.3d 1118, 1123 at n. 2 (9th Cir. 2010).  In contrast, hex code is largely incomprehensible.  That is why the Court's Local Patent Rule 3.4 requires production of the source code.

    Escort knew that the source code for some versions of the GX65 was version 2.46.  Yet instead of producing source code version 2.46, Escort produced a CD labeled ESC18692 that contained, on its face, source code version 3.46.  That version was non-infringing – it did not contain the directional arrow that Fleming alleged infringed his patent.  Escort represented that the CD contained the "versions of source code for the main and GPS processors from the beginning of this lawsuit that were placed into production . . . ."  *See Letter (Dkt. No. 265-5).*  In other words, Escort represented that version 3.46 was used in its commercially-sold products.  That representation was false; it is undisputed that version 3.46 has never been used in any Escort commercial product.

The CD contained 20 lines of source code. If a certain line was modified, the CD could produce source code version 2.46. But when Escort produced the CD, it failed to tell Fleming that (1) version 2.46 operated the GX65, not version 3.46; (2) that version 2.46 was on the CD but could only be accessed by modifying a line of the source code on the CD; and (3) that version 3.46 had never been used in any Escort commercial product.

Escort originally produced ESC18692 on October 7, 2013. It would be more than two months before Fleming would reveal that version 2.46, rather than version 3.46, operated the GX65. On December 30, 2013, Escort produced product compatibility logs. These logs identified the source code numbers for each model of Escort's allegedly infringing products. The log for two models of the GX65 (GX65 No Ku Versions A and B) revealed for the first time that source code version 2.46 was used for those models. *See Log (Dkt. No. 265-8).* The logs also revealed for the first time that source code version 3.46 was never used for any Escort commercial product, including the GX65.

But the logs did not tell Fleming where, in Escort's numerous prior submissions of source code, he could locate the version 2.46 source code that operated the GX65. Escort did not provide that information until May of 2014, when it represented that the source code Fleming requested for the GX65 could be found in ESC18692. *See Escort's Discovery Response (Dkt. No. 265-9)* at p. 4.

**Memorandum Decision & Order – page 5**

So seven months after production, Escort finally revealed that version 2.46 was used by the GX65 and that the source code could be found in ESC18692. But Escort had still said nothing to Fleming about how ESC18692 must be modified to access version 2.46.

On June 4, 2014, Fleming wrote a letter to Escort, detailing his attempts to reconcile the log with ESC18692, accusing Escort of deception, and describing how Fleming was finally able to discover how to modify the ESC18692 to reveal version 2.46. On June 20, 2014, Escort replied, denying the deception charge and confirming the accuracy of Fleming's methodology for accessing version 2.46.

Thus, Escort's production of ESC18692 looks very similar to its production of ESC17363. In both cases, Escort produced non-infringing source code and falsely represented that it was used in Escort's commercial products.

There are, however, important differences. Here, the allegedly infringing element – the directional arrow – was a visible display on the GX65. Thus it was obvious that version 3.46, which did not display an arrow, could not be the source code used in the GX65 (Versions A and B). It seems unlikely that Escort was trying to deceive Fleming on such an obvious point. While Escort's production was not intended to deceive, it was intended to be vexatious. Escort was trying to wear Fleming down. For that conduct, the Court will award sanctions, but the Court cannot find that Escort actually intended to deceive Fleming, and so affirms its earlier holding in that regard.

**Memorandum Decision & Order – page 6**

**Spoliation**

Fleming argues that the Court erred in holding that (1) source code version 2.46 was embedded in ESC18692, and (2) Escort could not be guilty of spoliation because it produced ESC18692 containing source code version 2.46.  Fleming has the burden of establishing spoliation by demonstrating that Escort destroyed documents and had "some notice that the documents were potentially relevant to the litigation before they were destroyed."  *Ryan v. Editions Ltd. West, Inc.,* 786 F.3d 754, 766 (9th Cir. 2015).

Escort's Senior Systems Engineer Jeff Stevens created version 2.46 source code on July 17, 2013.  *See Stevens' Declaration (Dkt. No. 192-10)* at ¶ 14.  About a month later, Stevens admits that he "made changes to" source code version 2.46.  *Id.* at ¶ 15.  He admits that he (1) removed the marked arrow location on the display, and (2) changed "Russian language prompts and support for European-specific forms of radar and speed detection."  *Id.*

On the date Stevens made changes to version 2.46, (1) this litigation had been ongoing for over a year; (2) Escort knew that version 2.46 ran some models of the GX65; and (3) Escort knew that the GX65 was alleged by Fleming to infringe his patents.  Under the authorities cited in *Ryan,* Escort was required to maintain the original source code version 2.46 as it was created on July 17, 2013.  Because Escort failed to do so, it has committed spoliation.

Escort recognizes "that Mr. Fleming's argument would be moot if Escort had 'snapshotted' version 2.46" before making those changes.  *See Supplemental Brief*

**Memorandum Decision & Order – page 7**

*(Dkt. No. 297)* at p. 6.  Escort argues, however, that its "failure to follow this course of action was not in bad faith because it is not part of Escort's standard business practice to save stand-alone versions of its source code."  *Id.*  But this business practice has no relevance under *Ryan* because version 2.46 was so clearly relevant to this litigation.

Escort responds that it did not spoliate the source code version 2.46 because it still exists on ESC18692.  But it is undisputed that it does not exist as it was created on July 17, 2013, by Escort's Senior Systems Engineer Jeff Stevens.  As Stevens himself admits, he made certain changes to that original version 2.46.  Stevens alleges that those changes were minor and irrelevant to this litigation, but that does not change the fact that Escort cannot produce the original version 2.46.  That failure establishes spoliation.

Spoliation of evidence "raises a presumption that the destroyed evidence goes to the merits of the case, and further, that such evidence was adverse to the party that destroyed it."  *Apple Inc. v. Samsung,* 888 F.Supp.2d 976, 998 (N.D.Cal. 2012).  The finding of spoliation shifts the burden of proof "to the guilty party to show that no prejudice resulted from the spoliation" because that party "is in a much better position to show what was destroyed and should not be able to benefit from its wrongdoing."  *Id.*

To show a lack of prejudice, Escort compared the hex code version 2.46 on ESC 18692 with the hex code actually loaded into Escort products, and found that they are an exact match.  *See Stevens Declaration, supra* at ¶ 18.  In other words, the

functionality of the source code version 2.46 produced by Escort to Fleming is identical to the functionality of the Escort products that Fleming accuses of infringement.

It remains true that the loss of the original version 2.46 means that programmer comments might be lost, although there is no way to be sure. While those comments do not affect the functionality of a device, they do offer insight into what the programmer was attempting to accomplish. Fleming's expert Douglass Schmidt testified that he uses these comments to "interpret the source code." *See Schmidt Declaration (Dkt. No. 299-12)* at p. 1. He goes on to state that "[w]ithout access to meaningful source code comments and names, it is not possible to efficiently and accurately understand complex software." *Id.* Escort itself has shown the importance it places on programmer comments by making over 100 changes to the source code on ESC 17363 to add comments that would highlight the non-infringing nature of the source code. *See Memorandum Decision (Dkt. No. 178).*

Nevertheless, Escort's expert, Timothy Ramey, testified that in his opinion no programmer comments were deleted. *See Ramey Declaration (Dkt. No. 297-1)* at ¶ 13. He reached that opinion because "the comments in the code were uniform and consistent – deleted comments would be apparent . . . ." *Id.*

As the Court sifts through all this evidence, it finds most important the functional match between the version 2.46 produced by Escort and the version 2.46 actually running Escort's allegedly infringing devices. While the Court cannot be sure

**Memorandum Decision & Order – page 9**

if programmer comments were deleted when Stevens changed the original version 2.46, Ramey's opinion convinces the Court that it is unlikely that any substantive comments were deleted.[1]

For all these reasons, the Court finds that Escort has carried its burden of showing a lack of prejudice from the spoliation. While Fleming has urged the Court to make a finding of infringement based on the spoliation, the Court will refuse to do so because Escort has carried its burden of showing no prejudice.

## Escort's Motion for Reconsideration

**Wasteful Discovery**

The Court would first note that all of its comments in this decision concerning Escort's litigation conduct relate to its prior counsel who have since withdrawn, and do not involve Escort's current counsel.

The Court's original decision found that Escort needlessly forced Fleming through a wasteful discovery process. Escort objects to that conclusion, arguing that (1) it produced version 2.46 precisely as it maintains that code in the ordinary course of its business – that is, embedded in the CD labeled ESC18692; (2) Fleming had previously objected to stand-alone versions of source code; (3) Fleming revealed that he understood how to obtain version 2.46 from ESC18692 in his letter of June 4, 2014;

---

[1] Fleming submitted an email purporting to show Escort's "strategy" of making changes to source code to trick Fleming into believing that the source code was not infringing. That email involved ESC 17363 and so the Court will evaluate it in the context of other pending motions involving ESC 17363.

(4) Escort quickly confirmed Fleming's understanding in Escort's letter of June 20, 2014; and (5) it is a relatively simple process to modify ESC18692 to obtain version 2.46, taking between 20 minutes and 2 hours.

But in the discussion above, the Court has largely rejected these arguments. The key misconduct by Escort that forced Fleming to waste time and effort was Escort's long delay in (1) explaining the source code used for the GX65, (2) explaining that the source code on the face of ESC 18692 was irrelevant, and (3) explaining how ESC 18692 needed to be modified to access version 2.46. None of Escort's rationalizations address these points.

Moreover, Escort's production of ESC 18692 was so much like its fraudulent production of ESC 17363 – as discussed above – that Fleming was entitled to spend long hours trying to unveil any fraud. Escort cannot assail Fleming for the time spent on this production when it was Escort's own acts that created a reasonable suspicion of a second fraud.

Escort argues that Fleming eventually figured out how to modify ESC18692 to obtain version 2.46. So what? After eight months – and with no help from Escort – Fleming had a version of code that *he had obtained himself by modifying discovery.* That is nearly worthless in litigation. Production in discovery is designed to be a binding act. It binds the producing party to a representation that the item produced is what it purports to be. *Maljack Prods., Inc. v. GoodTimes Home Video Corp*., 81 F.3d 881, 889 n. 12 (9th Cir.1996) (holding that documents produced by a party in

Memorandum Decision & Order – page 11

discovery were deemed authentic when offered by the party-opponent); *31 Federal Practice & Procedure: Evidence* § 7105, at 39 (stating that "[a]uthentication can also be accomplished through judicial admissions such as . . . production of items in response to . . . [a] discovery request"). Requiring your opponent to modify discovery to obtain a key piece of evidence mocks the binding effect that production in discovery is designed to create.

Stipulating to authenticity only addresses one of the harms – it does not address verification. Even if Escort admits under Rule 901 that modifications are authentic, Fleming has no way to verify that is true. Fleming can get the modifications admitted under the Rules of Evidence but will never be sure if he has the real thing from Escort. There is therefore an important difference between authentication and verification. That is why Local Rule 3.4 requires the straight-up production of source code. As the Court held in its original decision, "Escort had a duty to produce Version 2.46, not to produce something else, leaving it up to Fleming to figure out how to transform it into what Escort should have produced in the first place." *Memorandum Decision* at p. 6.

Escort takes issue with the Court's finding that Escort's claim that source code version 2.46 could not be produced in a stand-alone version was false. The Court found that Escort's own expert, Dr. Grindon, testified that Escort provided him with a stand-alone Version 2.46 that was not embedded in Version 3.46. *See Grindon Declaration (Dkt. No. 192-4)* at ¶¶ 11-13. Escort argues that the Court was mistaken: Dr. Grindon was "not provided with a stand-alone *source code* version 2.46 but

**Memorandum Decision & Order – page 12**

instead was provided with a stand-alone *hex code* versions 2.46 so that he could confirm the accuracy of the source code." *See Escort's Brief (Dkt. No. 261)* at p. 13 (emphasis in original).  But Escort's explanation gains it nothing.  The reason Escort has never been able to produce a stand-alone original version 2.46 is that Escort spoliated that version of the source code.

In conclusion, the Court can find nothing in Escort's arguments that would persuade it to reconsider its earlier decision.  The Court will therefore deny Escort's motion to reconsider.

**Fleming's Petition for Attorney Fees**

In the Court's original decision, it awarded fees and costs to Fleming, and he has now filed his petition seeking $51,461 in fees and costs.  *See Memorandum Decision (Dkt. No. 231).*  Escort argues again that the Court lacks authority to award fees and costs in this case.  But the Court's earlier decision fully discussed the Court's authority to award fees and costs, and the findings above clearly give the Court that authority for the reasons set forth in the Court's original decision.  There is no dispute over counsel's hourly rate and the Court finds it reasonable.  Escort makes various arguments that the fees are too high, but the Court rejects those arguments and finds the sum of $51,461 adequately compensates Fleming for the wasted time and effort caused by Escort in the way it produced ESC18692.

**Conclusion**

The Court will therefore grant Fleming's motion for reconsideration in part although it will deny the requested remedy that the Court enter a finding of infringement with regard to certain Escort products. The Court will deny Escort's motion for reconsideration. Finally, the Court will grant Fleming's motion for fees in the sum of $51,461.

## ORDER

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that the motion for reconsideration filed by Fleming (docket no. 265) is GRANTED IN PART AND DENIED IN PART. It is granted to the extent that the Court modified its findings as set forth above, but is denied in all other respects.

IT IS FURTHER ORDERED, that the motion for reconsideration filed by Escort (docket no. 260) is DENIED.

IT IS FURTHER ORDERED, that Fleming's fee petition (docket no. 238) is GRANTED and that Escort pay to Fleming the sum of $51,461 representing fees and costs.

DATED: September 4, 2015

B. Lynn Winmill
Chief Judge
United States District Court